UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SARRI ANNE SINGER, JUDITH SINGER, ERIC M.          :
SINGER, ROBERT SINGER, HARRY LEONARD               :
BEER, HARRY LEONARD BEER AS EXECUTOR OF            :
THE ESTATE OF ALAN BEER, HARRY LEONARD             :     **AMENDED COMPLAINT**
BEER AS EXECUTOR OF THE ESTATE OF ANNA             :     **JURY TRIAL DEMANDED**
BEER, PHYLLIS MAISEL, ESTELLE CAROLL,              :
MOSES STRAUSS, PHILIP STRAUSS, BLUMA               :
STRAUSS, AHRON STRAUSS, ROISIE ENGELMAN,           :     **19-cv-6-ENV-RML**
JOSEPH STRAUSS, TZVI WEISS, LEIB WEISS, LEIB       :
WEISS FOR THE ESTATE OF MALKA WEISS,               :
YITZCHAK WEISS, YERUCHAIM WEISS, ESTHER            :
DEUTSCH, MATANYA NATHANSEN, CHANA                  :
NATHANSEN, MATANYA NATHANSEN AND                   :
CHANA NATHANSEN FOR THE ESTATE OF                  :
TEHILLA NATHANSEN, YEHUDIT NATHANSEN,              :
S.N., a minor, HEZEKIEL TOPOROWITCH, PEARL B.      :
TOPOROWITCH, YEHUDA TOPOROWITCH,                   :
DAVID TOPOROWITCH, SHAINA CHAVA NADEL,             :
BLUMY ROM, RIVKA POLLACK, RACHEL                   :
POTOLSKI, OVADIA TOPOROWITCH, TEHILLA              :
GREINIMAN, YISRAEL TOPOROWITCH,                    :
YITZCHAK TOPOROWITCH, MICHAL                       :
HONICKMAN FOR THE ESTATE OF HOWARD                 :
GOLDSTEIN, MICHAL HONICKMAN, EUGENE                :
GOLDSTEIN, LORRAINE GOLDSTEIN, RICHARD             :
GOLDSTEIN, BARBARA GOLDSTEIN INGARDIA,             :
MICHAEL GOLDSTEIN, CHANA FREEDMAN,                 :
DAVID GOLDSTEIN, JULIE AVERBACH FOR THE            :
ESTATE OF STEVEN AVERBACH, JULIE                   :
AVERBACH, TAMIR AVERBACH, DEVIR                    :
AVERBACH, SEAN AVERBACH, ADAM                      :
AVERBACH, MAIDA AVERBACH FOR THE                   :
ESTATE OF DAVID AVERBACH, MAIDA                    :
AVERBACH, MICHAEL AVERBACH, EILEEN                 :
SAPADIN, DANIEL ROZENSTEIN, JULIA                  :
ROZENSTEIN SCHON, ALEXANDER ROZENSTEIN,            :
ESTHER ROZENSTEIN, JACOB STEINMETZ,                :
DEBORAH STEINMETZ, JACOB STEINMETZ AND             :
DEBORAH STEINMETZ FOR THE ESTATE OF                :
AMICHAI STEINMETZ, NAVA STEINMETZ, ORIT            :
MAYERSON, NETANEL STEINMETZ, ANN                   :
COULTER FOR THE ESTATE OF ROBERT L.                :
COULTER, SR., DIANNE COULTER MILLER,               :

ROBERT L. COULTER, JR., DIANNE COULTER          :
MILLER AND ROBERT COULTER, JR. FOR THE          :
ESTATE OF JANIS RUTH COULTER, LARRY             :
CARTER AS THE ADMINISTRATOR OF THE              :
ESTATE OF DIANE LESLIE CARTER, LARRY            :
CARTER, SHAUN CHOFFEL, RICHARD                  :
BLUTSTEIN AND KATHERINE BAKER FOR THE           :
ESTATE OF BENJAMIN BLUTSTEIN, RICHARD           :
BLUTSTEIN, KATHERINE BAKER, REBEKAH             :
BLUTSTEIN, NEVENKA GRITZ FOR THE ESTATE         :
OF DAVID GRITZ, NEVENKA GRITZ, NEVENKA          :
GRITZ FOR THE ESTATE OF NORMAN GRITZ,           :
JACQUELINE CHAMBERS AND LEVANA COHEN            :
AS THE ADMINISTRATORS OF THE ESTATE OF          :
ESTHER BABLAR, JACQUELINE CHAMBERS,             :
LEVANA COHEN, ELI COHEN, SARAH ELYAKIM,         :
JOSEPH COHEN, GRETA GELLER, ILANA               :
DORFMAN, REPHAEL KITSIS AND TOVA                :
GUTTMAN AS THE ADMINISTRATORS OF THE            :
ESTATE OF HANNAH ROGEN, TEMIMA SPETNER,         :
JASON KIRSCHENBAUM, ISABELLE                    :
KIRSCHENBAUM, ISABELLE KIRSCHENBAUM             :
FOR THE ESTATE OF MARTIN KIRSCHENBAUM,          :
JOSHUA KIRSCHENBAUM, SHOSHANA BURGETT,          :
DAVID KIRSCHENBAUM, DANIELLE                    :
TEITELBAUM, NETANEL MILLER, CHAYA               :
MILLER, AHARON MILLER, SHANI MILLER,            :
ADIYA MILLER, ALTEA STEINHERZ, JONATHAN         :
STEINHERZ, TEMIMA STEINHERZ, JOSEPH             :
GINZBERG, PETER STEINHERZ, LAUREL               :
STEINHERZ, GILA ALUF, YITZHAK ZAHAVY,           :
JULIE ZAHAVY, TZVEE ZAHAVY and BERNICE          :
ZAHAVY,                                         :
                                                :
              Plaintiffs,                       :
                                                :
       -against-                                :
                                                :
                                                :
BANK OF PALESTINE,                              :
                                                :
                                                :
              Defendant.                        :
------------------------------------------------------------------------x

Plaintiffs Sarri Anne Singer, Judith Singer, Eric M. Singer, Robert Singer, Harry Leonard Beer, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer as Executor of the Estate of Anna Beer, Phyllis Maisel, Estelle Caroll, Moses Strauss, Philip Strauss, Bluma Strauss, Ahron Strauss, Roisie Engelman, Joseph Strauss, Tzvi Weiss, Leib Weiss, Leib Weiss for the Estate of Malka Weiss, Yitzchak Weiss, Yeruchaim Weiss, Esther Deutsch, Matanya Nathansen, Chana Nathansen, Matanya Nathansen and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, S.N., a minor, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Pollack, Rachel Potolski, Ovadia Toporowitch, Tehilla Greiniman, Yisrael Toporowitch, Yitzchak Toporowitch, Michal Honickman for the Estate of Howard Goldstein, Michal Honickman, Eugene Goldstein, Lorraine Goldstein, Richard Goldstein, Barbara Goldstein Ingardia, Michael Goldstein, Chana Freedman, David Goldstein, Julie Averbach for the Estate of Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, Maida Averbach for the Estate of David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Alexander Rozenstein, Esther Rozenstein, Jacob Steinmetz, Deborah Steinmetz, Jacob Steinmetz and Deborah Steinmetz for the Estate of Amichai Steinmetz, Nava Steinmetz, Orit Mayerson, Netanel Steinmetz, Ann Coulter for the Estate of Robert L. Coulter, Sr., Dianne Coulter Miller, Robert L. Coulter, Jr., Dianne Coulter Miller and Robert L. Coulter, Jr. for the Estate of Janis Ruth Coulter, Larry Carter as the Administrator of the Estate of Diane Leslie Carter, Larry Carter, Shaun Choffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate of David Gritz, Nevenka Gritz, Nevenka Gritz for the Estate of Norman Gritz, Jacqueline Chambers and Levana Cohen as the Administrators of the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen, Eli Cohen, Sarah Elyakim, Joseph Cohen, Greta Geller, Ilana Dorfman, Rephael Kitsis and Tova Guttman as the Administrators of the Estate of Hannah Rogen, Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum, Isabelle Kirschenbaum for the Estate of Martin Kirschenbaum, Joshua Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Aharon Miller, Shani Miller, Adiya Miller, Altea Steinherz, Jonathan Steinherz, Temima Steinherz, Joseph Ginzberg, Peter Steinherz, Laurel Steinherz, Gila Aluf, Yitzhak Zahavy, Julie Zahavy, Tzvee Zahavy and Bernice Zahavy, by their attorneys, allege the following:

## **NATURE OF THE ACTION**

1.       This is a complaint for damages arising out of the unlawful conduct of BANK OF

PALESTINE – a Palestinian bank headquartered in Ain Misbah, Ramallah. BANK OF

PALESTINE aided and abetted the Islamic Resistance Movement ("HAMAS"), a Foreign

Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism

and Effective Death Penalty Act of 1996 ("AEDPA")) by knowingly providing substantial

assistance to HAMAS, and is civilly liable under 18 U.S.C. § 2333(d) of the Anti-Terrorism Act

("ATA") to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person by reason of such acts of international terrorism perpetrated by HAMAS.

2.     BANK OF PALESTINE knowingly – and with awareness of its important role – provided financial services to HAMAS in several related ways set forth below, by maintaining accounts for, and facilitating substantial payments on behalf of, several of HAMAS's leaders and most prominent institutions.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2338, as a civil action brought by citizens of the United States who were killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

4.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

5.     BANK OF PALESTINE is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because it has transacted business and committed tortious acts within the United States (and New York) by transferring funds through the United States (and New York) for the benefit of the FTO HAMAS and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

6.     Specifically, BANK OF PALESTINE effectuated its U.S. dollar-denominated funds transfers through correspondent bank accounts at three banks located in New York: Citibank, N.A. (111 Wall Street, 19th Floor, New York, NY 10043) JP Morgan Chase Bank (4 Chase Metrotech, Brooklyn, NY 11245) and Union Bank of California N.A.

4

7.      During the relevant period, BANK OF PALESTINE purposefully and knowingly used its correspondent bank accounts in New York to facilitate a large volume of U.S. dollar-denominated funds transfers to HAMAS.

## THE PARTIES

A.      **The Plaintiffs**

### THE JAFFA ROAD BUS #14A BOMBING – JUNE 11, 2003

8.      At approximately 5:30 p.m. on June 11, 2003, Abd el-Mu'ati Shabana, a HAMAS suicide bomber dressed as an ultra-Orthodox Jew, boarded Egged Bus #14A at the Mahane Yehuda market. A short while later, as the bus drove down Jaffa Road near the Davidka Square, Shabana detonated his bomb, destroying the bus and killing 17 people and injuring over 100 more, including dozens of bystanders.

**The Singer Family**

9.      Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

10.     On June 11, 2003, Sarri boarded Bus #14A in Jerusalem to meet a friend for dinner. The bus was filled with rush hour commuters. Eventually she was able to take a seat near the window.

11.     Shortly thereafter, Shabana detonated his bomb only two to three seats away from where Sarri was seated, killing everyone sitting and standing near her and causing the roof of the bus to fall in.

12.     When the explosives were detonated, Sarri felt a shockwave across her face.

13.     Sarri was struck with shrapnel from the explosion that entered her shoulder and broke her clavicle.

5

14.     After the blast, she was unable to open her left eye, and her right eye was extremely restricted.

15.     Sarri was unable to hear because of a loud ringing in her ears, and her eardrums ruptured.

16.     Barely walking, Sarri was taken to an ambulance.

17.     She incurred wounds to her face and legs resulting in scarring. She underwent physical therapy and additional surgery.

18.     Shrapnel lodged in Sarri's gums, moving her teeth and necessitating dental work.

19.     As a result of the attack, plaintiff Sarri Anne Singer has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

20.     Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Sarri Anne Singer.

21.     Judith learned of the attack when her son telephoned her at work.

22.     As a result of the attack, plaintiff Judith Singer has experienced severe mental anguish and extreme emotional distress.

23.     Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of plaintiff Sarri Anne Singer.

24.     Eric first learned of the attack when he received an emergency phone call from his father while Eric was having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

25.     As a result of the attack, plaintiff Eric M. Singer has experienced severe mental anguish and extreme emotional distress.

26.     Plaintiff Robert Singer is a citizen of the United States and a resident of the State

of New Jersey. He is the father of plaintiff Sarri Anne Singer.

27.     After learning of the attack, Robert traveled to Israel to be with his daughter.

28.     As a result of the attack, plaintiff Robert Singer has experienced severe mental anguish and extreme emotional distress.

**The Beer Family**

29.     Alan Beer was a citizen of the United States when he died.

30.     Alan was on the bus returning from a condolence call to his friend's family when Shabana detonated his explosives and killed him.

31.     Alan's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to have been in the area of the bombing earlier. Harry then telephoned his other sister, plaintiff Estelle Caroll, and informed her of the terrorist attack.

32.     After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body. Thereafter, Alan's mother, Anna Beer, Harry Leonard Beer and Estelle Caroll flew to Israel to attend Alan's funeral.

33.     Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio. He is the brother of Alan Beer.

34.     Anna Beer was a citizen of the United States and a resident of the State of Ohio when she died in 2016. She was the mother of Alan Beer.

35.     Plaintiff Harry Leonard Beer brings this action in his individual capacity, as the executor of the Estate of Alan Beer, and as the executor of the Estate of Anna Beer.

36.     As a result of Alan's death, plaintiff Harry Leonard Beer has experienced emotional

7

pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

37.    Plaintiff Estelle Caroll is a citizen of the United States and a resident of the State of Virginia. She is a sister of Alan Beer.

38.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel. She is a sister of Alan Beer.

39.    As a result of Alan's death, plaintiffs Estelle Caroll and Phyllis Maisel have experienced emotional pain and suffering, loss of their brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

40.    As a result of Alan's death, (before her death) Anna Beer experienced emotional pain and suffering, loss of her youngest child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE JERUSALEM EGGED BUS #2 BOMBING – AUGUST 19, 2003

41.    On August 19, 2003, Ra'ed Abdul Hamid Misk, a HAMAS suicide bomber, detonated explosives on Egged Bus #2.

42.    Twenty-three people were killed and over 130 others were injured in the attack.

## The Strauss Family

43.    Plaintiff Moses Strauss is a citizen of the United States and a resident of the State of New Jersey.

44.    Moses was studying in Israel in 2003, and was planning to return to the United States in April 2004.

45.    At around 9:00 pm on August 19, 2003, he boarded Egged Bus #2 in Jerusalem after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

46.     Approximately 15 minutes into the bus ride, Moses heard a deafening boom when Misk detonated the explosives on the bus.

47.     Moses fell forward as a result of the explosion. His eyeglasses, jacket, hat and cell phone flew off his body.

48.     As Moses regained his bearings and realized what had occurred, he witnessed people screaming and crying, and he saw blood and body parts all around him.

49.     His clothes were covered with blood, and his hearing was severely impaired.

50.     To exit the bus, Moses stepped over bodies, and in a state of shock made his way toward his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Moses's father, plaintiff Philip Strauss, to tell him Moses had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

51.     As a result of the explosion, Moses's body ached, especially his right ear and hand. After arriving at the hospital, he underwent numerous tests, and doctors removed the shrapnel from his ear and hand.

52.     Days after the attack, Moses still experienced agonizing pain in his ear, and his hearing loss did not improve.

53.     After the attack, Moses returned to the United States without completing his studies in Israel.

54.     Moses was examined by medical specialists in both Israel and the United States. Both physicians confirmed that he would require surgery on his ear.

55.     In the winter of 2004, Moses underwent ear surgery in the United States. His ear is still not completely healed, and he has been told that his condition will never improve. An ear

specialist continues to monitor his condition.

56.     Moses continues to relive the attack, the images of the attack replaying in his mind daily.

57.     As a result of the attack, plaintiff Moses Strauss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

58.     Plaintiff Philip Strauss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Moses Strauss.

59.     Plaintiff Bluma Strauss is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Moses Strauss.

60.     After hearing of the attack, Bluma attempted unsuccessfully to reach Moses on his cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Bluma grew increasingly concerned.

61.     Upon learning that her son was injured in the bombing, Bluma's distress grew.

62.     As a result of the attack, plaintiffs Philip Strauss and Bluma Strauss have experienced severe mental anguish and extreme emotional distress.

63.     Plaintiff Ahron Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

64.     Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

65.     Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact Moses on his cellular telephone but was unable to reach him. She also telephoned her other brother, Ahron, attempting to locate Moses or her parents.

66.     When Roisie finally received the news that Moses had been injured in the bus bombing, she was very concerned and extremely anxious.

67.     Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

68.     Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where Moses lived. Upon arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the plane flight, Joseph experienced great anxiety because he was uncertain if his brother had been present at the bombing.

69.     Ahron Strauss, Roisie Engelman and Joseph Strauss experienced great anxiety after learning of the attack that caused the injuries that Moses sustained.

70.     As a result of the attack, plaintiffs Ahron Strauss, Roisie Engelman and Joseph Strauss have experienced severe mental anguish and extreme emotional distress.

**The Weiss Family**

71.     Plaintiff Tzvi Weiss is a citizen of the United States and a resident of the State of New Jersey.

72.     Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

73.     On the evening of August 19, 2003, Tzvi boarded Egged Bus #2 in Jerusalem after visiting the Kotel, Judaism's holiest site, to pray. He was on his way to a friend's wedding.

74.     As the bus arrived at Shmuel Hanavi Street, he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

75.     In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus

and began to run, stumbling over dead bodies and body parts as he fled the scene.

76.     Tzvi was covered with blood, and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.

77.     Once he got his bearings, Tzvi telephoned one of his brothers, plaintiff Yitzchak Weiss, and waited for him to arrive to accompany him to the hospital.

78.     An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent medical tests.

79.     Both of his eardrums had been completely torn, and his hearing in his left ear was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

80.     Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

81.     After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

82.     Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

83.     Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the

surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

84.     As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

85.     Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer realize the academic success that he had achieved prior to the attack.

86.     As a result of the attack, plaintiff Tzvi Weiss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

87.     Plaintiff Leib Weiss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Tzvi Weiss.

88.     Malka Weiss was a citizen of the United States and a resident of the State of New York when she died in 2018. She was the mother of plaintiff Tzvi Weiss.

89.     Plaintiff Leib Weiss brings this action both individually and as the legal representative of the Estate of Malka Weiss.

90.     Leib Weiss and Malka Weiss experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

91.     As a result of the attack, plaintiffs Leib Weiss and Malka Weiss (before her death) have experienced severe mental anguish and extreme emotional distress.

92.     Plaintiff Yitzchak Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

13

93.     Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

94.     Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

95.     Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

96.     As a result of the attack, plaintiffs Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch have experienced severe mental anguish and extreme emotional distress.

**The Nathansen/Toporowitch Family**

97.     Tehilla Nathansen was a citizen of the United States and a resident of the State of Israel when she died.

98.     Tehilla was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack on August 19, 2003.

99.     The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

100.    Plaintiff Matanya Nathansen is a citizen and resident of the State of Israel. He is the father of Tehilla Nathansen.

101.    Plaintiff Chana Nathansen is a citizen of the United States and a resident of the State of Israel. She is the mother of Tehilla Nathansen.

102.    Plaintiffs Matanya Nathansen and Chana Nathansen bring this action individually, on behalf of the Estate of Tehilla Nathansen, and on behalf of their minor daughter, S.N.

103.    As a result of the explosion, Matanya suffered fractures in both feet and in his collar

bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

104.   As a result of the attack, plaintiff Matanya Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries he sustained, from witnessing and experiencing first-hand the death of his 3-year-old daughter, Tehilla, as well as the severe injuries sustained by his wife and young daughters (all of whom are U.S. citizens).

105.   Chana was severely injured in the explosion that killed Tehilla, was taken to Hadassah Hospital, and remained there for 12 days.

106.   Although Chana repeatedly asked about Tehilla's whereabouts, she did not learn until the next day that she had been killed. That uncertainty was torture for Chana.

107.   Chana's spleen was torn, and her ribs were broken.

108.   She had seven ball bearings that caused holes in her chest, leg and arm that had to be removed from her body.

109.   She has undergone numerous surgeries.

110.   Shrapnel lodged throughout her body, including her eye.

111.   Chana's hip was crushed, necessitating a hip replacement. She still experiences pain in that area.

112.   Her hearing is impaired and she suffers from tinnitus.

113.   Chana cannot walk long distances, and she has a limited range of movement.

114.   She feels indescribable pain at losing Tehilla and seeing her daughter Yehudit injured and her daughter S.N. severely injured.

115.   Chana has undergone psychological counseling.

116.    As a result of the attack, plaintiff Chana Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries she sustained, from witnessing and experiencing first-hand the death of her 3-year-old daughter, Tehilla, and witnessing the severe injuries sustained by her daughters, plaintiff S.N., a minor, and plaintiff Yehudit Nathansen.

117.    Plaintiff Yehudit Nathansen is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff S.N.

118.    At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

119.    Yehudit incurred cuts on her neck and waist from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

120.    She hears constant noise in her ears, which makes her tense.

121.    Yehudit suffered nightmares, sadness and guilt and underwent psychological counseling.

122.    As a result of the attack, plaintiff Yehudit Nathansen has sustained physical injuries and experienced severe mental anguish and extreme emotional distress due to her own injuries and from witnessing and experiencing first-hand the death of her 3-year-old sister, Tehilla, as well as the severe injuries sustained by her mother, father, and baby sister.

123.    Plaintiff S.N., a minor, is a citizen of the United States and a resident of the State of Israel. She is a daughter of Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff Yehudit Nathansen.

124.    S.N. was sitting on Chana's lap at the time of the explosion. She was 5 months old

at the time. As a result of the explosion, S.N. sustained burns all over her face, and her eardrums were ruptured.

125.    She suffered bilateral lung contusions and a fracture of her left femur and right leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs.

126.    S.N. also had multiple shrapnel and metal pellets lodged in her body, including in her eyes, and a laceration of the bone of her left forearm and in her left wrist. She has pain in her upper left arm.

127.    She is hearing impaired and suffers from tinnitus.

128.    She underwent psychological counseling.

129.    As a result of the attack, plaintiff S.N. has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

130.    Plaintiff Hezekial Toporowitch is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

131.    Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

132.    In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla, and crippled their daughter, Chana. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

133.    In the aftermath of the bombing, Chana, Matanya, and their children were transferred to different hospitals thereby complicating the family's efforts to locate them.

134.    Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body, but was in too much shock to do so. He was initially told to identify the bodies of two granddaughters since S.N. had not yet been identified at the hospital and was thought to be deceased.

135.    As a result of the attack, plaintiff Hezekial Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

136.    As a result of the attack, plaintiff Pearl B. Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by her daughter, and injuries sustained by her granddaughters and son-in-law.

137.    Plaintiff Yehuda Toporowitch is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

138.    In the middle of the night Yehuda was notified by telephone of the bombing that had killed his niece and crippled his sister.

139.    He had been working at a resort when he received the telephone call, and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

140.    Yehuda rushed home, traveled with his parents to the Tel Aviv area, and stopped at the home of one of his sisters. He took a taxicab to the central morgue and attempted to identify Tehilla's remains but could not positively identify them because of the nature and extent of

18

Tehilla's injuries.

141.     Yehuda then made arrangements for necessary DNA testing, which ultimately confirmed his niece's identity.

142.     As a result of the attack, plaintiff Yehuda Toporowitch has experienced severe mental anguish and extreme emotional distress from the death of his 3-year-old niece, Tehilla, and the attempt to identify her remains. He has also experienced severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

143.     Plaintiff David Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

144.     David was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself after his family had already left for Jerusalem.

145.     Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

146.     As a result of the attack, plaintiff David Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries sustained by his sister and other niece.

147.     Plaintiff Shaina Chava Nadel is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

148.    Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

149.    As a result of the attack, plaintiff Shaina Chava Nadel has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

150.    Plaintiff Blumy Rom is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

151.    Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

152.    As a result of the attack, plaintiff Blumy Rom has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

153.    Plaintiff Rivka Pollack is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

154.    Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

155.    She stayed with her baby niece S.N., caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply affected her.

156.    As a result of the attack, plaintiff Rivka Pollack has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

157.    Plaintiff Rachel Potolski is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

158.    Like the rest of her immediate family, Rachel experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

159.    As a result of the attack, plaintiff Rachel Potolski has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

160.    Plaintiff Ovadia Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

161.    Like the rest of his immediate family, Ovadia experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

162.    As a result of the attack, plaintiff Ovadia Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece,

Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

163.    Plaintiff Tehilla Greiniman is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

164.    Like the rest of her immediate family, Tehilla experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

165.    As a result of the attack, plaintiff Tehilla Greiniman has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

166.    Plaintiff Yisrael Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

167.    Like the rest of his immediate family, Yisrael experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

168.    As a result of the attack, plaintiff Yisrael Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

169.    Plaintiff Yitzchak Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

170.    Like the rest of his immediate family, Yitzchak experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with

the pain and loss experienced by his younger sister.

171.    As a result of the attack, plaintiff Yitzchak Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

## THE SHOOTING ATTACK ON ROUTE #60 – JUNE 20, 2003

172.    On June 20, 2003, Ahmad Najjar and Farah Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60 near the Yabroud underpass, killing one person and seriously injuring three others.

### The Goldstein Family

173.    Howard Goldstein was a citizen of the United States and a resident of the State of Israel when he died.

174.    He was murdered on June 20, 2003, while driving his car with his parents on Route #60 in Israel.

175.    Howard was driving his parents and his wife from Eli to Jerusalem where they had stayed the previous night following the wedding of Howard's son, plaintiff David Goldstein. Howard and his wife and parents were traveling for a weekend in Jerusalem to further celebrate David's wedding (which had taken place the previous night).

176.    While Howard was driving, Howard's father, plaintiff Eugene Goldstein, was seated in the front passenger seat and Howard's mother, plaintiff Lorraine Goldstein, was seated behind her husband. Howard's wife, plaintiff Michal Goldstein (now Michal Honickman), was seated in the rear seat of the car, on the driver's side, behind Howard.

177.    At some point, as Howard was driving, Eugene noticed two individuals on the side of the road near the Yabroud underpass. As the Goldsteins' car approached, the men turned and

began rapidly firing their guns at the Goldsteins' vehicle.

178.    Howard was struck by at least one bullet and ultimately succumbed to his injuries while driving and slumped over the steering wheel.

179.    At some point in time, while Howard was slumped over the steering wheel, Eugene grabbed the steering wheel and maintained control of the car until it crashed and rolled over, approximately eight miles south of where the HAMAS gunmen had opened fire.

180.    Plaintiff Michal Honickman, formerly known as Mindy Goldstein, is a citizen of the United States and a resident of the State of Nevada. She is the widow of Howard Goldstein.

181.    Plaintiff Michal Honickman brings this action both individually and as the legal representative of the Estate of Howard Goldstein.

182.    As a result of the attack, Michal was injured when glass fragments from the vehicle's windows struck her body, including her left eye. She also sustained hairline fractures of her ribs, bruising, and physical trauma when the vehicle eventually crashed and rolled over.

183.    Michal has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress having been present during the attack, and witnessed the death of her husband, whom she had to bury and mourn with her children, while her in-laws were hospitalized, all in the context of what had been, prior to that point, a joyous family occasion celebrating her son David's wedding.

184.    As a result of Howard's death, plaintiff Michal Honickman experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

185.    Plaintiff Eugene Goldstein is a citizen of the United States and a resident of the State of Florida. He is the father of Howard Goldstein.

186.     Plaintiff Lorraine Goldstein is a citizen of the United States and a resident of the State of Florida. She is the mother of Howard Goldstein.

187.     Eugene suffered multiple gunshot wounds in the attack.

188.     His shoulder blade was fractured, and his lungs were punctured. Shrapnel was lodged in his lung, liver and kidneys. A bullet remains stuck between his heart and his lungs.

189.     These injuries, which caused Eugene immense pain, were life threatening. Indeed it was highly improbable that Eugene would survive them.

190.     Eugene's injuries necessitated insertion of a trocar, a metal cylinder used to drain blood from his chest and facilitate insertion of a chest tube to maintain suction and permit healing of the lung. Insertions of a trocar and chest tube are extremely painful.

191.     Eugene was unable to see Lorraine for approximately five days after the attack and did not have specific information about her condition. His uncertainty about Lorraine's condition caused him immense anxiety.

192.     As a result of the attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three months to monitor their condition.

193.     As a result of the attack, Eugene has difficulty falling and remaining asleep. He constantly replays the image of the attack in his mind.

194.     He blames himself for taking his wife to attend his grandson's wedding.

195.     Lorraine was shot multiple times and severely injured in the attack.

196.     She suffered a bullet fragment injury from a bullet that clipped the tip of her nose and her left upper lip and lodged in her mouth. The fragment necessitated intubation and emergency surgery, during which the fragment was removed from an area less than an inch from the carotid sheath, which contains the carotid artery and the internal jugular vein. Disruption of

either of them would have resulted in her death.

197.    At one point during her hospital stay, Lorraine was placed on life support.

198.    Lorraine's chewing muscles were severely and permanently damaged, and she could not eat solid food for approximately one year.

199.    She required physiotherapy that encompassed use of a ratchet-like device designed to force her jaws open. It was very painful.

200.    Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from fully opening it. She still suffers from pain and headaches.

201.    She requires bridges (partials) because she lost her teeth as a result of the attack, and extensive periodontal and dental work.

202.    She was also struck by bullets that entered her body through her left shoulder and right lower neck. The resulting wounds caused her excruciating pain at the time.

203.    She must also deal with the harmful effects of shrapnel that lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations.

204.    Lorraine had difficulty sleeping because she thought about Howard's death.

205.    Eugene and Lorraine remained in Jerusalem at Hadassah Hospital for approximately 10 days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his lungs.

206.    As a result of the attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

207.     As a result of Howard's death, plaintiffs Eugene Goldstein and Lorraine Goldstein have experienced emotional pain and suffering, loss of their son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

208.     The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

209.     The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene and Lorraine being pulled from the wreckage of the car Howard had been driving.

210.     Lorraine's face and hair were covered with blood.

211.     Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York. He is a son of plaintiffs Eugene Goldstein and Lorraine Goldstein and a brother of Howard Goldstein.

212.     After learning of the attack, plaintiff Richard Goldstein telephoned his sister, plaintiff Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

213.     As a result of the attack, plaintiff Richard Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

214.     As a result of Howard's death, Richard Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

215.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene Goldstein and Lorraine Goldstein and the sister of Howard Goldstein.

216.    Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

217.    In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

218.    Barbara blames herself for encouraging her parents to attend the wedding.

219.    As a result of the attack, plaintiff Barbara Goldstein Ingardia has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of her parents.

220.    As a result of Howard's death, Barbara Goldstein Ingardia has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

221.    Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a son of plaintiffs Eugene Goldstein and Lorraine Goldstein and a brother of Howard Goldstein.

222.    As a result of the attack, plaintiff Michael Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

223.    As a result of Howard's death, Michael Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and

severe mental anguish and extreme emotional distress.

224.    Plaintiff Chana Freedman is a citizen of the United States and a resident of the State of New York. She is the daughter of Howard Goldstein and plaintiff Michal Goldstein.

225.    Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

226.    Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

227.    When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

228.    Chana informed her brother, David and his wife, who had just been married, of the attack when they arrived at the hospital.

229.    As a result of Howard's death, plaintiff Chana Freedman has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

230.    Plaintiff David Goldstein is a citizen of the United States and a resident of the State of Israel. He is the son of Howard Goldstein and plaintiff Michal Goldstein.

231.    At the time of the attack, David was at a Jerusalem hotel awaiting his family's arrival for weekend wedding celebrations when he was notified that something had happened to his parents and his grandparents, and that they had been taken to Hadassah Hospital.

232.    Upon his arrival at the hospital, David learned that his father had been killed in the attack, and that his mother and grandparents had been injured.

233.    Prior to the attack, David frequently spoke to his father, including on the morning

of his father's death.

234.    As a result of Howard's death, plaintiff David Goldstein has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE COMMUTER BUS #6 BOMBING – MAY 18, 2003

235.    On May 18, 2003, Basem Takruri, a HAMAS suicide bomber, boarded Bus #6, a commuter bus heading for Jerusalem, and detonated his explosives.

236.    Seven people ranging in age from 35 to 68, were killed by the explosion, and 20 others were injured.

## The Averbach Family

237.    Steven Averbach was a citizen of the United States and a resident of the State of Israel when he died.

238.    Steven died in 2010 as a result of injuries sustained during the suicide bombing that occurred on May 18, 2003. He was 44 years old.

239.    At the time of the attack Steven resided near Tel Aviv, Israel. He was a married father of four sons ranging in age from 2 to 13 at the time. Steven and his wife, Julie, were married in 1994 and have two sons together, Sean Averbach and Adam Averbach.

240.    Steven's older sons, Tamir and Devir are from a prior marriage.

241.    On May 18, 2003, Steven boarded the commuter bus heading for Jerusalem and took a seat facing the back.

242.    As the bus pulled away from the stop, it suddenly stopped and the bus driver allowed another passenger to get on.

243.    Steven caught a glimpse of him and saw that he was wearing a heavy coat in warm

weather that covered bulges underneath it. He also saw what looked like a trigger mechanism in his right hand.

244.    Having worked in the anti-terrorist division in the Israeli Army and the Israeli Police, knowing that Israeli buses do not usually pick up passengers after they have begun to leave the station, seeing the tension on the faces of the people on the bus, and taking into account Takruri's aforementioned suspicious characteristics, Steven immediately recognized that a terrorist attack was imminent.

245.    Steven grabbed the gun he carried and turned toward Takruri, who detonated the explosives.

246.    Steven absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

247.    Steven sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

248.    Following surgery, Steve was moved to intensive care where he stayed for five weeks. He almost died there several times because of an extremely high fever and from the blast injury to his lungs. He subsequently underwent numerous operations to his back, groin and gastric intestines. He also had a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

249.    Steven was forced to return to the Intensive Care Unit at least twice with complications.

250.    Steven was paralyzed from his neck down.

251.    On more than one occasion, Steven pleaded with his doctors and family members to take him off of life support.

252.    He was completely dependent on the 24-hour care provided to him, and had no foreseeable hope of recovery.

253.    Steven lived in constant pain. He battled depression and took antidepressants.

254.    As a result of the attack, Steven Averbach sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from May 18, 2003 until his death.

255.    Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the widow of Steven Averbach, and the mother of plaintiffs Sean Averbach and Adam Averbach.

256.    Plaintiff Julie Averbach brings this action both individually and as the legal representative of the Estate of Steven Averbach.

257.    As a result of the injuries Steven sustained, Julie had to relocate her family to be closer to the rehabilitation center where Steven resided for nearly a year. Steven moved home from the rehabilitation center in July 2004, but required continuous 24-hour care. Following the attack, Julie was, in most respects, a single parent and could not enjoy the normal companionship, day-to-day assistance and mutual support that she had previously received from her husband.

258.    Julie underwent psychological counseling after the attack.

259.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Julie Averbach has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

32

260.    Plaintiff Tamir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

261.    After the attack, Tamir underwent psychological counseling for approximately one year.

262.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Tamir Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

263.    Plaintiff Devir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

264.    After the attack, Devir experienced difficulty making friends, his grades declined, he cried, and he felt angry. He also underwent psychological counseling.

265.    Tamir and Devir witnessed their father's relentless and painful suffering and repeated surgeries and brushes with death. They remember what it was like before the attack, when he was an able-bodied man.

266.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Devir Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

267.    Plaintiff Sean Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

268.    As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father. Due to the severity

of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father were denied to him.

269.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Sean Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

270.    Plaintiff Adam Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

271.    As a result of the brutal attack on his father he has been emotionally traumatized and does not remember a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, playing sports together, or driving in a car with his father were denied to him.

272.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Adam Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

273.    David Averbach was a United States citizen and resident of the State of New Jersey when he died in 2013. He was the father of Steven Averbach.

274.    Plaintiff Maida Averbach is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Steven Averbach.

275.    Plaintiff Maida Averbach brings this action both individually and as the legal representative of the Estate of David Averbach.

276.    Maida Averbach and David Averbach had returned home late on May 17, 2003,

from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's body leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

277.    After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that Steven had been grievously wounded by the explosion and a ball bearing had lodged between his C3 and C4 vertebrae.

278.    As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

279.    At the time of the attack, David Averbach and Maida Averbach had partially retired from their jobs so that they could spend more time with Steven and his children.

280.    Following the attack, Steven's constant inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steven's four children were a constant source of anguish to both of his parents.

281.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, (before he died) David Averbach experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

282.    Plaintiff Maida Averbach experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack from the moment she saw her son's body on television in the early morning hours of May 18, 2003.

283.    As a result of the suffering that Steven experienced following the attack and his

death that resulted from the injuries sustained in the attack, plaintiff Maida Averbach has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

284.    Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Steven Averbach.

285.    Michael Averbach has always looked up to his brother and admired him. The injuries that his brother sustained, as well as his subsequent death, have been a severe emotional blow to Michael.

286.    Since the date of the attack, Michael flew to Israel repeatedly, often at his brother's request, simply to sit by Steven's bedside and talk.

287.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Michael Averbach has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

288.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Steven Averbach.

289.    Eileen was staying at her parents' home with her husband and three of her four children on the morning her mother received notification of the attack.

290.    Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack, as well his subsequent death.

291.    After the attack, she suffered from anxiety and depression, had trouble sleeping, and cried every day.

292.    Since the attack, she lost more than thirty pounds and has suffered physical

exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother, and subsequently resulted in his death.

293.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Eileen Sapadin has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING IN TEL AVIV – APRIL 30, 2003

294.    On April 30, 2003, Asif Muhammad Hanif, a HAMAS suicide bomber, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives,[1] killing three people and injuring more than 50 others.

295.    Hanif, 22, was a British citizen who entered Israel through Jordan.

**The Rozenstein Family**

296.    Plaintiff Daniel Rozenstein is a citizen of the United States and a resident of the State of Florida.

297.    Daniel was seated inside the bar and decided to step outside when he crossed paths with Hanif in the entryway just as he detonated his explosives.

298.    As a result of the attack, Daniel suffered second degree burns over his entire body.

299.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for two weeks. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

300.    As a result of the bombing, he sustained severe hearing loss. He has also suffered a

---

[1]      There were actually two bombers, both British nationals sent by HAMAS, but the explosive belt on one of the terrorists failed to detonate.

permanent loss of balance, is often dizzy, and frequently experiences black outs.

301.   Daniel's right hand no longer functions properly as it is covered in scar tissue. Much of the rest of his body is also covered by scar tissue, including his back.

302.   He also suffers from memory loss, nightmares and post-traumatic stress disorder ("PTSD"). He has also sustained a traumatic brain injury ("TBI") and undergone psychological counseling.

303.   As a result of the attack, plaintiff Daniel Rozenstein has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

304.   Plaintiff Julia Rozenstein Schon is a citizen of the United States and a resident of the State of Florida. She is the sister of plaintiff Daniel Rozenstein.

305.   On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there had been an attack and that no one was certain of Daniel's condition.

306.   When Julia first saw Daniel, she did not recognize him because his body was horribly burned, and his face and ears were swollen beyond recognition. She spent many days in the hospital and was there when her brother slipped into a coma.

307.   Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

308.   As a result of the attack, plaintiff Julia Rozenstein Schon has experienced severe mental anguish and extreme emotional distress.

309.   Plaintiff Alexander Rozenstein is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Daniel Rozenstein.

310.   As a result of the attack, plaintiff Alexander Rozenstein has experienced severe

mental anguish and extreme emotional distress.

311.    Plaintiff Esther Rozenstein is a citizen of the United States and a resident of the State of Florida. She is the mother of plaintiff Daniel Rozenstein.

312.    As a result of the attack, plaintiff Esther Rozenstein has experienced severe mental anguish and extreme emotional distress.

## THE SHOOTING ATTACK ON ROUTE #60 – JANUARY 29, 2003

313.    On January 29, 2003, Farah Hamad and Yasser Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60, seriously injuring one person.

### The Steinmetz Family

314.    Plaintiff Jacob Steinmetz is a citizen of the United States and a resident of the State of Israel.

315.    Plaintiff Deborah Steinmetz is a citizen of the United States and a resident of the State of Israel. She is the wife of Jacob Steinmetz.

316.    On January 29, 2003, Jacob was driving their car on Route #60. Deborah sat in the front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

317.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

318.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

319.    Four metal spikes were surgically inserted into his bone in order to restrain his arm. The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed. Jacob received a skin graft from his leg to cover the opening in

his elbow.

320.   In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

321.   Presently, the use of Jacob's arm is greatly limited.

322.   As a result of the attack, plaintiff Jacob Steinmetz has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

323.   As a result of being in the car that terrorists targeted, plaintiff Deborah Steinmetz has experienced great anxiety and severe mental anguish and extreme emotional distress.

324.   Amichai Steinmetz was a citizen of the United States when he died. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

325.   In 2009, Amichai Steinmetz went missing while on a trip to India. In December 2015, an Israeli court declared Amichai Steinmetz dead.

326.   Following the attack and prior to his declaration of death in 2015, Amichai Steinmetz experienced severe mental anguish and extreme emotional distress as a result of the attack.

327.   Plaintiffs Jacob Steinmetz and Deborah Steinmetz bring this action both individually and on behalf of the Estate of Amichai Steinmetz.

328.   Plaintiff Nava Steinmetz is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

329.   Plaintiff Orit Mayerson is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

330.   Plaintiff Netanel Steinmetz is a citizen of the United States and a resident of the State of Israel. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

331.    As a result of the attack, plaintiffs Nava Steinmetz, Orit Mayerson and Netanel Steinmetz have experienced severe mental anguish and extreme emotional distress.

## THE HEBREW UNIVERSITY CAFETERIA BOMBING – JULY 31, 2002

332.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A bomb planted inside the cafeteria exploded, killing nine people, five of them Americans, and injuring as many as 70 others.

333.    HAMAS planned and perpetrated the attack.

334.    Mohammad Odeh, a HAMAS operative, who worked at Hebrew University as a painter for an Israeli contractor, set off the bomb.

**The Coulter Family**

335.    Janis Ruth Coulter was a citizen of the United States when she died.

336.    Janis was in the cafeteria when the bomb exploded, killing her and injuring her friend who was eating lunch with her.

337.    Janis was the assistant director of the Hebrew University's Rothenberg International School's Office of Academic Affairs in New York.

338.    She had arrived in Israel just one day before the bombing to accompany a group of 19 American students who were scheduled to attend classes at the university.

339.    Robert L. Coulter, Sr. was a citizen of the United States and a resident of the State of Massachusetts when he died in 2018. He was the father of Janis Ruth Coulter.

340.    Robert L. Coulter, Sr.'s widow, Ann Coulter, brings this action on behalf of the Estate of Robert Coulter, Sr.

341.    Robert L. Coulter, Sr. was watching television news that morning in the United

States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw Janis's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Robert L. Coulter, Sr. and his daughter desperately tried to reach Janis on her cell phone without success.

342.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts. She is the sister of Janis Ruth Coulter.

343.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Janis Ruth Coulter.

344.    Plaintiffs Dianne Coulter Miller and Robert L. Coulter, Jr. bring actions individually and as the legal representatives of the Estate of Janis Ruth Coulter.

345.    Robert L. Coulter, Jr. had heard about the bombing on the radio on the way to work, but did not make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria, whereupon he drove immediately to his father's house.

346.    Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

347.    As a result of Janis's death, (before his own death in 2018) plaintiff Robert L. Coulter, Sr. experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

348.    As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

349.    As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Carter Family**

350.    Diane Leslie Carter was a citizen of the United States when she died.

351.    She was eating lunch in the cafeteria when the bomb exploded.

352.    Diane was killed by the bomb blast.

353.    In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

354.    Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Leslie Carter.

355.    Plaintiff Larry Carter brings this action both individually and as the Administrator of the Estate of Diane Leslie Carter.

356.    Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

357.    Plaintiff Shaun Choffel is a citizen of the United States and a resident of the State of Virginia. She is the sister of Diane Leslie Carter.

358.    Both Larry and Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

359.    As a result of Diane's death, plaintiff Larry Carter has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and

severe mental anguish and extreme emotional distress.

360.    As a result of Diane's death, plaintiff Shaun Choffel has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Blutstein Family**

361.    Benjamin Blutstein was a citizen of the United States when he died.

362.    He was killed by the bomb blast.

363.    Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

364.    Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' hometown of Harrisburg, Pennsylvania.

365.    Plaintiff Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. He is the father of Benjamin Blutstein.

366.    Plaintiff Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania. She is the mother of Benjamin Blutstein.

367.    Plaintiffs Richard Blutstein and Katherine Baker bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

368.    Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

369.    Richard first heard about the attack while watching Fox News early in the morning. He then called Benjamin's cell phone and heard a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive

identification, Richard received a call confirming Benjamin's death.

370.    Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine. Katherine then composed herself enough to inform her daughter, Rebekah.

371.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

372.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

373.    Although Rebekah's father had informed her about the attack, Rebekah learned that her brother had died when her mother telephoned her.

374.    As a result of Benjamin's death, plaintiff Rebekah Blutstein has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Gritz Family**

375.    David Gritz was a citizen of the United States when he died.

376.    He was killed by the bomb blast.

377.    He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

378.    He died after being in Israel for only two weeks.

379.    Norman Gritz was a citizen of the United States and a resident of France when he

died in 2005. He was the father of David Gritz.

380.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

381.    Plaintiff Nevenka Gritz brings this action individually and on behalf of the Estate of David Gritz and the Estate of Norman Gritz.

382.    Nevenka and Norman were in New York on the day their son was murdered. Friends informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

383.    As a result of David's death, (prior to his death) Norman Gritz experienced emotional pain and suffering, loss of his only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

384.    As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of her only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING – MAY 7, 2002

385.    On the night of May 7, 2002, Muhammad Muammar, a HAMAS suicide bomber, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

386.    Fifteen people were killed in the attack, and more than 50 others were injured.

**The Bablar Family**

387.    Esther Bablar was a citizen of the United States when she died.

46

388.    Although Esther initially survived the attack, she died of her injuries the following morning.

389.    Plaintiff Jacqueline Chambers is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

390.    Plaintiff Levana Cohen is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

391.    Plaintiffs Jacqueline Chambers and Levana Cohen bring actions both individually and on behalf of the Estate of Esther Bablar.

392.    Esther had spent the month before the bombing in Florida with her youngest daughter, Levana, who had just given birth to Esther's grandchild. The day before the attack she had been in New York visiting her other daughter, Jacqueline.

393.    On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister, Sarah Elyakim, in New York and told her the tragic news. Eventually Esther's daughters were notified and they quickly made arrangements to fly to Israel with their aunt and uncle.

394.    As a result of Esther's death, plaintiff Jacqueline Chambers has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

395.    As a result of Esther's death, plaintiff Levana Cohen has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

396.    Plaintiff Eli Cohen is a citizen of the United States and a resident of the State of New York. He is the son of Esther Bablar. He is being represented by his legal guardian, plaintiff

Jacqueline Chambers.

397.    As a result of Esther's death, plaintiff Eli Cohen has experienced emotional pain and suffering, and the loss of his mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

398.    Plaintiff Sarah Elyakim is a citizen of the United States and a resident of the State of New York. She is the sister of Esther Bablar.

399.    As a result of Esther's death, plaintiff Sarah Elyakim has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

400.    Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of New York. He is the brother of Esther Bablar.

401.    As a result of Esther's death, plaintiff Joseph Cohen has experienced emotional pain and suffering and the loss of his sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA – MARCH 27, 2002

402.    On March 27, 2002, Abd al-Baset Odeh, a HAMAS suicide bomber, blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover, and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends.

403.    Thirty people were killed and 140 others were injured.

**The Rogen Family**

404.    Hannah Rogen was a citizen of the United States when she died.

405.    Hannah was severely wounded in the attack and died of her wounds six days later,

on April 2, 2002.

406.    Hannah was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

407.    Greta Geller is the great niece of Hannah Rogen. She, along with Ilana Dorfman, Rephael Kitsis, and Tova Guttman, bring this action as the court-appointed administrators of the Estate of Hannah Rogen.

## THE BEN YEHUDA STREET BOMBINGS – DECEMBER 1, 2001

408.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Bahar, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed and 188 others were injured.

409.    After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

### The Spetner Family

410.    Plaintiff Temima Spetner is a citizen of the United States and a resident of the State of Missouri.

411.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

412.    As a result of the attack, the femoral artery of Temima's right leg was severed. She

was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

413.    There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

414.    Temima has also experienced psychological trauma as a result of the attack.

415.    As a result of the attack, plaintiff Temima Spetner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

416.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

417.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

418.    As a result of the first explosion, Jason was thrown to the ground. As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

419.    When he got up the second time he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off. When he began running up the street for help, he felt a sharp pain in his leg and back.

420.    Jason was taken to Shaare Zedek Hospital in Jerusalem where he underwent two operations. Surgeons removed 8 metal bolts from his arm, leg and back.

421.    Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

422.    As a result of the attack, plaintiff Jason Kirschenbaum has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

423.    Plaintiff Isabelle Kirschenbaum is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jason Kirschenbaum.

424.    Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York when he died in 2008. He was the father of plaintiff Jason Kirschenbaum.

425.    Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

426.    Isabelle first learned of the double suicide bombing while watching CNN. After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

427.    As a result of the attack, plaintiff Isabelle Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

428.    Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

429.    As a result of the attack, (before his death) Martin Kirschenbaum experienced severe mental anguish and extreme emotional distress.

430.    Plaintiff Joshua Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

431.    Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle telephoned Joshua to advise him that his brother Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Zedek Hospital in Jerusalem.

432.     As a result of the attack, plaintiff Joshua Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

433.     Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of plaintiff Jason Kirschenbaum.

434.     As a result of the attack, plaintiff Shoshana Burgett has experienced severe mental anguish and extreme emotional distress.

435.     Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

436.     As a result of the attack, plaintiff David Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

437.     Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of plaintiff Jason Kirschenbaum.

438.     As a result of the attack, plaintiff Danielle Teitelbaum has experienced severe mental anguish and extreme emotional distress.

**The Miller Family**

439.     Plaintiff Netanel Miller is a citizen of the United States and a resident of the State of Israel.

440.     On the evening of December 1, 2001, Netanel was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet away from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

441.     A nut from the bomb lodged in the upper part of Netanel's leg. Other nuts hit him in the back, resulting in burns. His hand and knee were also injured.

442.    Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

443.    Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

444.    Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

445.    Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

446.    Netanel was admitted to the hospital and remained there for two days.

447.    Netanel endured the pain in his leg for nearly two years.

448.    The pain in Netanel's leg became so severe that he had to undergo surgery, and the nut that was still lodged in his leg was finally removed.

449.    It is still painful for Netanel to hike, an activity that he has always enjoyed.

450.    Netanel had flashbacks as a result of the attack and underwent psychological counseling.

451.    As a result of the attack, plaintiff Netanel Miller has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

452.    Plaintiff Chaya Miller is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Netanel Miller.

453. Upon learning that her son Netanel had been injured in the bombing and knowing he has suffered greatly as a result of those injuries, plaintiff Chaya Miller experienced great concern and anxiety.

454. As a result of the attack, plaintiff Chaya Miller has experienced severe mental anguish and extreme emotional distress.

455. Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of plaintiff Netanel Miller.

456. Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

457. Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

458. As a result of the attack, plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional distress.

**The Steinherz Family**

459. Plaintiff Altea Steinherz is a citizen of the United States and a resident of the State of Israel.

460. Plaintiff Jonathan Steinherz is a citizen of the United States and a resident of the State of Israel. He was the husband of plaintiff Altea Steinherz at the time of the attack.

461. On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

462. Altea wanted to get home to her daughter who was with a babysitter at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

463.    A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

464.    While walking in the street, they saw a crazed-looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

465.    As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

466.    She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

467.    Altea was afraid that, as a result of her falls, her pregnancy might have terminated.

468.    Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

469.    Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

470.    Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

471.    As a result of the attack, plaintiff Altea Steinherz sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

472.    As a result of the attack, plaintiff Jonathan Steinherz experienced severe mental anguish and extreme emotional distress.

473.    Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of plaintiffs Altea Steinherz and Jonathan Steinherz.

474.    As a result of the attack, plaintiff Temima Steinherz has experienced severe mental

anguish and extreme emotional distress.

475.    Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Altea Steinherz.

476.    As a result of the attack, plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional distress.

477.    Plaintiff Peter Steinherz is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Jonathan Steinherz.

478.    Plaintiff Laurel Steinherz is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jonathan Steinherz.

479.    As a result of the attack, plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional distress.

## PATT JUNCTION BUS # 32A BOMBING – JUNE 18, 2002

480.    At approximately 7:50 a.m. on June 18, 2002, Muhamad al-Ghoul, a HAMAS terrorist, boarded Bus #32A in the Gilo neighborhood of Jerusalem. Almost immediately, he detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. Nineteen people were killed and 74 others were injured.

### The Aluf Family

481.    Boaz Aluf was a citizen of the State of Israel when he died.

482.    Plaintiff Gila Aluf is a citizen of the United States and a resident of the State of Israel. She is the widow of Boaz Aluf.

483.    On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot and was on Bus #32A when al-Ghoul detonated the

bomb.

484.     As a result of Boaz's death, plaintiff Gila Aluf has experienced emotional pain and suffering, and the loss of her husband's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

**THE ARIEL BOMBING – OCTOBER 27, 2002**

485.     On October 27, 2002, Muhammad Kazid Faysal al-Bustami, a HAMAS suicide bomber, detonated his explosives at a gas station outside of the West Bank town of Ariel, killing three Israeli soldiers and injuring 15 other people.

**The Zahavy Family**

486.     Plaintiff Yitzhak Zahavy is a citizen of the United States and a resident of the State of Israel.

487.     On October 27, 2002, Yitzhak was waiting with his platoon for a transport pickup at a gas station at the entrance to the town of Ariel.

488.     Al-Bustami emerged and stood approximately 50 meters from Yitzhak.

489.     Three of Yitzhak's fellow soldiers were killed as they (and Yitzhak) unsuccessfully attempted to stop al-Bustami before he detonated his explosives.

490.     Yitzhak suffered shrapnel injuries to his leg and was taken to Meir Hospital.

491.     The emotional effects of the attack continue to affect Yitzhak to the present day.

492.     As a result of the attack, plaintiff Yitzhak Zahavy has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

493.     Plaintiff Julie Zahavy is a citizen of the United States and a resident of the State of Israel. She is the wife of plaintiff Yitzhak Zahavy.

494.     As a result of the attack, plaintiff Julie Zahavy has experienced severe mental

anguish and extreme emotional distress.

495. Plaintiff Tzvee Zahavy is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Yitzhak Zahavy.

496. Plaintiff Bernice Zahavy is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Yitzhak Zahavy.

497. As a result of the attack, plaintiffs Tzvee Zahavy and Bernice Zahavy have experienced severe mental anguish and extreme emotional distress.

**B.**     **The Defendant**

498. BANK OF PALESTINE is a banking corporation licensed to do business by the Palestinian Monetary Authority and headquartered in Ain Misbah, Ramallah. It provides banking and financial services to retail, corporate, micro and SME, and individual banking customers in and outside of the Palestinian Territories.

499. BANK OF PALESTINE was established in the Gaza Strip in 1960 by Haj Hashem Atta Shawa. Between 2002-2007, his son, Dr. Hani Shawa, served as BANK OF PALESTINE's Chairman and General Manager. Its current Chairman is Dr. Hashim Shawa, the grandson of Haj Hashem Atta Shawa.

500. Mr. Tayseer Skaik served during the relevant period as the Bank's assistant General Manager.

501. BANK OF PALESTINE was the first bank in the Palestinian Authority and is currently the largest. It has 71 branches, including 15 in Gaza, over 1,700 employees serving almost 1 million customers, and assets of over $4.88 billion.

502. BANK OF PALESTINE has been licensed by the Palestine Monetary Authority since 1995.

503.     BANK OF PALESTINE has an approximately 30% market share of deposits and loans in the Palestinian Territories, and the largest card processing operations. It is the sole agent for issuing and acquiring Visa and MasterCard in the region. Because the online payment company PayPal® does not transfer money to recipients in the Palestinian Territories, BANK OF PALESTINE inaugurated "PalPay"® in 2011 to facilitate electronic payments.

504.     BANK OF PALESTINE has been listed on the Palestine Exchange ("PEX") since 2005. It represents more than 13.62% of total PEX market capitalization. Before becoming listed on the PEX, BANK OF PALESTINE was majority-owned by the Shawa family.

505.     During the relevant period, BANK OF PALESTINE effectuated its U.S. dollar-denominated funds transfers through correspondent bank accounts at three banks located in New York: Citibank, N.A. (111 Wall Street, 19th Floor, New York, NY 10043) JP Morgan Chase Bank (4 Chase Metrotech, Brooklyn, NY 11245) and Union Bank of California N.A.

## FACTUAL ALLEGATIONS

## I.     THE ISLAMIC RESISTANCE MOVEMENT (HAMAS)

### A.     HAMAS's Founding

506.     Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Islamic Resistance Movement ("HAMAS"), a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

507.     HAMAS[2] was established in the Gaza Strip on December 10, 1987, shortly following the outbreak of the First Intifada.[3] The founding of the organization was announced in an "official" communique on December 14, 1987.

---

[2]     HAMAS is an acronym of the Arabic "*Harakat al-Muqawama al-Islamiya*" – Islamic Resistance Movement – but its name also means, in Arabic, enthusiasm, courage, zeal for battle.

[3]     The term "First Intifada," as used herein, relates to the violent conflict that broke out in December 1987

59

508.    It represented the culmination of approximately 15 years of preparation and organization building, led by Ahmed Yassin (also known as "Sheikh Yassin"), the unrivaled leader of what had been the Muslim Brotherhood Movement in the Gaza Strip.[4]

509.    Although Yassin had been confined to a wheelchair throughout his adult life, he worked unceasingly for the establishment of HAMAS in the Gaza Strip. When HAMAS was established in Yassin's home in 1987, the Islamic Resistance Movement already had a defined ideology and a group of pre-existing institutions in Gaza, such as *Al-Mujama Al-Islami* (the Islamic Center) and *Al-Jam'iya Al-Islamiya* (the Islamic Society) and the Islamic University of Gaza that were the flagship institutions of the Brotherhood's civilian social framework – the *da'wa*.[5]

510.    On December 10, 1987, after violence broke out in the Jabalia Refugee Camp, Sheikh Yassin invited six of the leaders of the Muslim Brotherhood in Gaza to his home.

511.    There the group decided on the establishment of HAMAS, an organization that would combine terror against Israel with its *da'wa* (social welfare) activities, through organizations such as *Al-Mujama Al-Islami* (The Islamic Center of Gaza) and *Al-Jam'iya Al-Islamiya* (The Islamic Society of Gaza).

512.    In 1973 Yassin established *Al-Mujama Al-Islami*, and in 1976 he set up *Al-Jam'iya Al-Islamiya.*

---

between the Palestinians and Israel.

[4]    The Muslim Brotherhood Movement was established in Egypt in 1928 by Hassan al-Banna, had was dedicated to the the goal of fighting Western influences on Muslim society; ensuring the adherence of Muslims to Islamic law (Shari'a); and following the rectification of Muslim society, to eventually establish an Islamic state that would expand its rule over the world by means of Jihad and a call to join Islam.

[5]    The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used herein to refer to "the civilian infrastructure of HAMAS."

513.    The two organizations, which were based in Gaza, quickly expanded and established branches throughout the Gaza Strip, but neither of them was, at the time of its establishment, *openly* militant.

514.    Initially the two organizations placed emphasis primarily on mosques. The mosques were not meant solely for prayer. They also served as centers for religious, social, educational, cultural and political activity, while enjoying a measure of ex-territorial immunity that derived from their religious nature.[6]

515.    The seven participants in the December 1987 meeting are considered by HAMAS to be its founding fathers. All of them were members of the Muslim Brotherhood, and six of them were members of *Al-Mujama Al-Islami*: Sheikh Yassin, Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar, and Abd al-Fatah Dukhan.

516.    At the meeting, Sheikh Yassin was recognized as the supreme leader of HAMAS.

517.    His six associates in founding the movement became HAMAS's leadership council, and each of them was appointed to head a particular region: Salah Shehada was responsible for the northern Gaza Strip; Muhammad Sham'a was put in charge of Shati Refugee Camp; Ibrahim al-Yazuri was put in charge of Gaza City; Abd al-Fatah Dukhan was put in charge of the central camps (four refugee camps); Issa al-Nashar was put in charge of the Rafah area, and Abd al-Aziz al-Rantisi was responsible for the Khan Yunis area.

518.    All seven of HAMAS's founders were members of the *da'wa* apparatus (the civilian infrastructure of the Muslim Brotherhood and later of HAMAS).

---

[6]    Yassin and the Muslim Brotherhood did not accept the secular Palestine Liberation Organization (PLO) as the sole official representative of the Palestinian people, and subsequently began challenging representatives of PLO organizations in the trade unions, charitable societies, and universities in Gaza and the West Bank. In Gaza, where Yassin's leadership was more aggressive, the Muslim Brotherhood gradually seized control of the Islamic University of Gaza (founded in 1978) by removing the university's PLO-affiliated administration and replacing them with members of *Al-Mujama Al-Islami*.

519.    In a February 1, 1988 article titled "Islam's Voice in Gaza," *Time Magazine* wrote

about Sheikh Yassin and his obvious connection to the Islamic Center in Gaza:

> Sheik Yasin, 51, is a spiritual leader of the Islamic fundamentalist
> movement in Gaza and thus a prime force behind the religious gale that has
> recently fanned the flames of unrest in the occupied territories. Born in the
> Arab village of Al-Joura, Sheik Yasin has been paralyzed below the neck
> since age 15 as the result of an athletic accident. He resides with his wife
> and eleven children in a one-story house in Gaza City. Family members
> assist him in dressing and eating. Despite his handicap, he runs al-Mujama
> al-Islami, a community organization that builds mosques and sponsors
> cultural activities.

520.    In a January 1998 interview with a HAMAS publication, Dr. Ibrahim al-Yazuri,

one of the aforementioned founders of HAMAS, offered a telling description of HAMAS's

philosophy regarding charitable giving:

> Everyone knows that the Islamic Resistance Movement, HAMAS, is a
> Palestinian Jihad movement that strives for the liberation of all Palestine,
> from the (Mediterranean) sea to the river (Jordan), from the north to the
> south, from the tyrannical Israeli occupation, and this is the main part of its
> concern. Social work is carried out in support of this aim, and it is
> considered to be part of the HAMAS movement's strategy . . . The HAMAS
> movement is concerned about its individuals and its elements, especially
> those who engage in the blessed jihad against the hateful Israeli occupation,
> since they are subjected to detention or martyrdom. The movement takes
> care of their families and their children and provides them with as much
> material and moral support as it can. This is one of the fundamental truths
> of Islamic work and thus represents the duties of the Islamic state . . . The
> movement provides this aid through the support and assistance it gives to
> the zakat (Islamic alms-giving) committees and the Islamic associations and
> institutions in the Gaza Strip.

521.    Years before the establishment of HAMAS, Sheikh Yassin and the Muslim

Brotherhood in the Gaza Strip had developed the civilian infrastructure (such as *Al-Mujama Al-*

*Islami*, *Al-Jam'iya Al-Islamiya* and other organizations) which would soon form the backbone and

recruiting grounds for the Movement's terror apparatus, later named the *Izz al-Din al-Qassam* Brigades (herein, the "Qassam Brigades").[7]

522.    In January 1988, HAMAS also established a branch in the West Bank, through three of the leaders of the Muslim Brotherhood there: Jamil Hamami, Hamed Bitawi and Sa'id Bilal. As in the past, HAMAS relied on the infrastructure of the Muslim Brotherhood in the West Bank to build the backbone of command of HAMAS and its resources, while absorbing key Zakat committees and charitable societies[8] in the West Bank, and where necessary, also setting up new institutions.

**B.    HAMAS in the 1990's**

523.    In December 1992, as a result of increased terrorist activity by HAMAS, the Government of Israel decided to deport over 350 HAMAS operatives to Lebanon.

524.    This step later became known as the *Marj al-Zuhur* Deportation because the deported Islamists were delivered to a check point by that name in southern Lebanon during their brief exile.

525.    The *Marj al-Zuhur* Deportation was a formative moment in the history of HAMAS and the Movement's mythology. It established its status as a leading Palestinian political organization and brought it to prominence in the Arab and international arenas.

526.    HAMAS members who were deported to *Marj al-Zuhur* have a special place in the Movement's history, and quickly became the most iconic members of HAMAS and later emerged as key leaders of the HAMAS *da'wa*.

---

[7]    In 1984, the Israel Defense Forces ("IDF") uncovered a weapons cache in Yassin's house. He was later arrested and convicted of "establishing a radical Islamic religious organization whose aim was to destroy the State of Israel and replace it with a religious Islamic state." He was sentenced to 13 years in prison but was released a year later as part of the "Jibril Prisoners' Exchange" on May 21, 1985.

[8]    The term "Zakat" means tithing in Arabic. This is one of the five Pillars of Islam (Arkan al-Islam). It is loosely used herein to refer to a form of semi-compulsory charitable giving.

527.    The international community condemned the deportations and at the end of 1993 the Israeli Supreme Court ultimately determined that the Government of Israel was compelled to return the *Marj al-Zuhur* deportees.

528.    The saga transformed the *Marj al-Zuhur* deportees into celebrities within the Palestinian arena. The HAMAS deportees later became the backbone of HAMAS leadership.

529.    On September 13, 1993, President Clinton hosted the signing ceremony in Washington, D.C. for the so-called "Oslo Accords" presented by Yasser Arafat (PLO Chairman) and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.

530.    The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority (PA), headed by PLO Chairman Yasser Arafat.

531.    Under the agreement, the newly formed PA would perform the services previously provided by Israel, including education, health, social welfare, taxation and tourism.

532.    The agreement also included Letters of Mutual Recognition, whereby the Israeli Government recognized the PLO as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and purportedly renounced terrorism, violence and the desire for the destruction of Israel.

533.    The Oslo Accords were not, however, universally accepted by the Palestinian factions.

534.    HAMAS rejected the agreement for its recognition of Israel's right to exist.

535.    For HAMAS, the Oslo Accords contradicted its most valued tenet - the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

536.    Accordingly, HAMAS pursued a three-pronged strategy in the early 1990s.

537.    First, it upgraded its terror apparatus, improving the capabilities of its Qassam Brigades and beginning to perfect its bomb-making skills.

538.    Second, it intensified its efforts to subvert existing social welfare institutions – particularly in the West Bank – in order to systematically gain control of pre-existing zakat committees and other religious and social institutions that would ultimately compete with the PA for the "hearts and minds" of the Palestinian public in Gaza, the West Bank and even the Palestinian refugee camps in Jordan and Lebanon.

539.    Third, it accelerated the development of its world-wide fundraising network. While HAMAS enjoyed support from wealthy patrons in the Persian Gulf even in its prior incarnation as Sheikh Yassin's Muslim Brotherhood "branch" in Gaza, the Oslo Accords galvanized the Brotherhood's supporters in Europe, Africa and even the United States.

540.    HAMAS fundraisers and other operatives located abroad are key members of the HAMAS *da'wa*, closely tied to *da'wa* and Qassam Brigades operatives on the ground in the West Bank and the Gaza Strip, as well as to HAMAS political leaders in Turkey, Qatar and elsewhere in the Middle East.

### C.    HAMAS's European Fundraising Network

541.    CBSP ("Comité de Bienfaisance et de Secours aux Palestiniens"), HAMAS's primary fundraiser in France, was founded in 1990 and registered there as a non-profit organization.

542.    The Israeli government declared CBSP an illegal organization on May 6, 1997 because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

543. Interpal, HAMAS's most important fundraising organization in the United Kingdom was formally registered as a charity with the U.K. Charity Commission on August 11, 1994 and named at the time as the "Palestinian Relief and Development Fund."

544. As early as 1995, published reports in Israel linked Interpal to HAMAS.

545. The Israeli government declared Interpal an illegal organization on May 6, 1997 because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

546. On August 22, 2003, following the aforementioned deadly suicide bombing aboard Bus 2 in Jerusalem on August 19, 2003 in which Tehilla Nathansen was killed and multiple members of her family severely injured, the U.S. Treasury designated five HAMAS-related charities and six senior HAMAS leaders as SDGTs.

547. The five HAMAS-related institutions that were designated as SDGTs were:

1. Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), of France.

2. Association de Secours Palestinien ("ASP"), of Switzerland (an organization affiliated with CBSP).

3. Palestinian Relief and Development Fund, or Interpal, headquartered in the United Kingdom.

4. Palestinian Association in Austria ("PVOE").

5. Sanabil Association for Relief and Development based in Lebanon.

548. The U.S. Treasury Press Release announcing the designations of these five entities stated:

> The United States government has credible evidence that the following five organizations are part of a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS.

549.     According to the U.S. Treasury Department, "Interpal, headquartered in the UK, has been a principal charity utilized to hide the flow of money to HAMAS. Reporting indicates it is the conduit through which money flows to HAMAS from other charities, e.g., the Al-Aqsa Foundation (designated under EO 13224 on May 29th) and oversees the activities of other charities. … Reporting indicates that Interpal is the fundraising coordinator of HAMAS. This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy."

550.     Nonetheless, BANK OF PALESTINE did not stop processing transfers for Interpal and other designated HAMAS fundraising entities.

551.     In fact, even in 2016, BANK OF PALESTINE jointly sponsored "The Palestine Festival for Childhood Education" with Interpal, by then an SDGT for *thirteen years.*

552.     According to the U.S. Treasury Department, "CBSP and ASP are primary fundraisers for HAMAS in France and Switzerland, respectively. Founded in France in 1990, CBSP acts in collaboration with more than a dozen humanitarian organizations based in different towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon. ASP, a subsidiary of CBSP, was founded in Switzerland in 1994. The group has collected large amounts of money from mosques and Islamic centers, which it then transfers to sub-organizations of HAMAS. Khalid Al-Shuli is the president of CBSP and ASP."

553.     According to the U.S. Treasury Department, "PVOE is controlled by the leader of HAMAS in Austria. The money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to ensure the transfer of funds is undetected and reaches its intended recipients. PVOE is part

of the HAMAS network of charitable organizations that includes the Al-Aqsa Foundation."

554.   The six senior HAMAS leaders who were designated SDGTs were:

1.   Sheikh Yassin, the founder and spiritual leader of HAMAS.

2.   Imad Khalil Al-Alami, a member of HAMAS's Political Bureau in Damascus, Syria.

3.   Osama Hamdan, a senior HAMAS leader in Lebanon.

4.   Khalid Mishal, (then) head of HAMAS's Political Bureau and Executive Committee in Damascus, Syria.

5.   Moussa Abu Marzouk, (then) Deputy Chief of HAMAS's Political Bureau in Syria.

6.   Abd al-Aziz al-Rantisi, (then) HAMAS leader in Gaza reporting to Sheikh Yassin.

555.   The Al-Aqsa Foundation, a major fundraiser for HAMAS, had branch offices in Holland, Belgium, Denmark, Sweden, Yemen, South Africa, and Pakistan. It was founded in July 1991 in Germany (Al-Aqsa e.V.), where it was headquartered, and which served as its main branch until at least 2002.

556.   On May 6, 1997, Israel outlawed the Al-Aqsa Foundation (including its German headquarters). On January 17, 1998, Israel declared it a terrorist organization.

557.   In July 2002, the German government closed the offices of the Al-Aqsa Foundation located in Germany.

558.   According to the closure order, "AL-AQSA e.V. advocates, supports and calls for violence as means to achieve political, religious or other goals by awakening or at least strengthening the willingness of third parties to use violence as a political, religious or other means."

559.   With respect to Al-Aqsa's connection to HAMAS, the order stated: "AL-AQSA e.V. already financially supported the predecessor organization of HAMAS, the "Al-Mujama Al-

Islamiya" and to this day forwards at least some of the incoming donations to HAMAS. The funds resulting from collections of donations are flowing either directly to HAMAS or via seemingly unsuspected aid organizations."

560.     On May 29, 2003, the U.S. Treasury Department designated all branches of the Al-Aqsa Foundation as an SDGT pursuant to Executive Order 13224.

561.     The U.S. Treasury Press Release announcing Al-Aqsa's designation stated:

> Al-Aqsa is a critical part of Hamas' terrorist support infrastructure. Through its headquarters in Germany and branch offices in the Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere, Al-Aqsa funnels money collected for charitable purposes to Hamas terrorists.
>
> Other nations, including the Netherlands, Germany, Denmark, Britain, Luxembourg and Switzerland, have also taken action against the Al-Aqsa Foundation.

### D.     HAMAS in the United States – the Holy Land Foundation ("HLF")

562.     In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the so-called "Palestine Committee" in the United States gathered together in Philadelphia, Pennsylvania to discuss how to help HAMAS oppose the Oslo Accords.

563.     The Federal Bureau of Investigation learned of the Philadelphia meeting and obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

564.     During the meeting, the participants discussed the problems that the Oslo Accords presented for those opposed to co-existence with Israel and attendees were admonished not to mention "HAMAS," but rather to refer to it as "Samah," which is HAMAS spelled backwards.

565.     Attendees agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting HAMAS's vital social recruitment effort by

financially supporting institutions, organizations and programs in the West Bank and Gaza aligned with the HAMAS movement.

566.     Attendees identified several charitable societies and zakat committees as "ours."

567.     The Holy Land Foundation emerged from the Philadelphia meeting as the preeminent HAMAS fundraising organization in the United States.

568.     However, neither the HLF nor the U.S.-based Palestinian Committee worked in isolation on behalf of HAMAS.

569.     While HLF was a vital member of HAMAS's international network of organizations dedicated to financing the HAMAS agenda, it also worked in conjunction with organizations in Europe and throughout the world to funnel money to the same closed network of HAMAS-controlled charity committees in the West Bank and Gaza.

570.     These other organizations – including The Palestinian Relief and Development Fund (Interpal) in Great Britain, the Al-Aqsa Foundation in Germany, Belgium and Holland, the Comité de Bienfaisance et de Secours aux Palestiniens (CBSP), in France, the Association de Secours Palestinien (ASP) in Switzerland; the Palestinian Association in Austria (PVOE); and the Palestinian Branch of the World Organization of Muslim Youth (WAMY) – all operated in similar ways, sharing fundraising techniques, projects, and connections to HAMAS leaders.

571.     On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli government claims that Richardson Texas-based HLF was a "key fundraising operation" for HAMAS and discussed HAMAS's social infrastructure.

572.    The *Jerusalem Post* reported May 20, 1996 on proceedings in the High Court of Justice resulting in a decree by the Israeli government shutting down the Holy Land Foundation's Jerusalem office and authorizing confiscation of all its property.

573.    On May 6, 1997, the government of Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

574.    BANK OF PALESTINE opened and maintained a U.S. dollar-denominated account for HLF in 1994 under Account No. 101377/7.

575.    This account appears to have been under the direct control of HAMAS founder Ibrahim al-Yazuri (discussed below) and tied directly to HAMAS's Islamic Society of Gaza.

576.    HLF made multiple transfers from the United States to this account in Gaza.

577.    On December 4, 2001, HLF, a U.S.-based organization which provided millions of dollars to HAMAS, was designated an SDGT pursuant to Executive Order 13224 and an SDT under Executive Order 12947. HLF's designation was accompanied by an order blocking all its assets.

578.    The U.S. Treasury Press Release announcing HLF's designation stated, *inter alia*:

- The Holy Land Foundation for Relief and Development, headquartered in Richardson, Texas, raises millions of dollars annually that is used by HAMAS. Last year, Holy Land raised over $13 million.

- Holy Land supports HAMAS activities through direct fund transfers to its offices in the West Bank and Gaza that are affiliated with HAMAS and transfers of funds to Islamic charity committees ("zakat committees") and other charitable organizations that are part of HAMAS or controlled by HAMAS members.

- Musa Muhammad Abu Marzook, a political leader of HAMAS, provided substantial funds to the Holy Land Foundation in the early 1990s. In 1994, Marzook (who was named a Specially Designated Terrorist by the Treasury Department in 1995) designated the Holy

Land Foundation as the primary fund-raising entity for HAMAS in the United States.

579.    These findings were in part the product of an extensive FBI investigation that culminated in what has come to be referred to as the "Watson Memorandum" – named after former FBI official Dale Watson.

580.    The FBI report observed:

> It is the FBI's analysis that the zakat committees receiving HLFRD [Holy Land Foundation] financial support are controlled by HAMAS. GOI [Government of Israel] analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat committees. GOI analysis, as well as open source reporting, has identified that the civilian population is aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS.

581.    These large deposits were then often translated into checks written by HLF in the Palestinian Territories to HAMAS *da'wa* institutions in smaller increments.

582.    For example, HLF drafted separate checks on September 30, 2000 to three branches of the *Al-Jam'iya Al-Islamiya* (the Islamic Society) for $2,906, $6,615 and $2,687.

583.    Palestinian media widely reported the U.S. Government's actions against HLF.

584.    For example, the Palestinian daily newspaper *Al-Quds* reported on the freezing of HLF's accounts on December 5, 2001.

585.    In 2004, HLF and several of its directors were indicted on criminal charges that it was illegally providing material support to HAMAS.

586.    In 2008, after a jury trial, HLF and five of its former directors were found guilty of illegally transferring more than $12 million to HAMAS.

E.      **Early Media Coverage of the HAMAS *Da'wa***

587.    As early as 1994, HAMAS fundraising activities were discussed in the media. For

example, an article in *The New York Times* reported:

> HAMAS funding of all its activities is estimated by the Israelis at about $30
> million a year. It comes from money collected by associations operating
> largely abroad but with ties to the international Muslim Brotherhood
> network. Money is also collected from Islamic and Arab communities in the
> United States and in Britain, the Netherlands and other Western European
> locations.

588.    Also, on April 14, 1994, *The Globe and Mail* (Canada) published an article titled,

"Hamas evolves from political to military group" by Patrick Martin.

589.    The article explained HAMAS's *da'wa* in straightforward terms and identified its

best-known institution:

> The group calling itself Hamas first made its appearance in 1987, at the start
> of the Palestinian uprising known as the intifada. Concentrated in Gaza,
> where Islamic tendencies have always been strong, it stemmed from a
> decade-old Islamic movement known as the Mujamma…. Sheik Yassin,
> who had been an activist in the older Muslim Brotherhood, had been
> imprisoned by the Egyptians during the regime of Gamal Nasser. When the
> Mujamma turned into the political movement Hamas, Sheik Yassin was
> again arrested, this time by the Israelis.

590.    In 1996, *The New York Times* reported on HAMAS's intensified fundraising for

its network of institutions:

> Israeli, Palestinian and Western intelligence officials say Jordan is a major
> conduit for much of the Hamas budget, estimated at $70 million a year,
> nearly all of it for the social service network of mosques, hospitals, schools
> and other institutions that form the movement's political base in the West
> Bank and Gaza Strip.
>
> …Jordan, intelligence officials say, is a major path through which money
> reaches the Hamas network of mosques and charities. Jordanian intelligence
> reports indicate that much of the money is coming from the Persian Gulf
> emirates and Saudi Arabia.

591.    On September 17, 1997, the British-based *Mideast Mirror* published an article

titled "How to break the deadlock: Armed resistance, plus Arab pressure on U.S."

592.    The article quotes the Arabic press regarding Gulf State sources of funding for

HAMAS:

>    According to al-Hayat's sources, only some $ 10 million dollars is raised
>    annually by Palestinian Islamist charities in the Gulf, most of which is paid
>    directly to visiting fund-raising delegations or the charities' bank accounts
>    in Jordan, or via Palestinian support groups based in the U.S. or Britain.
>
>    Gulf-based charities also say they make a point of ensuring that recipients
>    are recognized by the Jordanian religious affairs ministry or the PA's
>    Jerusalem-based religious affairs department. They include the Zakat (alms)
>    Committees in Hebron, Jerusalem, Tulkarem, Kalkilya and Gaza, which
>    fund schools, Koran teaching classes and orphanages, provide cash or food
>    aid to the families of martyrs, and run self-help schemes for needy families.
>    Gulf funding also sustains the Islamic Charitable Society in Hebron,
>    Jerusalem's Makassed Hospital, and the Wafa Society in Gaza which looks
>    after the elderly.
>
>    Gulf donors also insist that they have always dealt openly with such
>    organizations, which Israel accuses of constituting the "infrastructure" of
>    Hamas. "We used to work with these organizations in broad daylight in the
>    days of direct Israeli occupation, and continued dealing with them under the
>    PA, though regrettably the pressures increased with the advent of the PA,"
>    *al -Hayat* quotes one aid worker as saying.
>
>    As for higher educational institutions, the main recipient of Gulf aid is Gaza
>    Islamic University, which has long been described as a "Hamas
>    stronghold."

593.    An August 11, 2001 article in the *Washington Post* reported:

>    On the streets of Gaza, and to a somewhat lesser extent in the West Bank,
>    Hamas's status has been underpinned by a network of medical clinics,
>    schools and welfare institutions that distribute free and subsidized food to
>    the needy.
>
>    According to Yassin, the group distributes $2 million to $3 million in
>    monthly handouts to the relatives of Palestinian suicide bombers; "martyrs"
>    who have been killed by Israelis; and prisoners in Israeli jails. When
>    pressed, he was vague about the provenance of the money, which, according
>    to the State Department, comes mainly from Palestinians overseas, Iran and
>    private benefactors in Saudi Arabia and other moderate Arab states.

> Under pressure from Israel and the West, Arafat cracked down on Hamas
> and Islamic Jihad following the suicide bombings in 1996. Scores of Hamas
> activists were jailed, and the terror attacks on Israel faded.

594.    On September 25, 1997, the Palestinian Authority temporarily closed what it identified as 16 HAMAS institutions and associations, including HLF's Gaza office, *Al-Mujama Al-Islami* (Islamic Center – Gaza) and *Al-Jam'iya Al-Islamiya* (Islamic Society – Gaza).

595.    The closures, including identification of HLF as a targeted HAMAS entity, were detailed in a *Jerusalem Post* news account on September 28, 1997.

### F.    Initial U.S. Designations of HAMAS

596.    On January 23, 1995, pursuant to Executive Order 12947, President Clinton designated HAMAS a Specially Designated Terrorist ("SDT").

597.    This designation made it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of HAMAS.

598.    HAMAS's designation as an SDT has remained in place since January 23, 1995.

599.    On October 8, 1997, the Secretary of State designated HAMAS a "Foreign Terrorist Organization" under section 219 of the Immigration and Nationality Act.

600.    This designation made it illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to HAMAS.

601.    HAMAS's designation as an FTO has remained in place since October 8, 1997, including throughout the relevant period of this Action.

602.    On October 31, 2001, pursuant to Executive Order 13224, President George W. Bush designated HAMAS a Specially Designated Global Terrorist ("SGDT").

603.    HAMAS's designation as an SDGT has remained in place since October 31, 2001.

604.     In 1996, under heavy pressure from Israel, the Palestinian Authority ("PA") (under the leadership of Yasir Arafat and the PLO), which had just been established, very publicly took steps against HAMAS as a result of a wave of HAMAS terrorist attacks that took the lives of 56 Israelis.

605.     Over the years, the PA would, from time to time, attempt to take measures against the zakat committees and other organizations run by HAMAS. Closures and arrests were always temporary.

**G.     The Second Intifada**

606.     The Second Intifada ("al-Quds" or "al-Aqsa Intifada"), which broke out in September 2000, was a key turning point in HAMAS's history.

607.     In the initial weeks of the Second Intifada, large demonstrations were organized in several Palestinian cities. During this period, a Palestinian mob in Ramallah attacked two off-duty Israeli reservists, lynched them, and celebrated their deaths – with much of the scene captured on camera.

608.     Soon thereafter, HAMAS, Palestinian Islamic Jihad and the Palestinian Authority's ruling faction, Fatah, all launched attacks on Israeli civilian centers, military installations, vehicles, and civilians through suicide bombings, drive-by shootings, and rocket launchings, which killed over 1,000 Israelis, and left thousands severely wounded.

609.     From September 2000 forward, support by the Palestinian public for HAMAS grew steadily.

610.     It won elections at Palestinian universities, trade unions, and later in municipal elections in May 2005.

611.    For approximately the next four years after the outbreak of the uprising, HAMAS launched hundreds of terrorist attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including numerous American citizens.

612.    HAMAS's improved political standing among the Palestinians was a result of the work of its *da'wa* institutions which served as a supportive framework for HAMAS's terror activities, including the use of suicide terrorists, in three main areas:

- HAMAS's *da'wa*'s educational institutions[9] contributed to the indoctrination of young Palestinians into what became a "culture of martyrdom for Allah," praising the religious virtues of those who sacrificed themselves in the framework of *Jihad* against Israel. Suicide terrorists earned a place of honor when they received special praise as martyrs (*shuhada*).

- HAMAS's *da'wa*'s institutions served as a mechanism by which to transfer money to orphans, widows and other relatives of suicide terrorists and movement prisoners, and thus provided a unique safety net for potential recruits concerned that their families would be adversely affected by their deaths or imprisonment. HAMAS committees collected the names of their activists who were killed by Israel and would then solicit aid from its network of charitable societies abroad. In 2001, Sheikh Yassin, in an interview cited in the *Washington Post*, publicly disclosed that the *da'wa* infrastructure distributed \$2-3 million dollars to the families of suicide bombers and prisoners.

- HAMAS's *da'wa* infrastructure provided a reservoir of new recruits for suicide attacks and for HAMAS's terror and murder apparatus.

## H.    Cultivation of the Culture of Death

613.    HAMAS's *da'wa*'s institutions played (and play) a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as

---

[9]       The *da'wa* institutions include kindergartens, schools, clubs, mosques, Quran recitation classes and student councils, most of which were controlled by HAMAS in the course of the Second Intifada. The *da'wa* also funds student associations such as *al-Kutla al-Islamiya*, which is a key source for recruiting operatives into the *al-Qassam Brigades*. For example, during the first year of the Second Intifada, at least five students from *al-Najah* University carried out suicide terrorist attacks. Other suicide terrorists were students at Hebron Polytechnic University and at al-Quds Open University. The HAMAS charitable societies also ran summer camps, in which systematic indoctrination for hatred against Israel took place.

recruiting grounds for HAMAS.

614.    As set forth in an internal HAMAS memorandum captured by the Israeli army during a raid of the offices of the Islamic Charitable Society – Hebron, HAMAS has arranged for the "transfer [of] large sums" to the charitable committees and other HAMAS *da'wa*'s institutions through the "charity activities" of their operatives abroad.

615.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that HAMAS will:

> invest efforts to transfer money for the martyrs (the *shuhada*) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

616.    The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its charitable organizations by, among other things, "***taking advantage of the conditions and the atmosphere of death***."

617.    Through its network of charitable organizations, since the early 1990's HAMAS has intensified its efforts to consolidate its position within Palestinian society via its social and welfare projects.

618.    Although these organizations perform actual social work and provide charitable services, they also raise substantial funds for HAMAS's political and operational terrorist infrastructure and free up money to be redirected to those latter ends.

619.    These charitable organizations provide streams of income to HAMAS operatives, assist HAMAS in recruiting new supporters, generate and disseminate HAMAS propaganda and compete with the Palestinian Authority in delivering social services and facilitating payments of honorariums (including "martyr" payments) to families of HAMAS operatives killed, injured or imprisoned as a result of their terrorist activities.

620.     Funds raised by HAMAS's charitable and social organizations are fungible and are allocated in part to terrorist activities (including recruitment, training, and propagandizing) or used to free up other funds that are then allocated for terrorist activities, including planning and carrying out suicide bombings and other violent attacks.

## II.     CORE INSTITUTIONS OF HAMAS'S SOCIAL WELFARE NETWORK IN GAZA

### A.     Key HAMAS Institutions in Gaza

621.     At the Philadelphia Conference in 1993, the FBI's wiretaps caught the words of Dr. Mu'in Shabib, a HAMAS operative, describing the close connection between HAMAS and several of its core institutions in Gaza:

> The principal organization known to be affiliated with us is the **Islamic University of the Gaza** region, and we will speak later regarding solutions. We mention it because it is a real wound in our heart. **Number two, the Islamic Complex, which was founded in 1973 and received a license in 1976. The activities of the Complex were then more comprehensive. The Islamic Society**, which was founded in 1976. **The *al-Salah* Society** in the region (Gaza), which supervises the sacrifices and other matters. The Young Women's Muslim Association and **the *al-Wafa* Society for the Care of the Elderly**, the orphanage, a number of charity committees, a number of social service institutions which received new licenses, such as the Institution for Law and Justice, which cares for the prisoners. (Emphasis added.)

### 1.     Islamic University of Gaza

622.     As noted above, the Islamic University of Gaza was established in 1978 after the Egyptian government retaliated against the PLO for its criticism of Egypt peace treaty with Israel and blocked Gazan students from studying in Egypt.

623.     Sheikh Yassin used the controversy to orchestrate the violent removal of the university's PLO-affiliated administration by *Al-Mujama Al-Islami* members. It took five years, but Yassin ultimately gained control and the university was split into entities: Al-Azhar University, which the PLO continued to control; and the Islamic University of Gaza, which came under the

control of *Al-Mujama Al-Islami* and Yassin.

624. Since the 1990s, the Islamic University of Gaza has been identified exclusively with HAMAS and has served as its principle source for recruitment of people into the organization's ranks in Gaza, including into the ranks of the Qassam Brigades. Many students of the Islamic University of Gaza were recruited by Qassam Brigades, and committed suicide attacks during the Second Intifada, among them Nafedh Ayesh Mustafa al-Nadher, who blew himself up near a bus heading to Kfar Darom on July 9, 2001, thus "killing many of the sons of monkeys and pigs, the cowardly Zionist infidels", according to the Qassam Brigades website.

625. The Qassam Brigades also used the Islamic University's facilities for its military purposes, such as storing weapons in it; exploiting the University's laboratories for developing and manufacturing weapons; and holding secret meetings of the Brigades' commanders and members in it.

626. HAMAS's founders Salah Shehadah (who later founded HAMAS's Qassam Brigades), Ibrahim Fares al-Yazuri and Abd al-Aziz al-Rantisi were among several prominent HAMAS leaders who were publicly affiliated with the University. In fact, more than ten percent (47) of the Marj al-Zuhur deportees were employees, administrators or students at the Islamic University of Gaza.

627. Khalil Isma'il Ibrahim al-Haya who also served as Deputy Chairman of *Al-Mujama Al-Islami* in the Gaza Strip between 2002 and 2005 lectured in Islamic Law at the Islamic University of Gaza. He is now the deputy of HAMAS's senior leader in Gaza, Yahya Sinwar. HAMAS leader Ismail Haniya (SDGT) served as the dean of the University of Gaza. Muhammad Saleh Taha, a co-founder of *Al-Mujama Al-Islami*, also lectured at the Islamic University as did other HAMAS luminaries, including Ahmed Bahar and Mahmud al-Zahar.

628.    From the early 1990s through 2004, the Islamic University of Gaza enjoyed financial support from CBSP, Interpal, the *Al-Aqsa* Foundation – Germany and many other HAMAS fundraising organizations.

629.    BANK OF PALESTINE maintained accounts for and provided financial services to the Islamic University of Gaza.

630.    The accounts included Account No. 1112222, Rimal branch and Account No. 1100280.

### 2.    The Islamic Center (or Complex) – Gaza (*Al-Mujama Al-Islami*)

631.    As noted above, *Al-Mujama Al-Islami* (the Islamic Center) was established in 1973 by Ahmed Yassin, the founder of HAMAS and the organization's spiritual leader.

632.    The foundations, infrastructure, and key operatives of *Al-Mujama Al-Islami* laid the basis for the establishment of HAMAS, the future growth and expansion of HAMAS in the Gaza Strip, and later throughout the Palestinian arena.

633.    Both *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* (the Islamic Society), which was founded three years later, in 1976, opened branches throughout the Gaza Strip.

634.    In 1978, a branch of *Al-Mujama Al-Islami* was established in Khan Yunis.

635.    In that same year several kindergartens which belonged to the organization in Gaza, were established.

636.    In 1985, *Al-Mujama Al-Islami*'s al-Aqsa School was built in Khan Yunis. Shortly after the organization's establishment, additional seven branches were set up throughout the Gaza Strip.

637.    These branches were run by people who later would become the founders of HAMAS, including al-Rantisi (the branch in Khan Yunis Refugee Camp), and Abd al-Fatah

Dukhan (Nusairat branch).

638.    From the early 1990s through 2004, *Al-Mujama Al-Islami* enjoyed financial support from the Holy Land Foundation in the United States (before it was declared a terrorist organization by the United States administration and its assets frozen in 2001) as well as CBSP, Interpal, Human Appeal International, the *Al-Aqsa* Foundation – Germany and many other HAMAS fundraising organizations.

639.    A 2000 fundraising brochure explicitly linked *Al-Mujama* to *Al-Aqsa* Foundation - Germany. The brochure referred to the "fragrance of the blood of the martyrs and wounded which watered the pure soil" and confirmed that *Al-Aqsa* Foundation donors "are committing Jihad with your monies in the land of [the people of] steadfastness, whose blood is violated and whose sanctuaries are desecrated everyday..."

640.    In an article on the popular Islamist website Islamonline.net, Ismail Haniya, prominent HAMAS leader in the Gaza Strip, stated that *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya* and Al-Salah Charitable Society provide financial support to the martyrs' families, the injured, the prisoners and the detainees of the Intifada.

641.    Following are details of the most important key figures in *Al-Mujama Al-Islami*:

- **Ahmed Yassin**: Sheikh Yassin, one of the founders of HAMAS and the founder of *Al-Mujama Al-Islami.* Yassin was arrested in 1984 after founding *al-Mujahidun al-Filastiniyun*[10] and was sentenced to 13 years' imprisonment. He was released in 1985 as part of the "Jibril Prisoners' Exchange" and then arrested a second time in 1989, tried and sentenced to life imprisonment for his role in planning the murder of two Israeli soldiers before being released from prison once more, as a result of a botched Israeli assassination attempt in Jordan in 1997. On January 25, 1995, the U.S. Department of Treasury designated Yassin a Specially Designated Terrorist. Upon his return to Gaza, Yassin rebuilt his standing within the HAMAS leadership. On August 22, 2003, the United States declared him a Specially Designated Global Terrorist for his involvement in HAMAS. On March 22, 2004, Yassin was killed by

---

[10]     The organization was the Muslim Brotherhood's precursor to HAMAS's Qassam Brigades.

Israel's security forces. To this day, Yassin has remained an object of admiration for HAMAS supporters, who see him as a source of authority and inspiration for the continuation of their jihad against Israel.

- **Abd al-Aziz al-Rantisi**: Rantisi was one of the seven founders of HAMAS, and one of the organization's key leaders in the Gaza Strip. With the founding of HAMAS in 1987, Rantisi was appointed to head the military wing (Qassam Brigades) in the southern districts of the Gaza Strip. Rantisi served as a member of *Al-Mujama Al-Islami*'s administrative board and founded the organization's Khan Yunis branch. In 1992 he was temporarily deported, along with other senior members of HAMAS, to *Marj al-Zuhur*, where he served as HAMAS's chief spokesman to the Western media. In March 1998, Rantisi was arrested by the Palestinian Authority and held for a period of 15 months for his continued activities related to HAMAS. He was considered the most radical voice within HAMAS political leadership in the Palestinian Territories. He publicly and explicitly encouraged HAMAS operatives to carry out *suicide actions* against Israel; he praised those who responded to the call for "self-sacrifice" and preached ceaseless war that would end with the destruction of Israel. On August 22, 2003, the United States designated Rantisi an SDGT. After Sheikh Yassin was killed by Israeli forces on March 22, 2004, Rantisi was declared his successor and appointed as leader of HAMAS in the Palestinian Territories. On April 17, 2004, Rantisi was killed by Israel's security forces.

- **Ibrahim Fares al-Yazuri**: Yazuri was one of the "founding fathers" of HAMAS and a close friend of Ahmed Yassin. Additionally, he was one of the founders of *Al-Mujama Al-Islami* in the seventies and a member of the organization's administrative board of from its inception. Yazuri served as Chairman of *Al-Mujama Al-Islami* following Yassin's arrest and imprisonment in 1984. In 2000, he was listed as the Secretary General of *Al-Mujama Al-Islami.* He also taught at the Islamic University of Gaza. Yazuri was later sentenced to 26 months imprisonment in Israel because of his HAMAS-related activities and subsequently arrested several times by the Palestinian Authority (following terrorist attacks carried out by HAMAS against Israel).

- **Muhammad Hasan Sham'a**: Sham'a was involved in the establishment of *Al-Mujama Al-Islami* and oversaw the organization's public relations. Sham'a was also listed as Deputy Secretary General of *Al-Mujama Al-Islami.* Subsequently he was one of the seven founders of HAMAS and one of its political leaders. He was among the deportees to *Marj al-Zuhur* and was later arrested by the Palestinian Authority in 1995 and 1998.

- **Issa Khalil al-Nashar (Abu Ali)**: Al-Nashar was one of the seven "founding fathers" of HAMAS and was responsible for its activities held in Rafah (Gaza). Al-Nashar was briefly arrested by Israel in 1988 for his membership in HAMAS and later deported to *Marj al-Zuhur*. In November 1995, he participated in the creation of HAMAS's National Islamic Salvation Party and served as head of its political bureau. In 1995, Al-Nashar was detained for four months by the Palestinian Authority's Security Forces.

- **Khalil Isma'il Ibrahim al-Haya**: Haya served as Deputy Chairman of *Al-Mujama Al-Islami* in the Gaza Strip between 2002 and 2005. In 1981, during his studies at the Islamic University of Gaza, he was a member of the Islamic Students' Association (*al-Kutla al-Islamiya*) and tried – on several occasions – to take over the University's campus together with other members of *Al-Mujama Al-Islami.* He served as Chairman of the HAMAS faction in the Palestinian Legislative Council in the years 2006-2007 and was one of the best-known HAMAS leaders in the Gaza Strip. He was imprisoned by Israel in 1991 for activities connected with HAMAS.

- **Abd al-Fatah Dukhan**: Dukhan was one of the seven founders of HAMAS. He served as head of the *Al-Mujama Al-Islami* branch in Nusairat Refugee Camp and was one of the *Marj al-Zuhur* deportees. He has served as a member of the Palestinian Legislative Council as part of HAMAS's Change and Reform Party.

- **Khalil Ibrahim al-Quqa**: Al-Quqa was one of the founders of *Al-Jam'iya Al-Islamiya* and headed the *Al-Mujama Al-Islami* branch in Shati. He was also one of the first to join the HAMAS Movement. Al-Quqa was deported by Israel to Lebanon in 1988, and from there he moved to Tunis and later Egypt. Two years later he was expelled from Egypt (1991) to the United Arab Emirates, where he died of natural causes in 2005.

- **Muhammad Saleh Taha (Abu Ayman)**: Taha took part together with Ahmed Yassin in the founding of *Al-Mujama Al-Islami* and served as a member of the organization's Administrative Council. He was arrested on several occasions, both by Israel and by the Palestinian Authority, for his HAMAS-related activities and was deported to *Marj al-Zuhur* in 1992 along with al-Rantisi and Sham'a. He has served as a lecturer at the Islamic University of Gaza. Taha was arrested numerous times by both Israel and the Palestinian Authority.

- **Osama al-Mazini**: Al-Mazini was one of the heads of HAMAS's political leadership, and one of the Movement's prominent spokesmen. Al-Mazini served as a member of the Administrative Council of *Al-*

*Mujama Al-Islami.* He also served as a lecturer in the Department of Psychology at the Islamic University of Gaza. He is married to Ahmed Yassin's daughter. Al-Mazini was arrested numerous times, both by Israel and the Palestinian Authority.

- **Nizar Muhammad Awd-Allah:** Awd-Allah was one of Ahmed Yassin's closest associates and was involved in the kidnapping and murder of Israeli soldiers Avi Sasportas and Ilan Saadon in 1989 – an act for which Yassin was sentenced to 13 years in prison. Awd-Allah was a member of HAMAS and a senior operative in *Al-Mujama Al-Islami*. Awd-Allah was appointed as commander of the Qassam Brigades in Gaza, following the arrest of Salah Shehadah in 1988.

- **Maryam Muhammad Yusuf Farhat (Umm Nidal):** In 1981, Farhat supervised the women's activities at *Al-Mujama Al-Islami.* Her eldest son, Nidal Farhat, joined the Qassam Brigades in 2000, where he oversaw planning and carrying out of numerous operations (such as mortar attacks) against Israelis, and became a HAMAS bombmaker. Farhat encouraged her son, Muhammad, to carry out a suicide attack, and was photographed with him before he departed for the attack. Farhat was elected in 2006 to the Palestinian Legislative Council as part of HAMAS's Change and Reform Party. She died in 2013.

642.    Due to its connections to HAMAS, *Al-Mujama Al-Islami* was temporarily closed by the Palestinian Authorities on September 25, 1997. On August 24, 2003, the Palestinian Monitory Authority issued an order to freeze *Al-Mujama Al-Islami*'s bank accounts in all banks in the Palestinian Territories, in order to stop funding HAMAS institutions.

643.    Due to its central role as a supporter of HAMAS's jihad activity, *Al-Mujama Al-Islami* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the commander of the IDF's Central Command on June 30, 2002.

644.    On May 29, 2007, the United States Department of Justice identified *Al-Mujama Al-Islami* as an "organization that operates on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

645.    The BANK OF PALESTINE maintained accounts for and provided financial services to the Islamic Center of Gaza.

646.    The accounts included Account No. 92022, Jabaliya Branch and Account No. 1103953 (which was still active in 2014)

### 3.    The Islamic Society – Gaza (*Al-Jam'iya Al-Islamiya*)

647.    *Al-Jam'iya Al-Islamiya* (the Islamic Society) was founded in the Gaza Strip in 1976 by Ahmed Yassin and other senior member of the Muslim Brotherhood organization.

648.    Like *Al-Mujama Al-Islami* (the Islamic Center), it served as a base for disseminating ideology and the political platform of the Muslim Brotherhood in Gaza in the seventies.

649.    From the time of its establishment, *Al-Jam'iya Al-Islamiya* was a significant HAMAS stronghold, operated and controlled by individuals who were identified initially with the Muslim Brotherhood and ultimately with HAMAS.

650.    In September 1997, the Palestinian Authority closed *Al-Jam'iya Al-Islamiya*, along with 16 other societies identified with HAMAS.

651.    Following a HAMAS terrorist attack in Israel in October 1998, the Palestinian Authority began a wave of arrests against HAMAS operatives in Gaza. Among those arrested were the Chairman of *Al-Jam'iya Al-Islamiya*, Sheikh Ahmed Bahar, and other senior personnel in the society.

652.    In December 2001, the Palestinian Authority closed a number of societies run by Islamic organizations (HAMAS and Palestinian Islamic Jihad), among them *Al-Jam'iya Al-Islamiya*, and on January 6, 2002, the Palestinian Monetary Authority directed the Palestinian banks to report on the sums of money held in the accounts of *Al-Jam'iya Al-Islamiya* and required them to consult with it prior to withdrawing funds from those accounts.

653.    *Al-Jam'iya Al-Islamiya* was declared an unlawful association by the Israeli Minister

of Defense on February 25, 2002, and by the IDF's Central Command on June 30, 2002.

654.    *Al-Jam'iya Al-Islamiya* official web site has, for many years, featured an image of Ahmed Yassin, the founder of HAMAS and of the Society.

655.    Similarly, senior HAMAS figures regularly participate in *Al-Jam'iya Al-Islamiya* events, and since the mid-1990s, the society has not hidden its affiliation with HAMAS from Western journalists, and this fact was published by the leading Western media outlets.

656.    For example, both *The New York Times* ("In Gaza, Peace Meets Pathology," November 27, 1994) and the *Financial Times* ("Fundamentalists Split Palestinian Unity," September 9, 1988) identified the Islamic Society in Gaza as part of HAMAS.

657.    As early as 1993, an article in the *Independent* by Sarah Helm described a Gaza kindergarten "run by the Islamic Society which is controlled by Hamas, the militant Islamic movement."

658.    A July 23, 1999 article published by Knight Ridder titled "Hamas wedding a political event" noted: "Thursday night's event was organized by the Islamic Society, the social arm of Hamas, the militant Islamic organization better known for the deadly suicide bombings that stalled the Israeli-Palestinian peace process in 1996."

659.    On January 1, 2002, the BBC Monitoring Service published an article translating a HAMAS report (put out by the HAMAS political bureau's official website) claiming "a large-scale campaign" by Palestinian police forces "closing a number of Hamas Islamic Resistance Movement and Islamic Jihad-backed institutions and societies."

660.    The report identified the Islamic Society of Gaza as one of "[t]he Hamas-backed societies."

661.    The *Mail on Sunday* (London) published an article in 2002 about a controversial

donation made by the British Consulate in Jerusalem to the Islamic Society of Gaza:

> But our inquiries have revealed the leadership of **the Islamic Society**, known in Arabic as Al Jamayia Al Islamiya is closely associated with Hamas and the group has been shut down several times on Yasser Arafat's orders.
>
> Its secretary general, Sheikh Ahmed Bahar, was arrested by the Palestinian Authority's security forces alongside several Hamas leaders in October 1998 during a clampdown on terrorism. He was then described by the Palestinians as leader of the Hamas splinter group the Islamic National Salvation Party.
>
> Indeed, **the Islamic Society** makes no secret of its support for the terrorists. (Emphasis added.)

662.   Following are details of some of the important leaders in *al-Jam'iya Al-Islamiya*:

- **Ahmed Yassin**: He was also one of the founders of *Al-Jam'iya Al-Islamiya*.

- **Ahmed Bahar**: Bahar was Chairman of *Al-Jam'iya Al-Islamiya* between the years 1985 and 2004. Bahar was arrested by the Israeli security forces and was imprisoned several times in Israeli jails, as a result of his membership in HAMAS. One of the *Marj al-Zuhur* deportees in 1992, he was arrested several times by the Palestinian Authority following terrorist attacks carried out by HAMAS. In June 1995 he was arrested by the PA's Preventive Security, and his beard was shaved off as an act of humiliation by his captors. Ahmed Bahar worked at the Islamic University of Gaza between 2002-2003, as a lecturer in the department of Arabic language and as deputy dean of the Faculty of Arts. Bahar also served as first deputy speaker of the Palestinian Legislative Council on HAMAS's "Change and Reform Bloc" political party.

- **Muhammad Faraj Mahmud Husain al-Ghul**: Al-Ghul is one of the founders of *Al-Jam'iya Al-Islamiya*, a member of its administrative board and served as its Secretary General. Al-Ghul also worked at the Islamic University of Gaza as a lecturer. Before the outbreak of the Second Intifada, he also served as attorney for senior HAMAS figures imprisoned in Israel, among them Sheikh Ahmed Yassin. Al-Ghul was jailed by Israel between the years 1981 and 1992 for terrorist activities and was one of the *Marj al-Zuhur* deportees, and 1998 he was arrested by the PA Preventive Security Services.

- **Isma'il Hassan Muhammad Abu Shanab**: Abu Shanab was one of the founders of *Al-Jam'iya Al-Islamiya*. He also worked at Islamic University of Gaza as a lecturer at the faculty of engineering and as president of the Faculty of Applied Science. Abu Shanab was also Sheikh Yassin's deputy. He was arrested by Israel in 1989 and imprisoned for 8 years. After his release from Israeli prison, Abu Shanab became political leader of HAMAS until he was killed in 2003.

- **Isma'il Abd al-Salam Ahmed Haniya**: Haniya served as a member of administrative board of *Al-Jam'iya Al-Islamiya*'s senior administrative body and headed its club in Gaza for approximately ten years. Haniya led the Islamic Students Association (*al-Kutla al-Islamiya*) in the Islamic University of Gaza in the early 1980s and was the head of the Islamic University Student Union in 1985-86. Haniya held several positions at the Islamic University of Gaza, among them Secretary of the Board of Trustees and the University's Director of Academic Affairs. Haniya was arrested by Israel several times and was also one of the *Marj al-Zuhur* deportees. He served as Sheikh Yassin's chief of staff following Yassin's release from prison in 1997. In 2006, he became "Prime Minister" in the HAMAS government in Gaza and in 2017 was appointed as the overall leader of HAMAS.

663.    From the early 1990s through 2004, *Al-Jam'iya Al-Islamiya* enjoyed financial support from the Holy Land Foundation in the United States before it was declared a terrorist organization by the United States administration and its assets frozen in 2001 as well as CBSP, Interpal, Human Appeal International, the *Al-Aqsa* Foundation – Germany and many other HAMAS fundraising organizations.

664.    BANK OF PALESTINE maintained accounts for and provided financial services to the Islamic Society of Gaza.

665.    The accounts included Account No: 1054079 (Khan Yunis Branch); Account No. 91999 (Jabalia Branch); Account nos. 332234, 135159 and 89970 (Beit Hanun Branch).

### 4.    *Al-Salah* Islamic Society – Gaza (*Jam'iyat Al-Salah Al-Islamiya*)

666.    *Al-Salah* Islamic Society – Gaza ("*al-Salah*") was founded in the town of Dir al-Balah in the Gaza Strip in 1978 and was a key part of HAMAS's *da'wa* in Gaza after 1987.

667.    Ahmad Harb Ahmad al-Kurd served as the chairman of, and dominant senior figure in, *al-Salah* during the relevant time period; he was also a member of the "Union of Good" (*Itilaf al-Khair)* in Gaza.

668.    Al-Kurd is a senior, prominent HAMAS member in Gaza and considered one of its senior *da'wa* operatives.

669.    According to the U.S. government, during the First Intifada, which lasted from approximately December 1987 to September 1993, "al-Kurd served as a Hamas Shura Council member in Gaza." HAMAS's *shura* is its governing council.

670.    An *Agence France Presse* report of arrests of HAMAS terrorists in Dir al-Balah in August 1994 noted that a senior HAMAS figure named Ahmad al-Kurd was detained for questioning by the Palestinian security forces.

671.    As a U.S. Department of the Treasury memorandum reported, in 1995 al-Kurd was characterized as an "extremely fanatic" and "dangerous" HAMAS member who played "an active role in the running of the Hamas movement."

672.    The *al-Salah* Society was temporarily closed in September 1997 by the PA (along with *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* in Gaza) as a result of Israeli and American pressure on the Palestinian Authority to rein in HAMAS.

673.    The Treasury memorandum noted that "[a]ccording to a comprehensive PA report prepared in October 1999 regarding **Hamas'** use of charitable organizations, the **AL-SALAH SOCIETY** works to increase the popular and youth leadership of **Hamas** – in turn strengthening popular support for **Hamas**. Reportedly prominent in importance during the first *Intifada*, the **AL-SALAH SOCIETY** supported **Hamas**-affiliated 'combatants,' adopted families of martyrs and prisoners, and succeeded in indoctrinating and recruiting youth into supporters of the plans and

methods of **Hamas**." (Emphasis and punctuation in the original.)

674.    The memorandum further noted that "[b]y providing **Hamas** with ostensibly legitimate charitable cover to conceal its recruitment of high quality new members predisposed to the plans and methods of **Hamas**, and to generate popular support for the **Hamas** agenda, the **AL-SALAH SOCIETY** acts for or on behalf of, assists in, sponsors, or provides financial, material, or financial or material support for, or financial or other services to or in support of **Hamas**." (Emphasis and punctuation in the original.)

675.    Isma'il Abu Shanab, one of the most senior leaders and founders of HAMAS, gave an interview in January 2001 to the Jordanian newspaper *al-Watan*, in which he referred to *al-Salah, Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* as integral parts of HAMAS's social infrastructure.

676.    An *Associated Press* article on March 2, 2001 described HAMAS's successful fundraising efforts, particularly in the Persian Gulf and Saudi Arabia, adding: "'With the money from Saudi Arabia alone, Islamic activists have distributed 200,000 food packages, and more are on the way,' said Ahmed al-Kourd [sic], head of the Al Salah Charity Committee in Gaza City."

677.    Later, as a result of heavy pressure from Israel and the United States on the PA following several terrorist attacks, Palestinian security forces periodically arrested the leaders of *al-Salah* while the Palestinian Monetary Authority temporarily froze its bank accounts in December 2001. Also, in late 2001 and early 2002, *al-Salah* was identified as the largest, best-funded Hamas organization in the Palestinian territories and was targeted to be shut down by the PA.

678.    According to the U.S. Treasury memorandum, former PA Minister of Communications Imad Falouji, speaking on March 14, 2001, "reported that associations like the

**AL-SALAH SOCIETY** were not publicly labeled as **Hamas**, 'though everyone knew they were affiliated with **Hamas** and had **Hamas** directors.'" (Emphasis and punctuation in the original).

679.    The U.S. government also noted that as of late 2002, four members of *al-Salah*'s leadership belonged to HAMAS's Qassam Brigades.

680.    *Al-Salah* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the IDF's Central Command on June 30, 2002.

681.    On August 7, 2007, the United States Treasury Department declared *al-Salah* an SDGT. In a press release announcing the declaration, the Treasury stated that:

> HAMAS has used the *al-Salah* Society, as it has many other charitable fronts, to finance its terrorist agenda. ... The *al-Salah* Society supported HAMAS-affiliated combatants during the first Intifada and recruited and indoctrinated youth to support HAMAS's activities. It also financed commercial stores, kindergartens, and the purchase of land for HAMAS. One of the most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the al-Salah Society as "one of the three Islamic charities that form Hamas's welfare arm." The al-Salah Society has received substantial funding from Persian Gulf countries, including at least hundreds of thousands of dollars from Kuwaiti donors.

682.    *Al-Salah* also received funding from several notable radical Islamic charitable organizations, which were members of the *Itilaf al-Khair* ("Union of Good"): Interpal (SDGT), CBSP (SDGT), Al-Aqsa Foundation (SDGT) and Holy Land Foundation (SDGT).

683.    An article published in the December 2005 Issue of *Filastin al-Muslima* ("Muslim Palestine," the official HAMAS newspaper), reported that from the outbreak of the Second Intifada in September 2000 to December 2005, *al-Salah*'s annual average budget was ten million dollars.

684.    On August 7, 2007, the United States declared Ahmad al-Kurd, former Chairman and then board member of *al-Salah*, an SDGT, and declared (in the same press release[11] announcing the declaration regarding *al-Salah* itself):

---

[11]    http://www.ustreas.gov/press/releases/hp531.htm

> The *al-Salah* Society is directed by Ahmad al-Kurd, a recognized high-ranking HAMAS leader in Gaza. Al-Kurd's affiliation with HAMAS goes back over a decade. During the first Intifada, al-Kurd served as a HAMAS Shura Council member in Gaza. As of late 2003, al-Kurd was allegedly the top HAMAS leader in Deir al-Balah, Gaza. Since mid-2005, he has served as the mayor of Deir Al-Balah, elected as a HAMAS candidate.

685.    He had also served as the minister of welfare and labor in the de facto HAMAS administration in the Gaza Strip. In February 2017, he was elected as a member of HAMAS's political bureau.

686.    Several former members on the administrative board of *al-Salah*, in its various branches, were also known as prominent operatives in HAMAS's *da'wa*, among them:

- **Osama al-Mazini**: al-Mazini was a senior HAMAS operative and one of HAMAS's political leaders in the Gaza Strip. He was also a member of the Board of *al-Salah* as well as *Al-Mujama Al-Islami* (as mentioned before). He was imprisoned by Israel between 1988-1994. Al-Mazini was arrested by the Palestinian Authority as well, following terrorist attacks committed by HAMAS.

- **Salem Salama**: Salama was a senior HAMAS member, a member of the administrative board of *al-Salah* and one of the *Marj al-Zuhur* deportees. Salama was arrested several times by Israel during the First Intifada.

- **Mansur Abu Hamid:** Hamid was a senior member of HAMAS and chairman of the Rafah branch of the al-Salah Society.

687.    From the early 1990s through 2004, *al-Salah* enjoyed financial support from the Holy Land Foundation in the United States (before it was declared a terrorist organization by the United States administration and its assets frozen in 2001) as well CBSP (SDGT), Interpal (SDGT), Human Appeal International, the Al-Aqsa Foundation – Germany (SDGT) and many other HAMAS fundraising organizations.

688.    BANK OF PALESTINE maintained accounts for, and provided financial services to, *al-Salah*.

689.    The accounts included Account No: 256754/9 (in both Rafah and Dir al-Balah) and Account No. 256754/1 and others.

690.    One of *al-Salah*'s accounts at BANK OF PALESTINE was a U.S. dollar-denominated account that both received multiple transfers from the United States via BANK OF PALESTINE's correspondent bank accounts in New York and issued payments in U.S. dollars that were settled through BANK OF PALESTINE's agents in New York.

691.    BANK OF PALESTINE maintained accounts for *al-Salah* until at least 2014 – knowing that *al-Salah* belonged to HAMAS and knowing that *al-Salah* had been designated an SDGT in 2007. By its conduct, BANK OF PALESTINE made clear that it was, at all times, knowingly assisting HAMAS in its terrorist activities.

692.    In 2015, after BANK OF PALESTINE finally closed *al-Salah*'s accounts, Asmaa al-Kurd (likely the daughter of Ahmad al-Kurd (SDGT)) who was in charge of the "orphans division" of *al-Salah*, told *Al-Monitor*, "During the past year, the Bank of Palestine froze the accounts of 32 charities operating in the Gaza Strip, including that of the Salah Association. The bank also refused to open new accounts for 50 charities, in addition to returning in the past month money transfers totaling $2 million that had been sent from donors and associations outside Palestine to the poor and orphans."

693.    Al-Kurd added, "The bank's policy of closing the accounts of charities is part of the siege on Gaza, which is aimed at sparking a revolution of the poor and widows against the Gaza government."

### 5.    Al-Wafa Charitable Society – Gaza (Jam'iyat Al-Wafa' Liri'ayat Al-Musinnin)

694.    The Al-Wafa Charitable Society was founded in 1980 in the Gaza Strip by the Muslim Brotherhood and after 1987 it became a key component of HAMAS's da'wa network in

the Gaza Strip, providing medical care to Gazan residents.

695.    An FBI recording made at the Philadelphia Conference in 1993 referred to the al-Wafa Society for the Care of the Elderly as one of "*the principal organization known to be affiliated with us…*"

696.    The Al-Wafa Charitable Society's annual budget during the relevant period was approximately $10 million dollars.

697.    It was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002 and by the IDF's Central Command on June 30, 2002.

698.    The Society's bank account was confiscated by Israel in February 2004, during IDF operations to confiscate the funds of HAMAS associations in Ramallah.

699.    Many of the Al-Wafa Charitable Society's key operatives are publicly known to be members of HAMAS. Its principal leaders included:

- **Muhammad Rafiq al-Khudari**: Al-Khudari was Chairman of Al-Wafa Charitable Society s Board of Directors during the relevant period. He was known as a senior civilian official in HAMAS and was in regular contact with the HAMAS leadership.

- **Basem Naim Muhammad Naim**: Naim served as a member of Al-Wafa Charitable Society's Board of Directors and was a prominent HAMAS operative in the Gaza Strip. He later served as "Health Minister" in the HAMAS government in Gaza.

- **Dr. Muhammad Abd al-Hadi Abd al-Rahman Muhammad Shihab**: Shihab served as General Secretary for Al-Wafa Charitable Society Hospital's pharmacies and medical supplies department and was a prominent HAMAS leader and was later elected as a member of the Palestinian Legislative Council for HAMAS's Change & Reform Party.

- **Taysir Nasr al-Baltaji**: Al-Baltaji is the Director General of Al-Wafa Charitable Society and Al-Wafa Hospital. He was one of the HAMAS leaders at the Islamic University of Gaza in 1985 and was known as a senior civilian official in HAMAS.

- **Salah al-Rantisi**: Rantisi was a board member of Al-Wafa Charitable Society and also the Director of Social Health Department in the de facto HAMAS Health Ministry in Gaza. Rantisi is the younger brother of deceased HAMAS leader Abd al-Aziz al-Rantisi.

- **Muhi al-Din Saleh al-Hilu**: Al-Hilu was a member of the board of the Al-Wafa Charitable Society. Al-Hilu is also the headmaster of Dar al-Arqam school which belongs to HAMAS.

- **Hazem al-Nakhala:** Al-Nakhala is a member of the board of the Al-Wafa Charitable Society. He is also the head of the Institutions Committee in HAMAS's Public Relations Department.

- **Jamal al-Zabda:** Zabda was the chairman of the Al-Wafa Charitable Society. He was also a professor at the Islamic University of Gaza, Dean of Community Service and Continuing Education and a member of the University's board. In 2003, Zabda was elected on the HAMAS list to the Palestinian Engineers Association in Gaza.

700.    BANK OF PALESTINE maintained multiple accounts for the Al-Wafa Charitable Society, including Account No. 521934 (in "Dollars-Dinars-Shekels-Euros") and Account No. 521934/11, *which remains open as of this date.*

## III.   BANK OF PALESTINE PROVIDED BANKING SERVICES TO NOTORIOUS HAMAS INSTITUTIONS

701.    As alleged above, HAMAS operates a social service network through local "zakat" committees and "charitable" societies. BANK OF PALESTINE has knowingly provided financial services to these organizations and affirmatively assisted them in collecting, receiving, transmitting and distributing funds to support HAMAS's terror campaign.

702.    BANK OF PALESTINE knowingly provided financial services and thereby aided and abetted HAMAS by receiving, holding and transferring funds for the following HAMAS institutions:

- ISLAMIC UNIVERSITY OF GAZA
  Account No. 1100280 **(active account)**
  Account No. 1112222, Rimal branch

96

- *AL MUJAMA AL ISLAMI* (ISLAMIC CENTER – GAZA)
  Account No. 1103953 **(active account)**
  Account No. 92022, Jabalia Branch

- *AL JAM'IYA AL ISLAMIYA* (ISLAMIC SOCIETY – GAZA)
  Account No. 89970, Beit Hanun Branch
  Account No. 1054079
  Account No. 91999, Jabalia Branch
  Account No. 332234
  Account No. 135159

- AL SALAH ISLAMIC SOCIETY
  Account No. 256754/9 (Dir al-Balah and Rafah Branches)
  Account No. 256754/1

- AL WAFA CHARITABLE SOCIETY
  Account No. 521934
  Account No. 521934/11 **(active account)**

703.    On August 23, 2003, the Palestinian Prime Minister and Minister of Interior, Mahmud Abbas, and the Minister of Security, Muhammad Dahlan, took official steps against HAMAS when they identified *Al-Jam'iya Al-Islamiya* and at least ten other organizations as part of HAMAS. The next day, the Palestinian Monetary Authority placed a temporary freeze on the bank accounts of *Al-Jam'iya Al-Islamiya* and other HAMAS organizations.

704.    In the Order forwarded to the Palestinian Prosecutor General on August 24, 2003, then-Prime Minister and Minister of the Interior Mahmoud Abbas justified the freeze on the accounts by saying that it was a matter of "security issues" and "requirements for the public interest."

705.    In a letter written to then-Minister of the Economy Salam Fayyad, then-Palestinian Minister of Internal Security Muhammad Dahlan openly declared that the steps that had been taken were directed against "Hamas organizations." The letter described the demand to freeze the accounts as stopping support for "Hamas Institutions."

706.     Nevertheless, public outcry in the Palestinian Territories led the new Palestinian Cabinet to officially cancel the freeze order on November 17, 2003.

707.     These actions not only provided BANK OF PALESTINE with (further) actual notice that specific account holders were part of HAMAS, but also that its own government and nominal regulator was aware of that fact.

708.     Notwithstanding all the foregoing, BANK OF PALESTINE knowingly maintained accounts and provided critical financial services to HAMAS through its services to the core HAMAS institutions until at least 2014.

709.     BANK OF PALESTINE did so knowing the importance of commercial banking services to HAMAS and the bank's ability to facilitate cross-border funds transfers, particularly in U.S. dollars.

710.     BANK OF PALESTINE was aware of the then-commonplace culture of lax due diligence at U.S. correspondent banks and the well-known deficiencies of the relatively new Palestinian Monetary Authority's banking oversight capabilities.

711.     As a "local bank" rooted in the Palestinian Territories, BANK OF PALESTINE understood its customer base in Gaza, that customer base's support for and reliance on HAMAS institutions and chose to provide vital financial services to HAMAS (even today) knowing (a) that HAMAS has been designated an FTO, (b) that it engages and has always engaged in horrific acts of violence, and (c) that HAMAS is dependent upon access to the international financial system and particularly U.S. dollar-clearing to collect the funds it needs to sustain its extensive infrastructure in the Palestinian Territories.

## CLAIM FOR RELIEF

## AIDING AND ABETTING HAMAS, A FOREIGN TERRORIST ORGANIZATION, IN VIOLATION OF 18 U.S.C. § 2333(d)

712.    Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth herein.

713.    Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331 that were committed, planned and authorized by HAMAS, a designated FTO at the time each act of terrorism described occurred.

714.    BANK OF PALESTINE provided substantial assistance to HAMAS by transferring significant sums of money to HAMAS and its operatives and maintaining bank accounts for its senior operatives and key institutions.

715.    BANK OF PALESTINE was fully aware of HAMAS's conduct, including its campaign of suicide bombings and other terrorist acts.

716.    BANK OF PALESTINE's own actions substantially assisted HAMAS and its conduct foreseeably aided HAMAS in committing acts of terrorism of the kind that injured the plaintiffs.

717.    BANK OF PALESTINE understood the value and importance to HAMAS of the bank's role in facilitating large transfers of funds, including U.S. dollars, from donors and co-conspirators around the world and making those funds available to HAMAS.

718.    Plaintiffs allege that BANK OF PALESTINE knowingly aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the

99

United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), §2b.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

    (a)    Accept jurisdiction over this action;

    (b)    Enter judgment against BANK OF PALESTINE and in favor of plaintiffs for compensatory damages in amounts to be determined at trial;

    (c)    Enter judgment against BANK OF PALESTINE and in favor of plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

    (d)    Enter judgment against BANK OF PALESTINE and in favor of plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

    (e)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

September 6, 2019

    By:    /s/ Dina Gielchinsky
    **OSEN LLC**
    Dina Gielchinsky, Esq.
    Gary M. Osen, Esq.
    Ari Ungar, Esq.
    Michael Radine, Esq.
    Aaron Schlanger, Esq.
    2 University Plaza, Suite 402
    Hackensack, New Jersey 07601
    Telephone (201) 265-6400

    1441 Broadway, Suite 6022
    New York, NY 10018
    Telephone (212) 354-0111

**ZUCKERMAN SPAEDER LLP**
Shawn P. Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
Telephone (646) 746-8655

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Telephone (501) 791-2277

**KOHN, SWIFT & GRAF, P.C.**
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone (215) 238-1700

Attorneys for Plaintiffs