UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SARRI ANNE SINGER, et al.,                        :
                                                  :
                          Plaintiffs,             :          MEMORANDUM & ORDER
                                                  :
              -against-                           :          19-cv-006 (ENV) (RML)
                                                  :
BANK OF PALESTINE,                                :
                                                  :
                          Defendant.              :
------------------------------------------------------------- x

VITALIANO, D.J.

        Plaintiffs are an alleged group of American citizens, or their relatives, survivors, or heirs,

who have been killed or injured by 12 devastating terrorist attacks in Israel perpetrated by the

infamous terrorist organization Hamas.  Am. Compl. at ¶ 1, Dkt 33. Plaintiffs have filed suit

against Bank of Palestine ("BOP"), claiming that it is civilly liable for their injuries because it

aided and abetted Hamas in violation of 18 U.S.C. § 2333(d) of the Anti-Terrorism Act

("ATA").  *Id.*  They contend that BOP has knowingly and purposefully provided financial

services to Hamas by maintaining accounts for and facilitating payments on behalf of Hamas's

leaders and prominent institutions.  *Id.* at ¶ 2.  On March 10, 2020, BOP moved to dismiss the

complaint for lack of personal jurisdiction and failure to state a claim.  Def. Mot., Dkt. 37.  For

the reasons stated below, the motion is denied without prejudice to renewal after completion of

limited jurisdictional discovery.

Background[1]

---

[1] The facts are taken from plaintiffs' complaint.  All facts alleged in plaintiffs' pleadings are
deemed to be true, and all reasonable inferences are drawn in their favor.  *Vietnam Ass'n of
Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008); *see also Pisani v. Diener*,
No. 7-CV-5118, 2009 WL 749893, at *5 (E.D.N.Y. Mar. 17, 2009) ("[I]n considering a Rule

The terrorist attacks relevant to this action are 12 in numbers separately occurring in Israel between December 2001 and August 2003. Am. Compl. at ¶¶ 8–497. These attacks, described in detail and covering over 50 pages of the complaint, resulted in serious, horrific, and often fatal injuries to the victims. *Id.*

Plaintiffs allege that these 12 attacks were carried out by individuals affiliated with Hamas, a radical Islamic terrorist organization. *Id.* at ¶¶ 1, 8, 41, 172, 235, 294, 313, 332, 385, 402, 408, 480, 485, 506, 711. Its terrorist pedigree well-established, Hamas was deemed a Specially Designated Terrorist ("SDT") organization in 1995, a Foreign Terrorist Organization ("FTO") in 1997, and a Specially Designated Global Terrorist ("SDGT") in 2001 by the government of the United States. *Id.* at ¶¶ 596, 599, 602. Plaintiffs allege that Hamas developed a three-prong strategy in the early 1990s to effect terror by 1) upgrading its terror apparatus, such as improving bomb-making skills, 2) intensifying efforts to subvert existing welfare institutions, and 3) accelerating the development of its world-wide fundraising network. *Id.* at ¶¶ 536–540.

Defendant Bank of Palestine ("BOP") is a banking corporation headquartered in Ain Misbah, Ramallah with branches solely in Palestine. *Id.* at ¶¶ 498, 501. It was the first bank organized in the territory controlled by the Palestinian Authority and is currently the largest, with 71 branches including 15 in Gaza. BOP has over 1,700 employees serving almost 1 million customers, and has assets of over $4.88 billion. *Id.* at ¶ 501. Plaintiffs claim that BOP violated ATA and the Justice Against Sponsors of Terrorism Act ("JASTA") when it knowingly provided financial assistance, such as maintaining accounts and facilitating payments, on behalf of

---

12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are to be resolved in plaintiff's favor.").

Hamas's most prominent *da'wa* institutions, and provided financial services for two key global Hamas fundraisers. *Id.* at ¶ 2.

Hamas *da'wa* institutions are a critical part of Hamas's civilian infrastructure and network.[2]  The Hamas *da'wa* apparatus refers to a civilian network of charitable, educational, and related welfare institutions which, in addition to their social welfare activities, work to further Hamas goals through activities such as recruitment and transferring monetary funds.  *Id.* at ¶¶ 612, 613.  These organizations provide streams of income to Hamas operatives and facilitate payments of honorariums (including "martyr" payments) to families of Hamas operatives killed, injured, or imprisoned as a result of their terrorist activities.  *Id.* at ¶ 619.

Plaintiffs contend that BOP provided financial services to five *da'wa* charitable and education institutions, The Islamic Center of Gaza, The Islamic Society of Gaza, the Al-Salah Islamic Society – Gaza ("*al-Salah*"), the Islamic University of Gaza, and the Al-Wafa Charitable Society – Gaza.  *Id.* at ¶¶ 622–630, 631–646, 647–665, 666–693, 694–700.  According to plaintiffs, each of these organizations had ties to Hamas, including affiliations to key Hamas leaders and founders.  *Id.*[3]  Plaintiffs assert that despite an awareness of these institutions' ties to Hamas, BOP knowingly maintained financial accounts and provided financial services for them until at least 2014.  *Id.* at ¶ 708.

Specifically, plaintiffs aver that BOP "maintained accounts for and provided financial services" to The Islamic Center of Gaza, The Islamic Society of Gaza, and the Islamic University

---

[2] The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used in this decision to refer to "the civilian infrastructure of Hamas."  Am. Compl. at 60 n.5.

[3] The amended complaint describes in detail each of these organizations' affiliations to Hamas based on articles, reports, and other records gathered by plaintiffs.

of Gaza at various bank branches in Palestine.  *Id.* at ¶¶ 629, 630, 645, 664.  They also allege that BOP "maintained multiple accounts" for the Al-Wafa Charitable Society.  *Id.* at ¶ 700.  The complaint lists the BOP account numbers for each of these institutions, but does not identify any specific payments or transactions made during the relevant period.  *Id.* at ¶¶ 630, 646, 665,

Plaintiffs also claim that BOP maintained accounts for and provided financial services to *al-Salah*.  *Id.* at ¶ 688.  One of *al-Salah's* accounts at BOP, plaintiffs contend, was a U.S. dollar-denominated account that both received multiple transfers from the U.S. via BOP's correspondent bank accounts in New York and issued payments in U.S. dollars that were settled through BOP's agents in New York.  *Id.* at ¶ 690.  Plaintiffs further maintain that BOP kept these accounts for *al-Salah* until at least 2014 despite knowing that it was associated with Hamas and that *al-Salah* had been designated an SDGT in 2007.  *Id.* at ¶ 691.  In 2015, according to the amended complaint, BOP closed *al-Salah's* accounts.  *Id.* at ¶ 692.

Aside from maintaining accounts for Hamas *da'wa* institutions, BOP also allegedly held accounts and processed fund transfers for Interpal and the Holy Land Foundation ("HLF"), two large fundraising entities on behalf of Hamas.  *Id.* at ¶¶ 550, 574.  Specifically, Interpal is, plaintiffs aver, Hamas's most important fundraising organization in the United Kingdom.  *Id.* at ¶ 543.  The Israeli government declared Interpal an illegal organization on May 6, 1997 because of its affiliation with Hamas.  *Id.* at ¶ 545.  It was declared an SDGT by the U.S. government following an August 19, 2003 bombing.  *Id.* at ¶ 546.  Plaintiffs claim that, nonetheless, BOP did not stop processing transfers for Interpal and that even in 2016, BOP jointly sponsored "the

Palestine Festival for Childhood Education" with Interpal. *Id.* at ¶¶ 550, 551. No further details are provided as to the alleged transfers on behalf of Interpal.

Crossing back over the Atlantic, HLF is the preeminent Hamas fundraising organization in the United States and funnels money to Hamas-controlled charities. *Id.* at ¶¶ 567, 569, 577. On December 4, 2001, the United States designated HLF an SDGT with ties to Hamas. *Id.* at ¶¶ 577, 578. Plaintiffs claim that BOP opened and maintained a U.S. dollar-denominated account for HLF in 1994 and that HLF "made multiple transfers from the United States to this account in Gaza." *Id.* at ¶¶ 574, 576. This account appears to have been under the direct control of Hamas founder Ibrahim al-Yazuri and had direct ties to Hamas's Islamic Society of Gaza. *Id.* at ¶ 575. Like the allegations regarding Interpal, specifics about these alleged transfers, such as amounts and dates, are not provided.

Plaintiffs also contend, generally, that "during the relevant period, BOP effectuated U.S. dollar-denominated funds transfers through correspondent bank accounts at three banks located in New York: Citibank, N.A. (111 Wall Street, 19th Floor, New York, NY 10043), JP Morgan Chase Bank, (4 Chase Metrotech, Brooklyn, NY 11245), and Union Bank of California N.A. *Id.* at ¶ 6.[4] They further claim that BOP purposefully and knowingly used its correspondent bank accounts in New York to facilitate a large volume of U.S. dollar-denominated fund transfers to

---

[4] "A correspondent account is 'a domestic bank account held by a foreign bank . . . used for deposits, payments and transfers of funds.'" *Spetner v. Palestine Investment Bank*, No. 19-CV-005, 2020 WL 6119298, at *3 n.5 (E.D.N.Y. Oct. 16, 2020) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161, 165 n.3 (2d Cir. 2013)). Foreign banks may use a New York correspondent bank account to "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Spetner*, 2020 WL 6119298, at *3 n.5 (citing *Licci IV*, 732 F.3d at 165 n.3). "Non-U.S. banks with correspondent accounts in New York can send and receive dollar-denominated funds transfers through their correspondent accounts, which are held at U.S. banks with access to the CHIPS or Fedwire system and thus have the ability to clear and settle funds transfers in New York." *Id.*

Hamas.  *Id.* at ¶ 7.  No details are provided as to the amounts, dates, frequency, recipients, or initiators of these transactions.

Discussion

As a threshold issue, BOP challenges jurisdiction, moving to dismiss the case under Federal Rule of Civil Procedure 12(b)(2).  Def. Mem. at 6, Dkt. 37-1.  The burden to establish personal jurisdiction over a defendant rests with plaintiff, who must make a prima facie showing "by pleading in good faith, legally sufficient allegations of [personal] jurisdiction."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013).  Pleadings that assert only "conclusory non-fact-specific jurisdictional allegations" or state a "legal conclusion couched as a factual allegation" do not meet this burden.  *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

Personal jurisdiction is, however, determined in accordance with the laws of the forum state, subject to federal due process constraints.  *Nautilus Ins. Co. v. Adventure Outdoors*, *Inc.*, 247 F.R.D. 356, 358 (E.D.N.Y. 2007) (citing *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990)).  New York's jurisdictional statutes provide for both general and specific personal jurisdiction.[5]  *See* N.Y. C.P.L.R. §§ 301–302.

---

[5] Defendant contends, and plaintiffs do not dispute, that the Court does not have general jurisdiction over BOP.  Def. Mem. at 10; Def. Reply at 4 n.2, Dkt. 39.  Indeed, general jurisdiction is plainly inapplicable here.  A corporation is subject to general jurisdiction only where it is "essentially at home."  *Daimler AG v. Bauman*, 571 U.S. 117, 122, 134 S. Ct. 746, 751, 187 L. Ed. 2d 624 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011)).  The Second Circuit has held that "except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business."  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016).  Here, BOP is a foreign bank with branches solely in Palestine that is neither incorporated nor maintains its principal place of business in New York.  Am. Compl. at ¶¶ 1, 498, 501; Def. Mem. at 2.

With respect to specific jurisdiction, in line with federal principles and the constitutional mandates of due process, "the plaintiff's cause of action must arise out of defendant's contacts with the state which, although not substantial, satisfy the state's long arm statute." *Nautilus Ins. Co.*, 247 F.R.D. at 359 (citing N.Y. C.P.L.R. § 302).  New York's long arm statute, in turn, allows courts to exercise personal jurisdiction over an out-of-state defendant who, "in person or through an agent," "transacts any business within the state," if the "plaintiff's claim arises from the transaction."  N.Y. C.P.L.R. § 302(a) (McKinney 2019).[6]   In other words, to determine whether personal jurisdiction may be exercised under section 302(a)(1), "a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50, 60 (2d Cir. 2012) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)).

Turning to the first prong, "[t]he New York Court of Appeals has explained that the overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York, thereby invoking the benefits and protections of its laws." *Licci II*, 673 F.3d at 61 (internal quotation marks and citations omitted).  As such, "[a] defendant need not physically enter New York State in order to transact business, so long as the defendant's activities here were purposeful." *Id.* (internal quotation marks and citation omitted).  But not all purposeful activity

---

[6] If, and only if, a plaintiff meets these jurisdictional requirements, he must then show that exercising personal jurisdiction over the defendant will not violate the Constitution's due process clause.  This analysis requires that the defendant have sufficient "minimum contacts" with the forum state and that the exercise of jurisdiction is reasonable under the circumstances.  *See generally Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021).

constitutes a "transaction of business" within the meaning of C.P.L.R. § 302(a)(1).  For instance, "merely telephoning a single order to New York requesting a shipment of goods to another state" would not meet the requirements under C.P.L.R. § 302(a)(1); rather, courts must look to the "quality of the defendants' New York contacts" as the "primary consideration."  *Id.* at 62 (internal quotation marks and citations omitted).

The story related by the complaint is long and painful, but detail related to BOP's contacts with New York is precious little.  As is the case with many ATA lawsuits involving foreign banks, the jurisdiction-creating business transactions alleged in the complaint hinged to defendant's purported use of correspondent bank accounts in New York to transfer funds to Hamas.  Am. Compl. at ¶¶ 5–7.  When the alleged business transaction involves correspondent bank accounts, "the Second Circuit has suggested that the 'mere maintenance' of a correspondent account would not create personal jurisdiction."  *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-007, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020).  But, "use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful."  *Licci IV*, 732 F.3d 161, 168 (2d Cir. 2013) (citing *Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 39 N.Y.2d 391, 348 N.E.2d 581, 384 N.Y.S.2d 124 (1976)).  Whether this use, standing alone, is a "transaction of business" is a "fact-intensive inquiry" which requires the trial court to "closely examine the defendant's contacts for their quality."  *Id.* (citing *Licci v. Lebanese Canadian Bank, SAL ("Licci III")*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012)).  Complaints which allege that a foreign bank engaged in sustained, deliberate, and repeated "use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's dependable and transparent banking

system." *Licci IV*, 732 F.3d at 168; *see also Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 19 (E.D.N.Y. 2016).

Applying this principle in the seminal ATA case *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, the Second Circuit held that the Lebanese Canadian Bank's ("LCB's") use of New York correspondent bank accounts to facilitate dozens of wire transfers, which totaled several millions of dollars, to the Shahid Foundation, a financial arm of the terrorist group Hizballah, demonstrated frequent and deliberate use of New York's banking system and purposeful availment of the privilege of doing business in New York.  732 F.3d at 171.  The amount of contacts sufficiently showed "deliberate and recurring activity" that was not "random, isolated, or fortuitous."  *Id.*

Following *Licci*, several courts in this Circuit have found a foreign bank's repeated and deliberate use of New York correspondent banks to transfer funds to terrorist organizations sufficient to demonstrate purposeful availment of New York's banking system.  *See Averbach v. Cairo Amman Bank,* No. 19-CV-004, 2020 WL 486860, at *7 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 1130733, (Mar. 9, 2020); *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-007, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020). In each of these cases, the courts undertook a fact-intensive inquiry, taking care to note the number of transfers, total dollars transferred, dates, and other details alleged in the complaint in order to determine the quality of the contacts asserted by the plaintiff as reasonably sufficient to support personal jurisdiction as provided in the New York long arm statute.  For instance, in *Bartlett*, the court noted that plaintiffs had "identified numerous specific transactions," numbering in the dozens, which totaled millions of dollars, and had listed the initiators of these transactions, some of whom were key Hezbollah leaders.  2020 WL 7089448, at *5.  "Such a

volume of transactions—both the number and aggregate dollar-value—[was] sufficient to show that Defendants deliberately availed themselves of New York through the use of these correspondent accounts." *Bartlett*, 2020 WL 7089448, at *5.  Similarly, in *Averbach*, the court pointed out that plaintiffs had alleged twenty-three fund transfers in the two years immediately prior to the alleged attacks, and although that was fewer total transfers than the "dozens" alleged in *Licci*, these transfers took place during a more concentrated period.  2020 WL 486860, at *7. The *Averbach* court also compared its case to *Indosuez International Finance B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 247, 774 N.E.2d 696, 746 N.Y.S.2d 631 (2002). In that latter case, New York's high court (the New York Court of Appeals), found that six New York based banking transfers in two years was sufficient for personal jurisdiction.  The court concluded that compared to the six transfers, twenty-three transfers sufficiently pleaded a course of dealing by the bank with the correspondent bank accounts.  *Averbach*, 2020 WL 486860, at *6 (S.D.N.Y. 2020).  Indeed, in both *Averbach* and *Bartlett*, the courts painstakingly identified key supporting facts in the complaint about the quality and the quantity of the alleged transfers to determine whether defendants allegedly engaged in "frequent and deliberate use" of New York banks.

In contrast, neither Singer nor any other plaintiff has identified a single transfer, dollar amount, transfer date, or the parties to any alleged BOP transfers through a New York banking institution.  Instead, plaintiffs attempt to thread the needle of personal jurisdiction through a series of more generalized allegations.  For instance, they allege, that "during the relevant period" BOP effectuated "funds transfers" through three correspondent bank accounts in New York to "facilitate a large volume of U.S. dollar-denominated" transfers to Hamas.  Am. Compl. at ¶¶ 6, 7.  No further information as to dates, dollar amounts, number of transactions, senders or recipients of these transfers is provided.

10

Further, plaintiffs' allegations regarding BOP's involvement with many of the individual *da'wa* institutions are fairly barebones. For example, plaintiffs claim that BOP maintained accounts for and provided financial services to the Islamic University of Gaza, the Islamic Center of Gaza, the Islamic Society of Gaza, and Al-Wafa Charitable Society. *Id.* at ¶¶ 629, 645, 664, 688, 700, 708. Other than account numbers, very little additional information is provided. *Compare Bartlett*, 2020 WL 7089448, at *5 (account numbers and the allegation that defendants transferred "millions of dollars on Hezbollah's behalf through these accounts" were somewhat general allegations, but the identification of numerous specific transactions and the volume, both in number and dollar value, of these transactions, were sufficient to demonstrate purposeful availment of New York banks).

Continuing to spin their conclusory web, plaintiffs then allege that BOP has "aided and abetted" Hamas by "receiving, holding, and transferring funds" on behalf of these institutions. Am. Compl. at ¶ 702. It is unclear, however, from these allegations whether there is any connection between New York, or the United States for that matter, and these alleged transfers. Similarly, with regards to Interpal, plaintiffs merely allege that BOP "did not stop processing transfers for Interpal and other designated Hamas fundraising entities." Am. Compl. at ¶ 550. No further details are provided as to these alleged transfers and whether they had any connection to the United States and specifically, New York.

Plaintiffs though come closest to identifying a New York connection for two of these entities, *al-Salah* and HLF. They plead that "one of *al-Salah's* accounts at BOP was a U.S. dollar-denominated account that both received multiple transfers from the United States via Bank of Palestine's correspondent bank accounts in New York and issued payments in U.S. dollars that were settled through Bank of Palestine's agents in New York." For HLF, plaintiffs allege

11

that BOP "opened and maintained a U.S. dollar-denominated account for HLF in 1994" that "appears to be under the direct control of Hamas founder Ibrahim al-Yazuri," and that HLF "made multiple transfers from the U.S. to this account in Gaza."  Am. Compl. at ¶¶ 574–576. But "multiple transfers" could mean as few as two transfers to as many as several dozens of transfers.  It is also unclear what the relevant time period for these transfers were and if they were in anyway related to the alleged attacks.  *Compare Licci III*, 984 N.E.2d at 901 ("Accepting the complaint's allegations as true, LCB's use of its AmEx correspondent account to transfer money for Shahid provided money for Hizballah to carry out terrorist violence, including the 2006 rocket attacks.").

To be sure, plaintiffs need not allege a specific transfer for each attack or trace specific dollars to specific attacks, especially at this stage of the litigation.  *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard.  Such a task would be impossible and would make the ATA practically dead letter because '[m]oney is fungible.'").  Nor must there necessarily be "dozens of transfers over an extended period . . . to establish a course of dealing and purposeful use of the New York correspondent accounts."  *Averbach*, 2020 WL 486860, at *6.  But the jurisdictional peg cannot attach to thin air either.  Clearly, as the operative complaint stands now, many of its allegations lack key supporting facts which would enable the Court to determine whether there was frequent and deliberate use of New York correspondent bank accounts to transfer money to Hamas.  As pleaded, the complaint relies heavily on vague terms such as "large volume" or "multiple transfers" such that the Court has no basis for determining whether the quantity and quality of contacts is sufficient.  Am. Compl. at ¶¶ 7, 576.

The absence of factual detail regarding BOP's relationship with New York bank institutions does not necessarily spell doom for plaintiffs.  For "[i]t is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record."  *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014).  Although the Second Circuit has not articulated a precise standard for when a plaintiff is entitled to personal jurisdiction discovery, *Viko v. World Vision, Inc.*, No. 8-CV-221, 2009 WL 2230919, at *16 (D.Vt. July 24, 2009), courts have generally permitted limited jurisdictional discovery where a "plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction[,] facts that would support a colorable claim of jurisdiction."  *Ayyash v. Bank Al–Madina*, No. 04-CV-9201, 2006 WL 587342, at *5 (S.D.N.Y. Mar. 9, 2006) (internal quotation marks omitted); *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*, 731 F. Supp. 587, 593 (S.D.N.Y. 1990) ("While a court should not approve a fishing expedition when little more exists than plaintiff's bare assertions that jurisdiction is proper, under New York law plaintiffs are entitled to discovery regarding the issue of personal jurisdiction if they have made a sufficient start, and shown their position not to be frivolous." (internal quotation marks omitted)).

Not surprisingly, district courts are afforded "considerable discretion in determining how best to handle jurisdictional issues," *Ayyash*, 2006 WL 587342, at *5 (S.D.N.Y. March 9, 2006) (internal quotation marks and citation omitted), and the decision whether to permit jurisdictional discovery lies soundly within the discretion of the district court, *Aaron Consulting Co., LLC v. Snap Solutions LLC*, No. 16-CV-6775, 2018 WL 4568800, at *8 (E.D.N.Y. Sept. 24, 2018). That said, courts "should take care to give the plaintiff ample opportunity to secure and present

evidence relevant to the existence of jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks omitted).

Here, plaintiffs have pleaded facts which could support a colorable claim of jurisdiction. Although somewhat bare, plaintiffs' complaint asserts that BOP used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas during the relevant period. Am. Compl. at ¶ 690. Account numbers have been identified as well as the locations of these correspondent bank accounts. Am. Compl. at ¶¶ 6, 574, 630, 646, 665, 689, 700, 702. They have also pleaded, again in somewhat bare terms, that BOP knowingly assisted Hamas, the party responsible for the terrorist bombings against plaintiffs, by providing financial services and facilitating these dollar transfers. *Id.* at ¶ 701. Some of these allegations could support a colorable basis for personal jurisdiction; it is fair to conclude that plaintiffs have made a sufficient start to establishing personal jurisdiction.

In sum, key supporting facts such as number of transfers, dates, and monetary amounts, which other courts have relied upon to find a prima facie showing of personal jurisdiction are lacking here. At the same time, it also appears from facts that have been plausibly pleaded that plaintiffs might reasonably be able to identify these facts if plaintiffs were allowed to further develop the factual record. As such, the Court also concludes, that limited, written jurisdictional discovery is appropriate here to determine whether the Court has personal jurisdiction over BOP in this action. To that end, accordingly, discovery shall be limited to document requests and interrogatories sufficient to show whether BOP engaged in frequent and deliberate use of New York banks during the time period relevant to the 12 terrorist attacks and that plaintiffs' claims arise from BOP's contacts with New York. Discovery must be reasonably tailored to this

jurisdictional issue.  The parties shall have 120 days from entry of this order to conduct this discovery.

Conclusion

For the foregoing reasons, defendant's motion to dismiss is denied without prejudice to renewal as set forth in this Order.  The parties are directed to contact Magistrate Judge Robert M. Levy who will manage the jurisdictional discovery and set a briefing schedule for the renewal of any motion to dismiss by BOP on jurisdictional grounds.  The Court will take up the balance of BOP's original motion to dismiss when these jurisdictional issues are finally resolved.

So Ordered.

Dated: Brooklyn, New York
        April 30, 2021


                                              /s/ ENV
                                              _____
                                              ERIC N. VITALIANO
                                              United States District Judge