1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3    SARRI ANNE SINGER, et al.,   .   Docket No.
                                  .   1:19-cv-00006-ENV-RML
4         Plaintiffs,             .
                                  .
5           v.                    .   Brooklyn, New York
                                  .   Tuesday, February 22, 2022
6    BANK OF PALESTINE,           .   10:16 a.m.
                                  .
7         Defendant.              .
     . . . . . . . . . . . . .    .
8

9

              TRANSCRIPT OF DISCOVERY HEARING
10        BEFORE THE HONORABLE ROBERT M. LEVY
             UNITED STATES MAGISTRATE JUDGE
11

     APPEARANCES:
12

     For the Plaintiffs:       Osen LLC
13                             GARY M. OSEN, ESQ.
                                  MICHAEL JACOB RADINE, ESQ.
14                             190 Moore Street
                               Suite 272
15                             Hackensack, New Jersey  07601
                               201-265-6400
16

     For the Defendant:        Squire Patton Boggs (US) LLP
17                             MITCHELL RAND BERGER, ESQ.
                                  GASSAN ADNAN BALOUL, ESQ.
18                                JOSEPH STEWART ALONZO, ESQ.
                               1211 Avenue of the Americas
19                             Suite 26th Floor
                               New York, New York  10036
20                             212-872-9800

21

22   Transcription Service:    Opti-Script, Inc.
                               P.O. Box 77
23                             Winfield, PA 17889
                               800-494-7500
24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

1                    P R O C E E D I N G S

2           THE COURT:  Good morning.  Thank you for your

3  patience.  This is Judge Levy.  We're here on docket number

4  19-cv-6, Singer, et al. versus Bank of Palestine.  Will

5  counsel please state their appearances for the record,

6  starting with Plaintiff?

7           MR. OSEN:  Good morning, Your Honor.  This is Gary

8  Osen from Osen LLC for the Plaintiffs.  And I'm joined this

9  morning by Michael Radine.

10          THE COURT:  Good morning.

11          MR. BERGER:  Good morning, Your Honor.  This is

12  Mitchell Berger from Squire Patton Boggs for Bank of

13  Palestine.  I am joined this morning by my colleagues Gassan

14  Baloul and Joseph Alonzo.

15          THE COURT:  All right.  Thank you.  So I understand

16  you're having some difficulties about discovery.  Why don't

17  we start with Plaintiffs' counsel, and then I'll hear from

18  Defendant's counsel.

19          MR. OSEN:  Good morning again, Your Honor.  This is

20  Gary Osen for the Plaintiffs.  I think it might be beneficial

21  to sort of do a little recap of where we started and where we

22  are now.  And of course Your Honor can interrupt at any point

23  with questions or to redirect me as necessary, but with your

24  permission I would start with sort of an overview.

25          THE COURT:  Please.

1          MR. OSEN:  Okay.  So Your Honor, jurisdictional

2    discovery in this case kicked off on May 10th of 2021,

3    approximately nine months ago.  And the focus of that

4    discovery was supposed to be financial transactions that

5    flowed through the United States for various Hamas entities

6    primarily identified in the operative complaint, which we

7    refer to in the discovery requests as the quote/unquote

8    subject entities.

9          In the last nine months, the Defendant has produced

10   a grand total of 13 pages of spreadsheets that confirm that

11   BOP held U.S. dollar accounts, a total of seven accounts, for

12   three of the nine subject entities that we identified in our

13   request.  So there's one account for Al-Salah, two for the El

14   Wafa Charitable Society, and four accounts for the Islamic

15   Society of Gaza.

16         It's worth noting that even within the 13 pages of

17   spreadsheets the date range of transactions is invariably

18   narrow.  So for example, for Al-Salah, the date range was

19   transactions from December of 2002 to August of 2003.  For El

20   Wafa, just to take one more, October 2001 to November of

21   2002.

22         So in addition to the narrow date ranges for the

23   transactions on the spreadsheets, BOP, the Defendant,

24   explained that due to its inability to extract complete data

25   from its backup files, it's, quote, unable to confirm whether

1    particular transactions were or were not funds transfers

2    processed in or through the United States.  That goes back to

3    June of this past year.

4         That specific information, which is the core of

5    jurisdictional discovery, i.e. whether transactions flowed

6    through the United States, is absent from the 13 pages of

7    spreadsheets produced.  And what's absent includes the names

8    of the counterparties to transactions, the originating bank

9    or receiving bank, essentially basic routine information

10   banks retain in order to address queries from customers or a

11   counterparty bank.

12        So I won't repeat, Your Honor, the whole six-month

13   saga concerning the 13 backup tapes which were sent to

14   WeRecoverData for retrieval or the fact that we obtained

15   clarification that there were also 26 HP backup tapes from

16   its legacy core banking application.  All that's highly

17   technical and, frankly, better detailed in a formal

18   submission to the Court.

19        What we'd like to do is file an omnibus motion to

20   compel with a formal briefing schedule rather than a long

21   series of three-page letter brief exchanges because all the

22   issues I'm going to outline are interrelated and the disputes

23   have many components, including many technical components.

24        I can stop there, Your Honor, but with your

25   permission I can sort of tick off what the sort of big ticket

1    disputes are.

2              THE COURT:  No.  Feel free to go ahead.

3              MR. OSEN:  Okay.  So nine months into this process,

4    Your Honor, Plaintiffs still don't know what databases were

5    searched and what search terms or queries were used.  BOP

6    originally provided unreadable and redacted search query

7    terms.  When repeatedly pressed on this issue, Defendant

8    advised that it had previously provided us not the actual

9    search terms used in this case but a redacted sample of a

10   search done in another matter.

11             BOP then provided a template for the searches it

12   purportedly conducted but again not the actual search terms

13   or query terms.  When we again asked for the actual search

14   and query terms BOP used to search for responsive records, we

15   received an assurance from BOP, quote, "that they had

16   searched its core banking system for any accounts or

17   transactions searched and searched its branches and the

18   remittance department for any transfers or other documents

19   related to the subject entities listed in the Plaintiffs'

20   document request as well as aliases, acronyms, permutations,

21   and combinations of those names in Arabic and English."

22             Essentially, and I don't want to be too glib, but

23   this is the equivalent of a teacher asking a student for

24   their homework and being told that the homework was done and

25   that the contents are in accordance with the request of the

1    teacher to do the homework.  It's tell, not show.  And put

2    simply, ESI discovery requires more than assurances.  Nine

3    months into this process, Plaintiffs have no idea what search

4    terms were actually used.  And that's only the tip of the

5    iceberg.

6          We also have no idea what account numbers

7    Defendants used when searching its ancillary Oracle database

8    for relevant records.  We don't know how BOP determined which

9    account numbers related to Plaintiffs' document requests,

10   what applications and databases and systems they searched at

11   its branches.  We first learned in February of this year that

12   they searched branches, but we don't know how many branches

13   it searched.

14         We don't know what terms and methods it used for

15   searching records from the branches.  We don't know what

16   applications and databases and systems BOP searched in its

17   remittance department, which we, again, first learned about

18   only a few days ago.  So I can keep going on, but I think the

19   general point is clear.  We simply have no idea of any of

20   these things because BOP has neither provided its search

21   terms or database queries, nor has it provided us with the

22   information necessary to understand how its databases work.

23         And this is, I think, a critical point, Your Honor,

24   because when we are talking about database materials, that is

25   not static documents but documents that are relational

1  because they are in a database system, it's incredibly

2  important and there's voluminous case law on this that in

3  order to understand database queries, you have to have the

4  schema, the documentation, the technical architecture so that

5  you understand how the information is drawn from the

6  database.  A spreadsheet, for example, is the sum total of

7  extracting different fields from within the database.  So

8  understanding how that process works is critical to even

9  understanding whether search terms or queries are

10  appropriate.

11        Put another way, if you think of a database is like

12  a building and you have been provided a picture of a door or

13  a window or a sink, you can't reconstruct the building from

14  that.  You don't even know what its function is, whether it's

15  a commercial building, a airport terminal, or a private

16  house.  Without the blueprints from the architect, without

17  understanding the major architectural elements, heating,

18  stairs, ventilation, et cetera, you don't know how the thing

19  works as a whole and you don't know what you're looking at.

20        So we intend to compel not just on the search terms

21  and database queries but also -- which by the way, our view

22  is we should have had that from the outset of this -- but we

23  also intend to compel production of the database schema and

24  technical architecture which would let us understand, among

25  other things, how the number of fields in each database

1  generate tables and how those individual fields work in

2  relation to other fields in the database.

3      I will note that last night Defense counsel sent us

4  what they purported to describe as the schema for one of

5  their databases.  But in fact, it's not a schema at all.

6  It's just a printout of names or lists from the -- that would

7  be part of the schema.  I don't know how to explain the fact

8  that we continue to not get that material, but to be clear,

9  even a simple search of Oracle's own website gives you

10 examples of schema diagrams of the kind that are generated

11 for databases.  So we intend to move on that.

12     I can stop there for a moment if Your Honor has any

13 questions.  Otherwise, I'll go into the dispute about the

14 backup tapes.

15     THE COURT:  If you had a deposition of someone who

16 might know the answers to the questions you just asked, would

17 that be what you're looking for?  Or you're looking for that

18 plus something else?

19     MR. OSEN:  Your Honor, I think a deposition of

20 someone inside BOP who has actual knowledge of their systems

21 and who performed the searches would certainly be helpful,

22 but it's not a substitute for getting the actual

23 documentation, the search queries, the search terms, the

24 schema.  And I can only stress that this is not a

25 particularly onerous thing.  It's frankly the most routine

1    starting point for discovery when we're talking about ESI.

2          So sure, we would certainly welcome a deposition.

3    But again, that would be better and more productive if we

4    actually had the underlying materials first.  So I hope that

5    answers your question.

6          THE COURT:  Yes.  That does.  Okay.  And you want

7    to talk about the missing tapes now?  And then we'll go to

8    BOP.

9          MR. OSEN:  Sure.  Sure.  So there are two sets of

10   tapes.  The one Your Honor is probably more familiar with are

11   the 13 backup tapes that were sent by the Defendant to

12   WeRecoverData.  And basically the dispute there comes down to

13   this.  The recovered tapes, of which the Defendant purports

14   only a couple of them are potentially relevant to the search

15   for underlying with SWIFT documentation.

16         Our position in consultation with our IT consultant

17   is that in order to properly search these recovered tapes,

18   they have to be searched in effect on their native system.

19   That is to say we propose that a vendor be hired and retained

20   to use emulator software for IBM's AIX operating system and

21   then run the tapes on their native software.  And we even

22   offered to pay half the cost of doing that in order to get

23   this done.

24         By analogy -- and I apologize in advance because

25   I'm not by any means a technical expert.  But my

1   understanding of this is that by analogy, if you had an old

2   WordPerfect file from 1995 and you opened it on your computer

3   today, you might be able to read some text from it, depending

4   on the software you use.  But you wouldn't be able to

5   reliably read it or search it the way you would had you been

6   looking at it on a computer in 1995.

7           And so to get the same effect you'd get in 1995,

8   you'd either have to have the original software on a computer

9   or desktop or what have you running Windows 95 and sort of

10  see it as you would have in 1995, or the alternative, which

11  is now available technologically, is to run it on an

12  emulator, basically a cloud version of that same system that

13  is native to it so that you can then properly search.

14          The Defendant's position, and obviously they'll

15  speak to this in a moment, is that based on the bank's prior

16  evaluation of the tapes and their IT expert's assessment of

17  that evaluation, there's no indication that the tapes would

18  contain responsive information.  And that's their position.

19  And, you know, I can't tell you sitting here today that

20  they're existentially certain to be wrong.  But we view the

21  process of just making that determination -- it's reasonable,

22  it's cost effective, and it's appropriate to do so on an

23  emulator looking and searching the files on their native

24  system.  And so we intend to move to compel on that.

25          With respect to the 26 backup --

1          THE COURT:  Can I stop you for one second?

2          MR. OSEN:  Sure.  Absolutely, Your Honor.

3          THE COURT:  Okay.  So when you say cost effective,

4    what are we talking about in terms of cost?  Have there been

5    some kind of estimate?

6          MR. OSEN:  We have an unofficial estimate, but part

7    of our submission -- we've never gotten that far with the

8    Defendants since they've refused to engage on that question.

9    But my understanding is that the total cost involved here

10   might run $20,000, probably less than that.  But part of our

11   submission when we move will be to actually price it out with

12   vendors.

13         THE COURT:  Thank you.

14         MR. OSEN:  Sorry.  And to be clear, the Defendant's

15   position is that it doesn't matter whether it's 20,000 or

16   5,000 or what have you.  They view it as excessively

17   burdensome and unjustified regardless.

18             With respect to the 26 backup tapes from the legacy

19   core banking application, we again ask that those tapes also

20   be searched using an emulator software.  And forgive me, Your

21   Honor, for the technical -- and just so that we're

22   clear -- it's a HP MPE XL operating system.  And that would

23   be, again, to meaningfully review and search those tapes from

24   its legacy core banking application.  And once again, we

25   offered to pay for half the cost of this process.

1          Now, BOP's position -- and again, they'll speak to

2    this in a moment -- is that there's no indication that those

3    tapes would contain additional potentially responsive data

4    beyond what's already been searched by the bank's application

5    in its prior production.  In other words, there's no

6    indication as they see it that other than the 13 pages of

7    spreadsheets we'll get anything more from the 26 tapes.

8          We don't agree with that because from our

9    standpoint the premise of this assertion is that everything

10   that was manually typed into that legacy system prior to 2003

11   was completely and perfectly transported over to its

12   auxiliary database now resident on the bank's current bank's

13   database system and therefore, the 26 tapes can't have

14   anything more than what the 13 pages we've received have.

15         But given that the data was entered 20-plus years

16   ago and transferred to the bank's database system 17 or 18

17   years ago, we don't believe we're required to accept

18   counsel's assertions based on statements presumably made by

19   unnamed BOP personnel who, you know, frankly are unlikely to

20   have been the people who have firsthand knowledge of how that

21   transfer took place 18 years ago.  BOP certainly disagrees

22   with that, and that's why we want to move to compel on that

23   issue.

24         Lastly, Your Honor, because, again, we're nine

25   months into this process and have only received 13 pages of

1  incomplete data and don't even have the search terms used to

2  compile those 13 pages, we also would like to move to compel

3  responses to several interrogatories.  We've previously asked

4  the Defendant to state whether the bank has maintained

5  accounts on behalf of various subject entities and, if so, to

6  state the account number, currencies in which those accounts

7  were denominated and the dates on which each of those

8  accounts was opened and, if applicable, closed.

9          The Defendants have interposed two main objections.

10  One, that they're overbroad and not proportional to the needs

11  of the case.  And second, that the disclosures would violate

12  Palestinian privacy laws.  In certain cases, they also added

13  that subject to and without waiving those objections they

14  refer us to the documents produced in this action, i.e. the

15  13 pages of spreadsheets.

16          Of course, the 13 pages of spreadsheets don't

17  answer the question of how many accounts the bank held for

18  the subject entities, the date on which those accounts were

19  opened or closed.  And we believe we're entitled to those

20  answers.

21          Moreover, we don't believe Palestinian privacy laws

22  should bar our ability to gain the answers we're entitled to,

23  and we'd like to move to compel on that issue and similar

24  issues as well.

25          THE COURT:  All right.  Thank you.

1          May I hear from the Bank of Palestine?

2          MR. BERGER:  Yes.  Good morning, Your Honor.  It's

3     Mitchell Berger.  And I hope you'll bear with me because Mr.

4     Osen spoke for nearly 25 minutes, and it's going to take me a

5     while to unwind what I frankly have to tell the Court are a

6     series of misstatements about how the discovery process has

7     gone.

8          So let me start at the beginning.  When Judge

9     Vitaliano ordered limited jurisdictional discovery almost 10

10    months ago, we have responded in a robust fashion.  We have

11    been accommodating.  And it has been very time-consuming.

12    Let me just highlight a few things that have happened.

13          Months ago, we produced all of the accessible

14    information that Bank of Palestine has on U.S. dollar

15    transactions for the relevant alleged account holders for the

16    relevant time period.  The one thing that Mr. Osen -- we

17    agree on is that those transactions in dollars do not

18    represent transactions through the United States.

19          Mr. Osen complains that we have not given him the

20    remaining information.  And that is frankly because the bank

21    doesn't have it.  These are transactions that are nearly 20

22    years old.  The bank has explained to Plaintiffs that they

23    manually transferred limited data from its old banking system

24    to its new banking system.  We have given them what limited

25    data was transferred.

1          Now let me move on to a few other things because if

2  I hear one more time about 13 pages, I honestly don't know

3  what I should say.  As of this morning, we have produced

4  5,668 pages of information to the Plaintiffs, of which 13 are

5  the spreadsheets containing this transactional information.

6          In addition, the bank has responded to Plaintiffs'

7  3 separate set of document requests, 22 interrogatories, and

8  the like.  We have also, in addition to the formal discovery,

9  received and responded to about a dozen letters from

10  Plaintiffs' counsel containing about 80 questions concerning

11  the bank's computer system.

12          And then, at Your Honor's direction back in

13  December, in January the parties two IT experts met for

14  nearly three hours to review the process that the bank has

15  used to try to extract additional information that might bear

16  on the question of whether there were U.S. transfers.  And I

17  wrote this down at the end of that three-hour conversation

18  when the Plaintiffs' IT expert says thank you, this has been

19  very helpful.

20          So this notion that Bank of Palestine is

21  stonewalling is garbage.  And more importantly, we are now

22  veering out of what is supposed to be limited jurisdictional

23  discovery about whether the bank engaged in certain U.S.

24  transactions during a certain time period into the rarely

25  visited and generally foreclosed territory of discovery about

1   discovery.  But we have informally, both through the answers

2   we've given to the Plaintiffs' letters, through the

3   conversations of the IT experts, we have tried to provide

4   discovery about discovery.  There's no reason to think that

5   an Arabic speaking chief technology officer of the bank with

6   whom our IT expert has been in touch is going to be able to

7   explain this to Plaintiffs' IT expert or Plaintiffs' counsel

8   in any way that was more effective than our IT expert who is

9   both an IT expert and a lawyer who is able to explain it to

10  their IT expert.  That was what Your Honor asked us to do.

11  We did that.  They said it was very helpful.

12          When we last got together, Your Honor, I said we've

13  been trying to give them anything resembling a SWIFT

14  transaction.  What we've only been able to get because of the

15  age of the records, because of the age of the transactions is

16  the information about dollar denominated transactions during

17  a certain time period for certain of the alleged account

18  holders.

19          And I said, you know, Your Honor, we're down to two

20  haystacks.  Now we're looking for needles in haystacks to see

21  if there's anything more that we possibly could give them.

22  Frankly, we have moved beyond looking into needles in

23  haystacks.  And now we are continuing to drill dry holes when

24  Plaintiffs simply will not accept that there is no additional

25  information.

1          Now, there is one open question, as we said in our

2   letter to Your Honor of las week.  We have these two sets of

3   tapes, the 13 tapes and the 26 tapes.  As to the 13 tapes,

4   there's very little that is in dispute.  Plaintiffs

5   essentially agree with us that of the 13 tapes, based on what

6   they and their IT expert have seen either contain no data at

7   all, cannot be restored and thus have no data that is

8   retrievable, or contained data that is not related to the

9   SWIFT system, the SWIFT system being the U.S. dollar transfer

10  mechanism, or do not contain SWIFT transactions from the

11  relevant time period.  So that's the 13 tapes.

12          Now, the 26 tapes, what we have -- we're the ones

13  who told them about the 26 tapes.  We said nobody was sure

14  whether they contained additional information.  But since

15  that time, we know that those tapes likely do not contain

16  information that is going to be related to the SWIFT system

17  or to U.S. transactions.  But nevertheless, in this effort to

18  continue to drill dry holes and look for needles in

19  haystacks, we agreed to accommodate Plaintiffs' latest

20  request.  This time, the request was for printouts of the

21  directories and files on the 26 tapes and on a subset, namely

22  2 of the 13 tapes.  We agreed to do that.  Again, at our

23  expense.

24          We have told the Plaintiffs that we were doing

25  that.  That work is underway.  Its in progress results show

1   nothing suggesting that those tapes contain additional

2   information that would be responsive Plaintiffs' requests.

3   But nevertheless, the job remains to be done.  We understand

4   that that job, which is being done by an outfit called

5   SullivanStrickler, working under the oversight and

6   supervision of our outside expert, Mr. Dan Regard, that

7   should be done in about two weeks.  We think it's fair to

8   complete that process because that table of contents, if you

9   will, for these tapes will be informative to see whether or

10  not we are continuing to drill dry holes to accommodate

11  Plaintiffs' speculation that there must be more there there.

12          Frankly, Your Honor, we don't think there will be.

13  We think we have gone way beyond what is required both for

14  jurisdictional discovery and for discovery about discovery

15  and that we're shortly going to reach the point where enough

16  is going to be enough.

17          But let me say a bit more because Mr. Osen went on

18  into some other issues.  He says, oh, we stonewalled them on

19  the interrogatories.  Well, that's nonsense.  Let me explain,

20  Your Honor, what it is we've objected to.  Recall that Judge

21  Vitaliano said that the focus of this limited jurisdictional

22  discovery should be restricted to document requests and

23  interrogatories sufficient to show whether BOP engaged in

24  frequent and deliberate use of New York banks during the time

25  period relevant to the 12 terrorist attacks such that

1    Plaintiffs need to show large volumes of payments in U.S.

2    dollars to organizations affiliated with Hamas during the

3    relevant period through New York or the United States.

4            Okay.  So what have Plaintiffs given us?  They've

5    said show us transactions you had through the United States

6    with the subject entity.  We said we've given you all we have

7    that potentially bears on that issue.  That is the famous 13

8    pages out of 5,668 that Mr. Osen keeps referring to.

9            Additionally, their interrogatories ask for account

10   activity outside of the relevant time period prescribed by

11   Judge Vitaliano.  That would include requests for production

12   number 7.  It includes requests for account or account

13   activity unconnected with the United States.  That would be

14   interrogatories number 1 through 7.  And also requests,

15   therefore, that have nothing to do with Judge Vitaliano's

16   restriction of the transfers through the United States.

17           They have asked for know your customer and

18   anti-money laundering activity for certain alleged customers

19   that has no relationship to the United States and no

20   relationship to the relevant period.  That would include

21   requests for production of documents 1 through 2 and

22   interrogatory number 16.

23           So Bank of Palestine is not this sort of

24   stonewalling, big, bad bank here that won't tell them

25   anything.  And Mr. Osen complains that last night they got

1    the schema for one of the bank's operating systems and that

2    it wasn't what they wanted.  Well, let me say this, which is

3    we gave them that same information, which they apparently

4    didn't understand or overlooked, way back in August of 2021

5    at Singer 00176 through 00463.  You may notice that those

6    numbers exceed somewhat 13 pages because that was part of

7    what we have done to try to inform Plaintiffs about what's

8    going on here.

9            And so at some point there has to be an end to

10   so-called limited jurisdictional discovery.  And there has to

11   be a restriction on discovery about discovery.  We have done

12   everything and more that is reasonable and humanly possible

13   to give the Plaintiffs insight into what's been going on.  We

14   arranged to have our IT expert speak to their IT expert.  We

15   have been completely transparent about telling them what's

16   what.

17           What they simply are at the stage where they're

18   saying -- and I don't know which of these two possibilities

19   is true -- what you've given us is not enough for us to make

20   a case for jurisdiction over the bank and therefore we want

21   to keep on going until we have drilled every dry hole that is

22   left.  Well, if that's the case, there has to be some showing

23   that this continuing -- this exercise is worth it.  There is

24   a limit not only for limited jurisdictional discovery but for

25   proportional discovery further.

1          Or perhaps the other part of the fork in the road,

2    their view is what we've given them is sufficient for them in

3    their view to state a prima facie case for jurisdiction but

4    they want more.  If that's the case, then a motion to compel

5    is not the way to go.  Rather, the way to go -- and this has

6    been done in many other cases and it's consistent with Judge

7    Vitaliano's order -- is to allow the bank to renew its motion

8    to dismiss for lack of jurisdiction.  They can make whatever

9    argument they want to in response, including saying what

10   we've got, we think, shows enough for jurisdiction but we

11   also have targeted additional limited jurisdictional

12   discovery requests that we think would allow us to show more.

13         Rather than having a complete sideshow collateral

14   litigation involving discovery about discovery or, worse,

15   involving essentially merit discovery asking for account

16   information, KYC information, and the like that has nothing

17   to do with what Judge Vitaliano said limited jurisdictional

18   discovery should focus on, namely transfers through the

19   United States.

20         So I don't want to say this in a way that will be

21   misunderstood, but we all remember the famous opening

22   statement in My Cousin Vinny, and that more or less sums up

23   my view of what Mr. Osen's version is about what's been going

24   on here.  To the contrary, Bank of Palestine has been

25   incredibly accommodating.  We have been looking alongside

1    with them for needles in haystacks.  We have been drilling

2    dry holes.  We think that the outside expert ought to be

3    allowed to complete the latest task Plaintiff has given us,

4    which is to prepare the directories and files of the 26 tapes

5    and 2 of the 13 tapes.  And at that point, when we get those

6    results, which we expect will show that there's no more there

7    there, that we should be done.

8            So Your Honor, I'm happy to answer any questions.

9    And I'm sure I would have more to say if Mr. Osen is going to

10   go on at length in reply.

11           THE COURT:  There were a couple of things that Mr.

12   Osen was asking for specifically, such as search query terms

13   and specification of the databases searched.  Have those been

14   produced?  And what's your position on those?

15           MR. BERGER:  Our position is that the search terms

16   were produced, that questions were asked about that during

17   the three-hour conversation between the IT experts, and that

18   they have what they have asked for.  If they have something

19   more concrete than simply saying they want the schema for the

20   bank's operating system -- which they've now received twice,

21   once in August of 2021 and again last night -- then they need

22   to be clearer about what it is that they want.

23           THE COURT:  All right.  So Mr. Osen, let's talk

24   specifically.  And we don't have -- this may not be the time

25   since you'd like to brief this.  But what is your position on

1   whether or not search terms have been produced?  What has

2   been produced and what hasn't?

3             MR. OSEN:  Your Honor, again, I don't want this to

4   descend into sort of ad hominem, but we flatly disagree with

5   Mr. Berger's characterization.  As I mentioned at the outset,

6   we initially received redacted and unreadable pages of what

7   purported to be search query terms.  We asked repeatedly that

8   those be unredacted and that we be provided a readable form.

9             After multiple requests, we ultimately got an

10  explanation that what we had received was not the search

11  queries in our case but rather a sample from another case and

12  that's why the redactions were appropriate.

13            They then produced to us a template of what their

14  search query would look like but without the actual search

15  terms contained in the production.  In other words, it's the

16  effect of saying we searched blank for blank.  And so I don't

17  think there's genuinely a misunderstanding here.  I think

18  there's just been a refusal to do the very basic elemental

19  requirements of producing search terms, the actual search

20  terms used, making clear, for example, whether they searched

21  for account numbers and, if so, what searches they did to get

22  to the point where they identified account numbers.

23            I understand Mr. Berger's position is that they

24  have gone above and beyond and are as clear as the driven

25  snow and all that.  Our position is the complete and

1    diametric opposite.  We can argue about it, I'm sure, for

2    many hours, but I'm not sure that's particularly productive.

3    I think we've reached the point where we'd like to move to

4    compel.  We will set for exactly in detail on all the

5    subjects I've outlined.  If Your Honor is obviously persuaded

6    by Mr. Berger's claims and arguments, most of which, I have

7    to say, we regard as patently and transparently

8    incorrect -- but if you're persuaded, then that's great for

9    the bank and that will be the end of it.

10          But I don't understand why there is opposition

11   here.  Mr. Berger is very confident of his position.  Great.

12   Let's brief it.  And Your Honor can sort through it with the

13   benefit of the actual documentation, with the benefit of, you

14   know, a detailed description rather than try to follow all of

15   these technical things on a phone call.

16          THE COURT:  Right.  Well, I just wanted to drill

17   into one issue because I've had a number of cases with ESI.

18   And usually, the debate is over which search terms to use,

19   not whether or not search terms should be disclosed and not

20   whether or not search terms were actually disclosed.  It

21   seems to me it would be fairly simply, hopefully, if Mr.

22   Berger could -- and I don't think this will resolve all the

23   issues obviously.

24          But Mr. Berger, if you could just identify which

25   search terms have been provided and Plaintiff could say why

1   they are or are not adequate.

2          MR. BERGER:  Yes, Your Honor.  And our position is

3   that the search terms were in fact provided, and they've been

4   provided twice.  The reason why there was a redaction that

5   Mr. Osen refers to is that the bank uses a standard search

6   query that they use to obtain information from its bank

7   database.  And what we did was we produced the search terms

8   that they used.  And they had sent it, those search terms, to

9   us in the form of the most recent inquiry, unrelated to this

10  case, that they had run using this set of search terms.

11         So what we redacted was not the search terms but

12  the results that were obtained using these search terms in an

13  unrelated situation.  But they have the search terms and what

14  has been asked for, what is within the scope of

15  jurisdictional discovery.  This is not merits discovery, of

16  course, Your Honor, as you appreciate.

17         And so when Judge Vitaliano ordered that we provide

18  them information for a small list of customers, alleged

19  customers during a small time period involving transfers to

20  the United States, it was not, with all due respect to the IT

21  experts, rocket science to figure out whether or not this

22  small set of alleged customers had transactions through the

23  United States for the relevant time period.

24         Mr. Osen doesn't seem to be satisfied that it could

25  be as simple as that and therefore wants to complexify it

1  because he doesn't like the results that the search terms

2  yielded.  But we have not been hiding the search terms from

3  them.  We have given them the search terms.  Now, they --

4          THE COURT:  Would you be --

5          MR. BERGER:  I'm sorry, Your Honor.

6          THE COURT:  Excuse me.  It sounds as though what

7  you're saying is that the bank has a template for search

8  terms that it uses in similar types of searches.  And the

9  response you gave was that here is the template, this is what

10  we would use or would have used in this case.  Are you

11  objecting to providing a response that would say these are

12  the terms that were used in this case?

13          MR. BERGER:  We're not objecting, Your Honor.

14  Those were the terms that were used.  We told them that those

15  were the terms that were used.  We gave them the terms.

16          THE COURT:  Right.

17          MR. BERGER:  What seems to be causing the

18  confusion -- I'm sorry, Your Honor.  I'll stop.

19          THE COURT:  No.  Go ahead.  Finish.

20          MR. BERGER:  What seems to be causing the confusion

21  is that because the bank has a process for querying its

22  system using a search term that has been successful over time

23  is that when they sent it to us, they sent it to us with the

24  most recent result in an unrelated situation.  So we simply

25  redacted the results from the application of those search

1  terms in a different situation.  But we did not redact any

2  bit of the search terms.

3          THE COURT:  All right.  So are you prepared then to

4  provide a response that says these were the search terms that

5  were used?

6          MR. BERGER:  Yes.  And I believe we've done so,

7  Your Honor, but happy to sort of do it.  I don't have the

8  document number in front of me.  We have provided it more

9  than once.  But happy to confirm that we have provided the

10  search terms used to query the system for the parameters that

11  Judge Vitaliano prescribed.

12          THE COURT:  All right.  So Mr. Osen, that's only

13  one of many issues that you've brought up.  Why don't we set

14  the schedule, then, for your motion to compel and the

15  opposition.  And at that point, the Court will look carefully

16  and we'll have argument and a ruling.

17          MR. OSEN:  Thank you, Your Honor.  We would propose

18  to submit our opening brief on March 11th.

19          THE COURT:  Okay.

20          MR. OSEN:  And then the Defendant can have whatever

21  time they want on their opposition.  And then give us another

22  week or 10 days on reply.

23          MR. BERGER:  So Your Honor, looking at the

24  calendar -- Mitchell Berger here for Bank of Palestine.

25  They've picked a day that I'm departing the country for a

 1    week, so I would ask that we could have at least three weeks

 2    to respond.  So that would be April 1st.

 3            THE COURT:  Okay.  That's fine.  And then April

 4    11th -- is that a weekday -- for the reply?

 5            MR. OSEN:  April 11th is a Monday.  That should be

 6    fine, Your Honor.

 7            THE COURT:  Okay.  And is there anything else we

 8    need to accomplish today?

 9            MR. OSEN:  Just one more thing, Your Honor.  I was

10    wondering -- this is Gary Osen for the Plaintiffs -- one

11    other issue as we're sort of going through this is we asked

12    the Defendants for the bank statements of the correspondent

13    banks for the relevant time period.  And they indicated that

14    they no longer have that material.  We were wondering if the

15    Court would permit us to serve some third-party subpoenas to

16    the extent that U.S. correspondent banks have responsive

17    records.

18            THE COURT:  Mr. Berger, you don't oppose that, do

19    you?

20            MR. BERGER:  We don't oppose it.  As I think I've

21    told Your Honor in previous occasions, one of the

22    correspondents, the primary one JPMorgan Chase, long before

23    this started, we contacted JPMorgan Chase to ask them if they

24    had the records of any transactions for this period.  And

25    they said due to the age, they hadn't retained it.

1          So I hope to be as good as my word.  They are

2  welcome to issue the subpoenas.  And if they have any

3  different response than we got, then that will certainly be

4  informative.  But when they asked us after all of this, after

5  we'd say we don't retain this information, please produce the

6  accounts.  We said we've already told you.  We don't have the

7  accounts.  We would have given them to you in the first place

8  had they been available.  So I don't think the U.S. banks are

9  in any different position than Bank of Palestine.

10          THE COURT:  Okay.  So the answer then is yes,

11  there's no problem with those subpoenas?

12          MR. BERGER:  Yes, Your Honor.  I meant to say that,

13  if I didn't at the outset.  We have no problem.  They may

14  issue the subpoenas assuming they are limited to the scope

15  that Judge Vitaliano authorized.  Given the interrogatories

16  that they have propounded and document requests they have

17  propounded to us, which go well beyond what Judge Vitaliano

18  authorized, I would hope that Your Honor would direct them to

19  restrict their subpoenas to precisely what Judge Vitaliano

20  authorized in terms of party discovery.

21          THE COURT:  All right.  Mr. Osen, you're not

22  looking to serve subpoenas that would contradict Judge

23  Vitaliano's order, are you?

24          MR. OSEN:  No, Your Honor.  I think we may have a

25  somewhat different view of what Judge Vitaliano's order

1    authorizes or doesn't, but I can say that we're certainly

2    focused on the relevant materials pertaining to the subject

3    entities and essentially the time period up to August of

4    2003.

5             THE COURT:  Right.

6             MR. BERGER:  So Your Honor, Mitchell Berger here.

7    Just one point on that.  I mean, I'm sure Mr. Osen will be as

8    good as his word.  And in the off chance that there's some

9    dispute over it, given that we, the bank, cannot object to

10   third-party subpoenas as such and can only seek a motion for

11   a protective order, perhaps, given that they will have to

12   give notice to us of the subpoenas, if we think that their

13   subpoenas exceed in some respect the scope that Judge

14   Vitaliano's authorized, I suppose we would make a motion for

15   protective order and the same schedule that Your Honor has

16   set for their motion to compel.

17            THE COURT:  That's fine.  All right.

18            MR. OSEN:  No objection.

19            THE COURT:  Thank you.  I think everything is clear

20   at this point.

21            MR. BERGER:  Thank you, Your Honor.

22            THE COURT:  Well, let me just reiterate the

23   schedule.  The motion, March 11th.  Opposition, April 1st.

24   Reply, April 11th.  Okay.  Thank you very much.

25        (Proceedings adjourned at 11:04 am)

1

2                    TRANSCRIBER'S CERTIFICATE

3          I certify that the foregoing is a correct

4    transcript from the electronic sound recording of the

5    proceedings in the above-entitled matter.

6

7          *Carrie Clouse*                    February 23, 2022

8    _____    _____

9    Carrie Clouse, CET-1207                      DATE

10   Legal Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25