UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SARRI ANNE SINGER,         \*   Case No. 19-CV-00006(ENV)
                               \*
                               \*
           Plaintiff,     \*   Brooklyn, New York
                               \*   May 25, 2022
     v.                      \*
                               \*
BANK OF PALESTINE,         \*
                               \*
           Defendant.     \*
                               \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          MICHAEL JACOB RADINE, ESQ.
                            GARY M. OSEN, ESQ.
                            Osen LLC
                            190 Moore Street,
                            Suite 272
                            Hackensack, NJ  07601

For the Defendant:          MITCHELL R. BERGER, ESQ.
                            JOSEPH S. ALONZO, ESQ.
                            Squire Patton Boggs, LLP
                            1211 Avenue of the Americas
                            New York, NY  10036

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1        (Proceedings commenced)

2        THE COURT:  Good morning.  This is Judge Levy.

3    We're here on Docket No. 19-CV-0006, Singer v. Bank of

4    Palestine.

5        Would counsel please state their appearances for the

6    record, starting with plaintiff?

7        MR. RADINE:  Good morning.  This is Michael Radine,

8    from Osen LLC, on behalf of plaintiffs, and I'm joined today

9    by Gary Osen.

10        MR. BERGER:  For Bank of Palestine, Your Honor, this

11    is Mitchell Berger and I'm joined by Joseph Alonzo.

12        THE COURT:  Is anyone expecting anyone else at this

13    point?

14        MR. RADINE:  Not from --

15        MR. BERGER:  No, Your Honor.

16        THE COURT:  All right.  So we've had extensive

17    briefing on the motion to compel, motion for protective order.

18    So why don't we focus on -- why don't I stay with plaintiff's

19    counsel.  If you were to list briefly what it is that you're

20    seeking today, or what it is you would be satisfied with at

21    this point, what would that be?

22        MR. RADINE:  Sure.  Thank you, Your Honor.  This is

23    Michael Radine speaking.  If my colleague, Gary Osen, jumps in

24    at any moment, he'll introduce himself as well so it's clear

25    for the reporter.

1          So very briefly, the relief we're seeking is as

2     follows.

3          First, based on what has occurred in discovery so

4     far, we believe the Court needs to appoint an independent and

5     qualified vendor to review the backup tapes and a copy of the

6     bank system for responsive records.

7          So that would be a vendor that the parties can

8     jointly and transparently communicate with so we're not left

9     out of the process.

10         In our view, anything short of that is going to just

11    bring us right back here with additional motion practice and

12    time and money wasted on expert opinions, all disputing

13    records that we can't see or representations we can't test.

14         Second, we want the Court to order BOP to produce

15    all the actual search terms and search queries it used in this

16    process and the systems those searches were performed on.

17    That's something we still don't have, which in our view is

18    inexplicable at this stage.

19         Third, we want the Court to order BOP to produce the

20    database schema and data dictionaries, which any independent

21    and qualified vendor will need anyway to properly perform a

22    meaningful search, in which we need to interpret the queries

23    we've gotten from BOP so far, as well as any future queries

24    the parties can agree upon.

25         Fourth, and this shouldn't have been something

1   necessary to ask the Court for assistance with, but we need

2   the Court to order BOP to provide the backup tape indexes from

3   Sullivan Strickler that they promised us in January, and that

4   they withheld, despite relying on them in their briefs.

5          Fifth, we want the Court to order BOP to fully,

6   completely, and honestly answer the interrogatories we've

7   identified in our briefs, including listing all the relevant

8   accounts they held for the Hamas entities we identified in the

9   complaint, as well as any accounts they've held during the

10  time period for Ahmed Alcurd (ph) the Hamas SDGT, that's a

11  specially designated global terrorist, who is also the person

12  in charge of Al Salah (ph), another customer of the bank, and

13  also a specially designated global terrorist.

14         Sixth, and then finally, Your Honor, we want the

15  Court to order BOP to produce responsive records for all the

16  subject entities who held accounts at the bank, including the

17  Al Salah account which they have only now acknowledged in

18  surreply that they have withheld.

19         So I'll stop there in our list of demands for any

20  questions from the Court.

21         THE COURT:  Could you repeat the last demand?  I'm

22  not sure I fully understood it.

23         MR. RADINE:  Yes.  We want the Court to order BOP to

24  produce responsive records for all of the subject entities who

25  held accounts at the bank or who processed transactions

1   through the bank.  So that would include the Al Salah account

2   raised in our last brief, but it would also include non-

3   account holders who processed transactions through the bank,

4   say, to an account holder for instance.

5         THE COURT:  Okay.  And when you say all subject

6   entities, is there any limitation on that?

7         MR. RADINE:  I mean, just the ones that are raised

8   in our request for production, which is, you know, a short

9   list.  I think that -- you know, as we've raised with

10  defendants and in our briefing, there is different ways that

11  may be identified.

12        Accounts may be held by the leadership of those

13  groups who are largely themselves designated SDGTs.  They may

14  be joint accounts, beneficial accounts.  We haven't, you know,

15  had a limitation there because we haven't had an opportunity

16  to have that conversation.

17        In fact, they have so far refused to even tell us

18  what accounts they think they have, much less whether we need

19  to dig further or push back on their definitions.

20        THE COURT:  All right.  Thank you.  So for BOP,

21  which, if any of these six demands, are you prepared to

22  consent to?

23        MR. BERGER:  So, Your Honor, Mitchell Berger for

24  BOP, and I know you've read the papers and have heard this ad

25  infinitum from both sides, but honestly, Items 2 and 3, we've

1    already provided.

2            I hear Mr. Radine saying they're not satisfied, but

3    there is no doubt that we have provided search queries and

4    search terms, which is Item 2.  There is no doubt we have

5    provided the database schema, which is Item 3.

6            We object to No. 1, because they're basically saying

7    that they have the right jointly with the bank, to root

8    through the bank's undifferentiated records so that they can

9    search for what they want, and that is not only far outside of

10   jurisdictional discovery, but no organization would let the

11   plaintiffs come in and just sort of root through their records

12   so that they were satisfied.

13           And when they say an independent and qualified

14   vendor would do this, they also said -- Mr. Radine said they

15   want equal access to them.  In other words, they get to look

16   at all our data.

17           So one, is completely unacceptable.  Four, even

18   though it will simply reopen the endless debate over discover

19   and discovery, we will produce the indexes done by Sullivan

20   and Strickler of the backup tapes, as I understand it, 196,000

21   lines of text.  Your Honor, frankly, you can imagine we will

22   be back here a year from now arguing over what is in those.

23           Numbers 5 and 6, we have -- object to, because let

24   me explain in plain English what I heard Mr. Radine say.  They

25   want to count records.  I have no doubt not only in my mind,

1    that what Judge Vitaliano ordered was a transactional

2    discovery, not account discovery.

3         But I have to say, if you would look at Mr. Radine's

4    declaration, Exhibit 1, their first request for production of

5    documents, it included what they called a jurisdictional

6    limitation.  It said, and I'm quoting, "For purposes of the

7    documents requested below, Bank of Palestine needs only

8    produce responsive records that reflect funds, transfers that

9    cleared and/or settled in or through the United States," close

10   quote.

11        That is at Page 4 of Radine Declaration, Exhibit 1.

12   We have moved well beyond what even they conceded at the

13   outset is appropriate when they asked for all account

14   documents for all of the subject entities.  The account

15   records have nothing to do with what Judge Vitaliano ordered,

16   and they have nothing to do with what the plaintiffs

17   themselves requested.

18        So to recap, we have provided 2 and 3, we will

19   provide 4, we object to 1, 5, and 6.

20        THE COURT:  All right.  Would plaintiff like to

21   respond?

22        MR. RADINE:  Sure.  I'll just go through the request

23   and order in terms of responding to that.

24        So for the independent vendor, we want equal access

25   to the vendor.  We don't need equal access to the data.  We

1  don't need to root around in BOP's data necessarily.  What we

2  need to make sure is that BOP no longer has the ability to sub

3  silentio define for themselves what they'll search, what's

4  relevant, what kind of transaction is relevant, how queries

5  are designed, how search terms are designed, and so on.

6       And then when they get results from the vendors that

7  they've hired, withhold them from us so we have no idea.  I

8  just mean, for instance, the file indexes.  I don't mean all

9  the raw data that's necessarily developed.

10      An appropriate protective order can be put in place

11  to make sure that the raw data is handled appropriately, but

12  what's happened so far is that they've spent, I think vastly

13  more money on the vendors they had retained to produce

14  misleading results that we have no daylight on than would have

15  been spent just doing this in a forthright -- in a forthright

16  manner, that we need an independent vendor to do.  And

17  (indiscernible) --

18      THE COURT:  So let me stop you for one second on

19  this.  So if you were to define the parameters of what you're

20  requesting, what would be the scope of the raw data that you'd

21  be looking for, and to what extent do you have a sense of the

22  cost?

23      MR. RADINE:  So the scope of the raw data we've been

24  looking for would be transactions relating to these subject

25  entities that may have passed through or processed in New

1   York.  That's not -- there's different kinds of evidence that

2   can show that, which is why there may be a broad definition.

3   U.S. dollar transactions that are passed -- it's certainly our

4   position that U.S. dollar transactions that are passed from

5   one foreign bank to another are cleared and/or settled in New

6   York.  So just to -- Mr. Berger just read from our first

7   request for production.  This is a great example.  And as he

8   read, our request is limited to funds transfers that quote,

9   "Cleared *and/or* settled in or through the United States."

10          So in their surreply, they argue that they were

11  entitled to remove U.S. dollar check transactions from the

12  production because those are cleared in the Palestinian

13  territories.  That may be the case, but they are certainly

14  settled in New York, hence the phrase, cleared and/or settled.

15  And as Mr. Berger knows from *Spetner* (ph), another case we

16  have together, it is our position that that qualifies as

17  purposeful availment, and certainly that will be a decision

18  the circuit will make at some point.

19          So all manner of other kinds of transactions may

20  qualify, and while we are happy to have that discussion with

21  defendant to define that universe, what we can't have so far

22  -- as we've had so far, is to have them define that for

23  themselves but then not tell us what that is and just to have

24  us learn later that they've been removing those transactions.

25          MR. BERGER:  Your Honor, may I respond?  This is

1    Mitchell Berger.

2              THE COURT:  Yes.

3              MR. BERGER:  I'm going to have to say that what Mr.

4    Radine is asking for is truly extraordinary, and I mean, I

5    know plaintiffs are never settled in any -- satisfied in any

6    case with what they get and always want more, but the reality

7    is the bank searched for precisely what Mr. Radine is asking

8    for, and the bank found precisely what Mr. Radine is asking

9    for, and the bank produced, almost a year ago, precisely what

10   he's asking for.

11             They're not complaining, when you strip it down to

12   the bare essence, about our search terms or our search

13   process.  They are complaining about the search results.  They

14   are saying, there must be more, and therefore, somebody else

15   needs to have a go at this.

16             What he said about our removing checks is simply

17   incorrect.  You can look at Singer 1 through 13, which is the

18   spreadsheets we produced, and they include checks.  We over

19   included information in Singer 1 through 13, even though we're

20   prepared to prove on the merits when we get to the

21   jurisdiction argument, that those checks did not pass through

22   the United States.

23             So that's simply a factually incorrect statement to

24   say that we've carved this stuff out, when what we carved out,

25   and what clearly falls within both their jurisdictional

1    limitation and with what Judge Vitaliano ordered, are things

2    like a credit for interest.  There is no way that a credit for

3    interest, which is a book-to-book entry, could possibly have

4    passed through the United States.

5         And so I understand they have a view of what the law

6    is or what the law should be, but if a check is cleared on a

7    book-to-book basis within Palestine, it simply is not

8    something that passed through the correspondent account in the

9    United States, which is the focus of jurisdiction.

10        So I hear what he's saying, but the bank did this

11   job, and absent their proving some material defect in what we

12   did as opposed to their saying, well, there must be more,

13   there's no reason for that.

14        Let me just give two points about historical context

15   here, which is, they can complain that they haven't gotten

16   what they think is enough, but the very correspondent banks

17   that were on the other side of these transactions in the

18   United States, JP Morgan Chase, Citibank, they have nothing

19   because we're talking about ancient history.

20        SWIFT itself, the platform that was used for

21   transferring -- making transfers, they have nothing.  Bank of

22   Palestine, because it did a good job here, despite all the

23   rhetoric Mr. Radine wants to use, did a good job.  We found

24   what JP Morgan Chase and what Citibank and what SWIFT couldn't

25   find, and that's just the truth.

1          THE COURT:  Mr. Radine.

2          MR. RADINE:  Sure.  The statement that they removed

3     transactions from their production is from the El Reyes (ph)

4     declaration at Paragraph 14, the statement that they removed

5     checks is from Mr. Berger's brief.  Page -- what am I on here?

6     18.

7          Plaintiff should not be permitted belatedly to seek

8     jurisdictional discovery here of checks cleared locally in

9     Palestine based on a jurisdictional theory that they have not

10    asserted in this action and was rejected by the District Court

11    in *Spetner* (ph).

12         Of course, the district court in *Spetner* was

13    rejecting an argument based on the fact that that bank and

14    another interposed correspondent bank, but the statement here

15    is that we should not get jurisdiction discovery of checks

16    cleared locally in Palestine, as in, they have omitted checks

17    that in their view were cleared locally in Palestine, even

18    though they know it's our position that those checks were

19    settled in New York.  It's the second step of that process.

20         The Al Salah account that they withheld, the

21    transactions, incoming transactions they are U.S. dollar

22    denominated checks, and yet we didn't get the entire account

23    because they choose to interpret those dollar checks as book-

24    to-book transactions, and again, to be clear, did not tell us

25    about this.

1          It is a grievous abuse of the discovery process to

2     withhold information like this without discussing it with us

3     or the Court, and then to give this misrepresentation

4     description to the Court now.

5          MR. BERGER:  Your Honor, if -- and I --

6          THE COURT:  Well, hold on one second.

7          MR. BERGER:  -- maybe some facts would help you.

8          THE COURT:  Yes.  Mr. Berger, just a question.  So

9     there is some discussion of a distinction between clearing

10    checks in the Palestinian territory and settling them in the

11    U.S.  What is the distinction for someone who is not a banking

12    expert?

13          MR. BERGER:  Your Honor, is that question directed

14    to me or Mr. Radine?

15          THE COURT:  I think to Mr. Radine first, and then to

16    you, Mr. Berger.

17          MR. RADINE:  Sure.  Sure.  So the processing process

18    -- in *Lashay* (ph), the Court talks about processing

19    transactions through New York correspondent banks, and for --

20    just to sort of boil down a complicated universe here, when

21    banks, foreign banks move U.S. dollar denominated assets from

22    one bank to another, they do it virtually in a sense, and the

23    actual passage of money, of like a real value money, what's

24    called settlement finality, happens across the books of the

25    Federal Reserve Bank in New York.

1          Now that requires that each transaction that passes

2     from one foreign bank to another, be in a sense, sent to New

3     York, and the SWIFT messaging system is the system generally

4     used to execute those transfers.

5          Now one way to cut down on transaction costs is to

6     net out some of the countervailing transactions between banks

7     first, and then take the remaining credit position that the

8     banks are into each other, and settle that in New York.

9          So what you tend to get -- and we have the same

10    thing in the United States with checks by the way.  What you

11    tend to get is a clearinghouse structure, where checks passed

12    among banks in a given day are canceled against each other,

13    set off against each other among the banks in the

14    clearinghouse.

15         And that is a function that the Palestine monetary

16    authority provides in the Palestinian territories.  The

17    resulting credits and debits are then settled by the banks

18    through SWIFT message wire transfers between themselves and

19    the PMA, which again then distributes the money.

20         So the actual value of the check is settled in New

21    York.  If a check is not settled through that New York

22    process, the check can be unwound, as in as if it never

23    happened.  So it's not an ancillary step in the process.

24         This was briefed at length, and I won't bore the

25    Court with this, but this was briefed in length in *Spetner*,

1    where it's a key allegation and the first issue presented by

2    the plaintiffs, and was argued ostensibly by the two parties

3    before the panel there.  So I'll pause there.  But also, I

4    have one more note.  Sorry.

5         So other asset transfers work this way.  All U.S.

6    dollar credit cards that are cross-border or cross-bank tend

7    to be settled in the United States.  MoneyGram transfers work

8    this way as well.

9         So all those SWIFT messages are usually used to

10   execute one part of that transaction.  The point is, is that

11   all of them are settled in New York and it's our position that

12   that qualifies as a purposeful availment raised in *Leshay*.

13   And I'll stop there.

14        MR. BERGER:  So, Your Honor, three points.  First of

15   all, what Mr. Radine said is an overstatement, and don't take

16   my word for it.

17        If you look at Paragraphs 8, 9, and 10 of the El

18   Reyes declaration that we filed, you will see that there are

19   three flavors here, vanilla, chocolate, and strawberry for

20   lack of a more imaginative description.  Not all checks clear

21   through the United States.

22        If Depositor A at Bank of Palestine writes a check

23   to Depositor B at Bank of Palestine, that check doesn't go

24   anywhere near the central bank's clearing process, doesn't go

25   anywhere near the United States.

1          What happens is, Bank of Palestine makes a book

2     entry that says Depositor A wrote a check to Depositor B,

3     therefore one's account goes down, the other one goes up.

4     That type of check is a check we would have removed because it

5     is a book entry.

6          Number two, sometimes there's a check written

7     between a customer at Bank of Palestine and another bank, say

8     Palestine Investment Bank, the bank that is involved in the

9     *Spetner* case that Mr. Radine likes to talk about.  That type

10     of check does not go through the United States.  It is not a

11     clearinghouse check.

12          What happens is literally every Palestinian bank

13     once a day meets at the central bank, and they exchange

14     checks, and they see whether or not they have a net credit

15     owed to them or a net debit that they have to pay off.

16          If there is one net debit that they have to pay off,

17     then that check that was exchanged, those checks that were

18     exchanged do not go through the United States.  What happens

19     is, bank -- the central bank in Palestine says, okay, make a

20     bulk transfer of money for whatever it is you owe the other

21     bank and send it to our correspondent account in the United

22     States.

23          What's important here is none of this was ever

24     mentioned to Judge Vitaliano.  None of this is mentioned in

25     their amended complaint.  They like this theory, they used it

1    in the *Spetner* case, they've never used it here, has nothing

2    to do with here, but it doesn't matter because we have

3    produced that information.

4         Only if there is a check that went through, and this

5    is Paragraph 10 of Mr. El Reyes's declaration, there's a check

6    that has to go to the United States, so there's a transfer

7    that goes to the United States.  That's what Judge Vitaliano

8    was focusing on.  That they've -- this new theory which they

9    seem to like has nothing to do with the theory that brought us

10   to jurisdiction discovery.

11        But as I was saying earlier, some facts will help.

12   From our standpoint, the proof of the pudding that we have

13   done what we said we were going to do is in the actual

14   spreadsheets.  Singer 1 through 13, you can find these

15   attached to Mr. Radine's declaration at Exhibit 2.  If you

16   look on the various entries, and there are 250 entries on

17   these spreadsheets, you will see -- I'm looking at the first

18   entry on Page 1, clearing funds withdrawal.  The next one,

19   clearing checks deposit.  It has clearing funds withdrawal

20   throughout.         You will see that in fact, contrary to

21   what Mr. Radine is telling you, the last entry on Singer 2,

22   clearing checks deposit, that this notion that we somehow sub

23   silentio removed things -- he wants to point to this new

24   account record they came up with in their surreply.

25        There were two -- there are two credits, if you

1  will, to the account in that one.  And, Your Honor, I

2  recognize, we're on the public record here and this has all

3  been filed under seal and we seem to have other participants

4  in this hearing, so I want to be careful.

5          But those were confirmed by the bank to be of the

6  first type that I mentioned, entirely local transactions.  The

7  bank is entitled in winnowing non-responsive information out

8  of otherwise responsive information to do that.

9          And this notion that effectively some special master

10  has to be appointed because they don't like the fact that the

11  bank did what every other responding party does, which is to

12  apply a responsiveness screen to undifferentiated data, this

13  is -- it is overkill and it is inappropriate.  They have not

14  demonstrated anything that would warrant taking, as is

15  appropriate, the document production process out of the hands

16  of Bank of Palestine.

17          And I have just given you chapter and verse in

18  Singer 1 through 13, which contradicts everything Mr. Radine

19  told you about our supposed pruning and editing.

20          THE COURT:  Mr. Radine, is that correct?

21          MR. RADINE:  No, Your Honor.  So the only part of

22  that that was correct is that checks passed from one account

23  to another at the same bank won't necessarily be settled in

24  the United States because they can be credited/debited via a

25  book-to-book entry.

1          Well, the other part that was sort of partially

2     correct was Mr. Berger's sort of dismissive attempt to kind of

3     put the bulk payment through New York at the end of the check

4     clearing process.  That is the settlement of the checks.

5     Without that step, those checks are unwound.

6          He is attempting to then draw focus to a different

7     process where if you get a check from like a U.S. bank, then

8     you really do physically mail that check back to New York, but

9     that's not what we're talking about.

10         We're talking about checks passed from one

11    Palestinian bank to another are all settled in New York.  I

12    know that Mr. Berger doesn't agree with whether that qualifies

13    as purposeful availment because it happens a step later in the

14    process.  That's neither here nor there.

15         The fact, of course, that our complaint does not

16    spell out this entire process is because our complaint is

17    establishing BOP's liability for terror financing.  It is not

18    attempting to exploitate the entire check clearing process.

19    That is a step for discovery, where we're in now.  And

20    certainly, Mr. Berger has known from his days with us in

21    *Spetner*, that we consider that a process that qualifies as

22    purposeful availment.

23         As for the terms used in the Singer 1 through 13,

24    the word check does show up in some confusing ways.  We asked

25    them in one of our letters, many, many, many months ago, for

1    definitions of the transaction types that he is describing.

2    So for instance, like he just mentioned, clearing checks

3    deposit.  They refused to provide those.  In fact, they just

4    provided the list again in Arabic, which was simply the same

5    words we have here in English, but with no definitions.  I

6    don't know what a clearing check deposit is.

7          I do know that in their opposition brief, BOP called

8    all manner of these transaction types, quote, clearly local,

9    which now I guess he's taking back as to these checks.  And

10   while I appreciate that, it doesn't change the fact that we

11   don't have definitions of these terms.

12         But from at least the Al Salah account and from the

13   description that he just gave you, they call the checks of the

14   same species that are at issue in *Spetner* -- *Spetner* is not

15   about checks that were mailed to the United States.  *Spetner*

16   is about checks being passed from one Palestinian bank to

17   another.  They say those are checks they have the entitlement

18   to withhold from us, and they know that is wrong.

19         MR. BERGER:  So, Your Honor, I have one point and

20   two suggestions if I may, that maybe will simplify things and

21   make everybody's life easier and avoid this sort of complete

22   overkill notion that some special master needs to redo work

23   that we believe the bank has done appropriately.

24         The one point I want to make is, I understand Mr.

25   Radine likes this theory that bulk transfers create

1    jurisdiction, even though it's not pled in the complaint.

2    They made that argument, Mr. Radine and his colleagues, in the

3    *Spetner* case, and Judge Komitee rejected it as a matter of

4    law.

5           Yes, they've appealed to the Second Circuit, but so

6    far the law in the Eastern District is what Judge Komitee held

7    in the *Spetner* case, which is transfers, bulk transfers

8    involved that are directed by the Palestinian Monetary

9    Authority, the central bank, do not create jurisdiction, full

10   stop.

11          And don't take my word for it, Your Honor, you can

12   read the opinion.  But these are really jurisdictional merits

13   issues  and not jurisdictional discovery issues which leads to

14   my two suggestions if I may?

15          Number one, to eliminate any doubt about the fact

16   that we believe we've already been over-inclusive, we're happy

17   to reproduce the spreadsheets, Singer 1 through 13, and

18   include in them all manner of checks, even manners of checks

19   that we believe demonstrably, according to the bank's due

20   diligence, were only cleared locally, never got anywhere near

21   this jurisdictionally irrelevant PMA process.  So it will be

22   done.  We will reproduce the sheets.  They will then have it.

23          So now where are we?  Now we, I would suggest, and

24   this leads to my second suggestion is, we ought to be able

25   when we're done with the rest of Mr. Radine's wish list today,

1    to move -- renew our motion to dismiss for lack of

2    jurisdiction, and we will put in affidavits that explain all

3    of these points that I am explaining to you.

4            If, in response to that renewed motion, where we

5    have a framework and we have evidence on this issue, they feel

6    they need further jurisdictional discovery to respond, then

7    they can make that application to Your Honor, because Your

8    Honor has been, of course, authorized by Judge Vitaliano to do

9    it.  But we have now -- Judge Vitaliano's order came out April

10   30th of 2021.

11           We've been at jurisdictional discovery for nearly 13

12   months.  We need to get back to the business of demonstrating

13   why the evidence we've produced is jurisdictionally

14   irrelevant, rather than Mr. Radine trying to convince you he's

15   right, and my trying to convince you we're right about the

16   significance of this information.

17           We'll reproduce the additional detail he wants and

18   we can hash it out in the context of the motion, and if he

19   says, you know what, I still don't think I need any, but

20   here's my more targeted jurisdictional discovery request, I've

21   seen their motion, fine.  Your Honor, we'll deal with it in

22   that context.

23           THE COURT:  Mr. Radine.

24           MR. RADINE:  No, that doesn't work for us.  First of

25   all, I'm sorry, we'll -- I know you're probably tired of

1    hearing about *Spenter*, but just to be clear, I just want to

2    clarify for the record, that's not an accurate -- Mr. Berger

3    knows that's not an accurate description of what happened in

4    that case.  In that case, and I'll keep this very brief,

5    Palestine Investment Bank, unlike BOP, did not have a

6    correspondent bank account in New York.  It had a

7    correspondent -- it was called a nested account in Jordan, and

8    that bank had a correspondent account in New York.

9    As the Court can see from reading the *Spetner*

10    decision, that decision came down entirely to whether using a

11    nested account in Jordan still meant that the bank was

12    purposefully availing itself of the New York system.  It does

13    not have representation that the Court -- that -- sorry.

14    It was not Judge Komitee's position that check

15    clearing and settlement through a bank's own correspondent

16    account in New York did not qualify as purposeful availment.

17    Mr. Berger knows that.  It's clear from the decision, and also

18    I assume Mr. Berger knows that in the Eastern District,

19    district courts cannot bind each other.

20    But anyway --

21    MR. BERGER:  Well, I want to just respond to that.

22    MR. RADINE:  -- that's (indiscernible).

23    MR. BERGER:  I have to respond to that.

24    MR. RADINE:  Yeah, so, Mr. Berger, I --

25    MR. BERGER:  There are two -- there are two theories

1          --

2                    MR. RADINE:  Mr. Berger.

3                    MR. BERGER:  There are two theories --

4                    MR. RADINE:  Mr. Berger.

5                    MR. BERGER:  -- Your Honor.

6                    MR. RADINE:  I'll finish my bit first and you can

7          talk when it's your turn.

8                    MR. BERGER:  It's really not for you to say.  Your

9          Honor --

10                   MR. RADINE:  As for the proposal --

11                   MR. BERGER:  -- I'd like to be heard on that.

12                   THE COURT:  Just a minute, Mr. Berger.  Let Mr.

13         Radine finish.

14                   MR. RADINE:  As for the proposal where they will now

15         produce checks that they withheld transactions, it's still --

16         and then we briefed the whole thing over again.  It seems like

17         a poor use of time given that, A, we don't know what the terms

18         mean.

19                   We obviously still disagree as to fundamental

20         issues.  B, the entire process thus far has shown that BOP has

21         either through mendacity or incompetence, been unable to

22         manage their own systems, search them properly, or even

23         provide a query that they actually used in this case to

24         understand what dates mean and so on, to understand what

25         things like SWIFTNet Link files mean.

1           At this point, the far more efficient process is to

2    take this out of their hands and put it in the hands of an

3    independent and qualified vendor that can do a proper job of

4    these searches on agreed upon terms with whatever protections

5    are necessary for Bank of Palestine.

6           THE COURT:  All right.  Mr. Berger, you wanted to be

7    heard?

8           MR. BERGER:  If I may be heard, Your Honor?

9           THE COURT:  Yes.

10          MR. BERGER:  Yeah, although I (indiscernible) to Mr.

11   Radine's last comment, I do have an additional point which is,

12   you know, I'm not going to respond in kind to this overheated

13   rhetoric like -- and I wrote it down -- mendacity or

14   incompetence, Mr. Radine says.  That is not a productive way

15   to get to the bottom of solving a discovery problem if I may

16   so respectfully suggest.

17          We have worked very hard here.  We have been

18   incredibly transparent, and just because they don't like the

19   fact of what we've produced, I'm trying to be positive and

20   productive in giving the Court some suggestions.

21          So let me suggest yet another thing that might move

22   the ball forward.  But first, let me explain about *Spetner*,

23   and Your Honor, you don't need me to read the case for you.

24   We don't need Mr. Radine to tell you.  They have two theories

25   in *Spetner*, both were theories that are not in this case.

1          One theory was the nested account theory that Mr.

2     Radine mentions.  In other words, that bank didn't have a

3     correspondent account in the U.S., unlike BOP.  Plaintiffs in

4     that case argue that the bank in Jordan they used was their

5     agent.  Put that aside.  That has nothing to do with this

6     case.

7          They also argued that the central bank, the PMA, was

8     the agent of PIB because that -- because the PMA had this

9     check clearing process.

10          Again, don't take my word for it, don't take Mr.

11     Radine's word for it.  Judge Komitee wrote a published

12     decision on this and he rejected both theories, including the

13     PMA theory.  That is a merits issue we will get to.

14          However, let's do this.  I am now going to suggest

15     that not only will we reproduce the spreadsheets and include

16     the additional detail so they can see it, but we will have our

17     client produce an affidavit of the type we would produce in

18     support of our motion to dismiss, but we'll do it in advance.

19          That explains what these categories are and why

20     these categories would not have gone through the United

21     States.  Or if there's some possibility that it could have

22     gone through the United States, why that possibility cannot be

23     resolved on the basis of the existing information.

24          Then Mr. Radine and his colleagues will have that

25     information before we renew our motion to dismiss.  But to go

1    from saying, they don't understand document -- information we

2    produced that was responsive to their requests, to saying

3    forget it, even though we never asked to confer about search

4    terms and the like, take it out of the bank's hands contrary

5    to the rules of discovery, give it effectively to a special

6    master.

7            That's -- I think the word for Rule 26 that I can

8    use politely here is, not proportional to what we're supposed

9    to be dealing with here in limited jurisdictional discovery.

10   We want to get to the end game of renewing our motion to

11   dismiss for lack of jurisdiction.  If that requires going

12   above and beyond what we've already done, then those are the

13   suggestions I've got.

14           THE COURT:  All right.  Well, I don't think

15   plaintiff is asking for a special master.  Plaintiff is asking

16   for a paid vendor that can cut through some of these issues on

17   the grounds that it believes that the parties acting

18   independently, are able to cut through them.

19           MR. RADINE:  That is correct, Your Honor.

20           THE COURT:  So, Mr. Radine, what about reproducing

21   the spreadsheets with more explanations, et cetera, why

22   certain items are discounted or considered not relevant?

23           MR. RADINE:  Of course they should reproduce records

24   with things they withheld inappropriately.  They should have

25   done that in July, but that doesn't -- I think the -- if that

1    were the sole problem, if we were arguing about whether checks

2    were produced on that spreadsheet -- Mr. Berger kept saying

3    details.  I hope he means transactions, but -- and in

4    additional accounts that we would consider qualified, such as

5    the Al Salah account.

6            But even to do that now, the history of this case I

7    think makes clear that that's not going to be sufficient, and

8    what will happen is we will indeed be back before Your Honor,

9    having moved the ball very little forward as we have

10   additional questions.

11           I know the affidavit they're proposing to put

12   forward was -- we've seen that in *Spetner*.  Palestine

13   Investment Bank and BOP had the same operations.  We don't

14   need to see that again.  Nor with that address any other

15   problems.  For instance, the SQL procedures don't search the

16   SWIFT fields of banks.

17           The various and numerable problems that we laid out

18   in our briefing, and I understand BOP's desire to avoid having

19   an independent and qualified vendor go through their records

20   and produce the ones that are actually responsive, but we

21   can't accept half measures at this point, especially when we

22   have no visibility on it.

23           MR. BERGER:  How is that -- may I ask a question,

24   Your Honor, which is, this independent vendor, and I take Your

25   Honor's correction, I shouldn't use the words special master.

1    But the reason why it seems like one to me is the bit Mr.

2    Radine added at the end, which is, and to produce responsive

3    records.

4           In other words, this independent and qualified

5    vendor -- not just a technology expert -- apparently this

6    independent and qualified vendor is going to make legal

7    responsiveness determinations about what fits within the

8    categories of their document requests.  That is an

9    inappropriate job where a technology advisor.

10          You know, if they now want to redo everything the

11   bank did by having agreed search terms, even though they

12   haven't explained anything wrong with our search terms,

13   although we have produced them, we have produced the SQL

14   queries, we produced the software code behind the SQL queries.

15          I really don't know what more we can produce,

16   because if they want to redo everything, no independent and

17   qualified vendor can take the bank's raw information and say,

18   you know, I have to -- I'm going to decide what's responsive

19   or not.

20          That is Bank of Palestine's job and solely Bank of

21   Palestine's job.  And that is not a job for a technology

22   advisor or vendor because for example, what Mr. Radine keeps

23   saying, and these are his Items 5 and 6, they want all the

24   account information.

25          Well, they're not entitled to account information.

1    That's not a vendor issue.  That is a Judge Vitaliano issue.

2    He didn't say account discovery.  He said transactions

3    discovery.  We've agreed to fill in what they think are the

4    gaps in missing transactions, and we have agreed to explain

5    what those transactions are.

6            And I understand, they want the moon and the stars,

7    but that's inappropriate here, completely out of line with the

8    law, and completely out of line with the facts here.  We are

9    the ones who produced the spreadsheet.  The spreadsheet gave

10   them what they asked for.  They don't like it, that is not a

11   reason to have an independent vendor redo the process.

12           MR. RADINE:  But, if I could respond to that, Your

13   Honor?

14           THE COURT:  Yes.  What's missing from what Mr.

15   Berger is offering you?

16           MR. RADINE:  So the offer was just to produce

17   checks, or check-based transactional information that we don't

18   -- that they withheld so far.

19           I'll assume for a moment that that would include

20   like, counter-party information we've not been given.

21   Largely, you can see the counter-party column is largely blank

22   on the 13 pages.

23           And no, we don't trust the process as it works so

24   far.  We don't even have a complete list of search terms, for

25   instance.  There's no account numbers for example.  We have no

1       idea if they searched for the accounts that we listed in our

2       complaint.  There's no beneficial owners or joint owners or

3       anything like that in the search terms.

4               The query.  The query they produced that took them

5       an entire year or replacing prior queries that they produced

6       after we filed the motion to compel, is not the query that

7       used those search terms, which alone is extraordinary.  That

8       is a query that, as near as we can tell, they used by plugging

9       the account numbers that they've found and will not tell us

10      about, and then searched in some manner with banks.  That's

11      what that is.

12              And by the way, as I mentioned earlier, of the field

13      it selects to search, it doesn't search the SWIFT fields.

14      Instead, Mr. Regard (ph) said in his declaration that he

15      separately asked the bank to go back and search those SWIFT

16      fields, and they found nothing, but we don't have that query

17      for instance.

18              The amount of gamesmanship here is breathtaking, but

19      no, it can't be kept any longer in their hands, even if

20      they're willing to produce one of the many categories of

21      information we have asked for, that being the checks.

22              MR. BERGER:  So may I again respond with what I hope

23      are facts here?  Let's deal with my suggestions first.  I'm

24      not saying, oh, you know, let's -- I'll give you a little peek

25      here, I'll put in checks.

1          I am saying if what they want is all dollar

2    denominated transactions, even though we believe they are

3    exclusively local, during the relevant period that are

4    retrieved for the subject entities, then we will reproduce the

5    spreadsheets that have all dollar denominated transactions.

6          We will, number two, produce an affidavit explaining

7    why we believe that -- let's say it's 300 entries, that if

8    entries 1 and -- you know, we believe the -- these are all

9    local for the following reasons.

10         We believe we cannot tell whether the other ones are

11   local for the following reasons, even though we think they

12   didn't, because they're not SWIFT transfers.  They will have

13   that.

14         It is simply incorrect to say we're withholding

15   counter-party information.  That's a little bit like saying JP

16   Morgan Chase and Citibank are withholding SWIFT information.

17   We can't give them what we don't have.  The bank did not

18   retain, for this ancient history period, counter-party

19   information.  He can say gamesmanship, but I'm just telling

20   you facts trump speculation.  There is no counter-party

21   information for this period of time because it was not

22   retained when the bank transferred from it's old IT system to

23   the new IT system.

24         If they -- next, the SWIFT system has been queried.

25   How do we know that?  Singer 13, the last page of the

1    spreadsheet, has things that are denominated as SWIFT

2    transfers.  I don't know where Mr. Radine thinks we got that

3    from if we didn't get it from the SWIFT system.

4           The proof of the pudding, the eyes on the prize here

5    is the spreadsheets.  He doesn't want to focus the Court's

6    attention on the spreadsheets.  The spreadsheets prove that we

7    looked for the right things, we found the right things, we

8    produced the right things.

9           I am now saying even though we think more

10   information is not responsive, because the end game here is to

11   get to a motion, we will give them that additional

12   information, we will give them that explanation by way of an

13   affidavit that they wouldn't otherwise see, into a renewed

14   motion.

15          And I just -- I think they have come up with nothing

16   other than saying, there must be more there that would justify

17   the expense time and burden of bringing in an independent

18   vendor and then arguing over the scope of the independent

19   vendor's authority, not just to run search, but to determine

20   what's responsive.

21          MR. RADINE:  Your Honor, if I could respond to that

22   briefly?

23          First of all, we are -- as I have said throughout

24   this, we're happy with an order that protects BOP.  They can

25   see the records first.  We're not -- this is a red herring Mr.

1   Berger is trying to make (indiscernible) produce.  But just to

2   be clear, of all the statements that you just received that

3   were untrue, and why that means we'd need an independent

4   vendor.

5        Number one, even if it were true that the counter-

6   party information is missing off the ancillary table, the

7   legacy system, there is nine months of responsive transactions

8   from banks that should have the counter-party information of

9   they're active banking system.  They said it was one month

10  initially.  We showed it was nine.  They backed off of that.

11  One more reason they can't be sort of left alone with these

12  materials.

13       Number 2, the Singer 13 transaction, that is not a

14  search of their SWIFT system.  They have been consistent in

15  saying they don't have SWIFT records that old, except on

16  backup.  That is a search of the bank system in which in the

17  transaction type field, it said SWIFT.  It was not a search of

18  the SWIFT fields or the SWIFT system.

19       Mr. Regard stated that -- this is in his first

20  declaration at 149 and 150.  He had BOP conduct an inspection

21  of all SWIFT indicated tables and fields for data and data

22  ranges, and there were no responsive data.

23       So that after Singer 13 were produced, then they

24  went back on our demand to look for the SWIFT fields and the

25  entire evidence we have that they did that search is that

1    single statement for which we have no query or evidence or

2    anything.

3              MR. BERGER:  Yeah, (indiscernible) is correct, Your

4    Honor.

5              MR. RADINE:  I (indiscernible) search terms.

6              MR. BERGER:  That's not really correct, Your Honor.

7              MR. RADINE:  So I think -- and by the way -- Mr.

8    Berger, enough.

9              I -- El Reyes says that they only searched banks and

10   that that's where the ancillary table and the bank's tables

11   are held.  I think that the sort of stream of misdirections

12   here is the clearest evidence of why we need an independent

13   vendor to run these searches with whatever protections is

14   necessary for BOP.

15             MR. BERGER:  May I be heard, Your Honor?

16             THE COURT:  Yes.

17             MR. BERGER:  Yeah.  Look, I -- this isn't in the

18   deposition, and I guess Mr. Radine -- behavior thinks that it

19   is, but let me point to some facts.

20             Paragraph 11 of the El Reyes declaration that was

21   provided to Your Honor with the surreply says, first sentence

22   and I'm quoting, "In 2017, the SWIFT system was electronically

23   integrated into the bank's core banking system."  So we were

24   able, by searching the bank's system, to come up with whatever

25   SWIFT information was integrated from the SWIFT system, and

1    that is how we were able to produce SWIFT records to the

2    extent they exist in the SWIFT system.

3           What Mr. Radine is conflating, and he's mixing

4    apples and oranges here, are statements that our expert made

5    about backup tapes, not searches of the live system.  The live

6    system has been searched.

7           The SWIFT system has been searched, the power card

8    system has been searched, the bank's system has been searched,

9    the ancillary table of historical information has been

10   searched.  Mr. Regard, when he said he ran searches for SWIFT

11   information, is talking about backup tapes.  He is not talking

12   about the live system in order to provide the information of

13   the type we've provided in SWIFT 13.

14          As to the backup tapes, I mean, that's a whole other

15   issue, which is, you know, our view is, we'll give them the

16   indexes, but their view is, you've got to read every book in

17   the library to know if the card catalog is correct, and that

18   is simply not correct.

19          Our expert looked at the indexes.  They want to look

20   at the indexes, we'll give them the indexes, but we are going

21   to spend the next year quibbling over what ought to be done,

22   and that is not what limited jurisdictional discovery,

23   originally supposed to take four months, is all about.

24          I don't like the adjectives and the adverbs I'm

25   constantly hearing from Mr. Radine, but adjectives and adverbs

1 don't contradict facts.  We searched these systems, we

2 produced this stuff.  He is arguing over whether we should

3 have identified additional information that we have.  I've

4 stated we'll give it to him.

5    MR. RADINE:  All I can say, Judge, that again,

6 that's all wrong.  They have been very clear that they did not

7 search the backup tapes.  That statement from Mr. Regard I

8 read to you said SWIFT indicated tables and fields, referring

9 to banks.

10    We know they didn't search the backup tapes, because

11 they've gone to these extraordinary arguments about divining

12 some meaning from the field of metadata rather than from --

13 the field names and dates rather than just opening the files

14 themselves.  It's an inappropriate process.

15    In fact, we just saw this case, *Rodman v. Safeway*.

16 This is 2016 Westlaw, 5791210.  It reads, "It is not clear

17 whether Safeway's counsel ever determined Mr. Guthrie searched

18 within the contents of the files, the legacy drive, as opposed

19 to merely within the documents' names.  Such lack of guidance

20 and oversight supports a finding of unreasonableness."

21    And that's at Star 3.  That's the process they've

22 used so far in the backup tapes.  We pointed out in our briefs

23 that their attempt to divine meaning from file dates is wrong.

24 We pointed out that it was surprising that they did not

25 understand the January 1st, 1970 date, did not show that a

1  file predated the relevant period, but that instead it was

2  just a default date used by the UNC system.

3        We've showed that the SWIFTNet Link system was

4  irrelevant.  We showed that backup files definitionally are

5  created after the data they're backing up.  And their response

6  to all of this is to fall back on simply repeating lines like,

7  well, the bank said they transferred all the data 20 years

8  ago, so that must be what happened.

9        We've made clear time and time again that their

10  search processes are not sufficient, and having them run them

11  again is not a good use of the Court's time or our time, or

12  resources.

13        MR. BERGER:  Your Honor, if I could just have two

14  minutes to sort of recap what the bank did because again, I

15  think what you're hearing are things that are jumping from

16  live systems to tapes, et cetera.  So let me just try to be

17  systematic.

18        The bank received the plaintiff's discovery request.

19  It created search terms.  We have produced the search terms.

20  There's nothing shocking about the search terms.  They are

21  both sort of direct and fuzzy translations of the names of the

22  entities they wanted.

23        We apply those to every live system to see whether

24  or not they contain responsive information.  That included, I

25  am representing on the record, happy to -- and I'm putting my

1       reputation as an attorney behind this.  We looked at all of

2       the live systems in the bank.

3              We have produced the queries, and I confess, I'm not

4       the world's greatest technology expert.  I -- there's a

5       difference between the queries and the search terms, but we

6       have produced the queries.

7              How did the bank apply these to the live system?

8       Your Honor, literally there is a dialog box that comes up on

9       the screen of the computer to want to search to see account

10      records.  The dialog box, we -- the single most uninformative

11      piece of information in the world.  So when we thought, oh, I

12      guess we could given a screenshot of the dialog box.

13             But we said no, what we're going to do is we're

14      going to give them both a narrative explanation of how one

15      searches for these.  That was the first query we produced.

16      And then we said, when we produced this, here is the software

17      that is coded to the dialog box that comes up on the computer,

18      so that when you plug in a computer name, this is how the

19      computer executes it.

20             So we had search terms that translated what they

21      wanted.  We've produced the query that they wanted, we have

22      produced the software behind the dialog box that implements

23      the query.  We have confirmed that we searched all of the live

24      records.  We have given them the product of that.  That is

25      what is the 250 transactions which will be augmented and will

1    have -- I suggested.

2         Then there are 39 tapes.  We have used indexes to

3    winnow down the tapes.  And Mr. Radine says we don't

4    understand the 1970 issue, it's a default date.  Your Honor,

5    there are only three tapes that might potentially contain

6    SWIFT information.  This is all set out in Mr. Regards's

7    declaration.  Exabyte Tape No. 2, Exabyte Tape No. 6, DDS Tape

8    No. 4.  Not one of those three involves this 1970 issue that

9    Mr. Radine wants to throw around.  Every one of those three

10   tapes has an index that shows the dates of the data on those

11   tapes.

12        Exabyte Tape No. 2 has information that is only

13   after 2004.  So it's only 2005 and later, other than 12 system

14   files, non-data files.  Exabyte Tape No. 6 has 1 zero-byte as

15   opposed to -- that is an empty file from 2004.  It has SWIFT

16   data, but the dates are 2005 to 2007.  The 1970 issue does not

17   affect that tape.

18        DDS Tape No. 4 has SWIFT Alliance files from 1996 to

19   1998.  I appreciate he wants to accuse of incompetence,

20   mendacity, and the like, but the fact is, we know what we're

21   doing and we did a good job, and there's no reason why because

22   they're frustrated, they should take this process over in the

23   way they've suggested.

24        MR. RADINE:  It won't surprise the Court that I'd

25   like to respond to that.

1          So on the live side, not all that was true, but just
2    to focus on what happened.  Some of that we received from
3    them.  The queries, we only in April got a query that they
4    have yet to now take back and say they actually didn't use in
5    this matter.
6          We know it doesn't relate to the search terms.  We
7    know that their queries are structurally broken in the sense
8    that they, as we set out in our briefs, don't seem to pull
9    transactions for one account on one system that they get for
10   the other.
11         So for instance, the Islamic Society query
12   transactions just stop right at the cut over, and then the Al
13   Salah ones start right at the other side of the cut over
14   already with a balance.  We know that's not working right.
15         We know that the -- that they're not pulling all the
16   field data that we need.  We asked for that.  Asked for the
17   tapes.  We have walked through this in the briefs, but if you
18   recall, their very good methods that they used involved them
19   starting by saying, well, you can set aside Tape 6 because it
20   just has one big file on it, and when we look at the file
21   manually on the screen, we see it's not data files.
22         When we say that doesn't sound right from a basic
23   computer competence kind of view, that looks like a TAR, an
24   archive file that contains many other files, what do you know,
25   we learn later that it contains 61,000 files.

1          Now of course, they won't let us see the index for

2     that.  Now we just have to be assured that those files can't

3     be relevant because of their dogged belief that backups are

4     somehow made before data is created.  That's not right.  Or

5     that SWIFTNet Link files are relevant.  That's not done right.

6          As for the DDS tapes, we see that they have knocked

7     out about half of them for the 1970 date.  That's not right.

8     But looking even at the -- on Mr. Regards's table on those

9     tapes, we see under content that those 1970 tapes are marked

10    as Oracle.  Oracle, the database, underlines SWIFT Alliance

11    access in banks.  There is no reason to believe that those

12    don't contain the data files themselves.

13         We've seen on a previous document that they have 72

14    gigabytes of SWIFT data files that are sitting on Oracle.

15    There could be all manner of additional data like that sitting

16    on these tapes that are marked Oracle, or are marked DB2 or

17    dBASE.  We have no idea why they're excluding those.  They've

18    never said why.  That's a valid database.

19         What we get here is not an attempt at transparency

20    and cooperation.  We get here a tortured attempt to avoid

21    doing normal cooperative production procedures.

22         MR. BERGER:  If I may be heard, Your Honor.  I have

23    one more suggestion maybe that will move the ball forward, or

24    at least I hope it will.

25         You know, he says this process isn't working right

1   because there are gaps in the data.  Well, there are gaps in

2   the data because there are gaps in the data.  I mean, that's

3   the only historical information.

4          But here's my suggestion.  When we were last

5   together on February 22nd, when they asked for permission to

6   file the motion to compel, I told Your Honor, you can find it

7   in the transcript, it's quoted in our surreply, that we were

8   having Sullivan Strickler do indexes of the tapes.  We said

9   that work ought to be completed before they file a motion to

10  compel, and they said, no, no, we want to move right away.

11         So from our standpoint, they have completely jumped

12  the gun in bringing this motion to compel before Your Honor.

13  One of the items on Mr. Radine's wish list is the indexes that

14  Sullivan and Strickler was in the process of preparing when

15  they came to the Court the last time.  So my suggestion is the

16  following.

17         We will produce the indexes.  We will reproduce the

18  spreadsheets.  We will create an affidavit that explains the

19  information that is on the spreadsheets.

20         Your Honor, we'll direct the parties to meet and

21  confer further, after they have reviewed the indexes, and then

22  make to us a concrete proposal of what they want to do next,

23  rather than sort of having to run into the court prematurely

24  and say, you know, we don't like the way it's going, even

25  though we never asked to meet and confer over search terms and

1    the like in the front end, and therefore take it out the hands

2    of the parties and give it into the hands of an independent

3    vendor, and let's come back and speak to Your Honor in 15

4    days, 30 days, and see if we can't narrow this somewhat

5    because this all or nothing approach that either we have to do

6    it the way they want to do it or, you know, Your Honor has to

7    decide sort of in a bit of a vacuum, whether there's more to

8    be done.

9          We think we've done more than enough, but we're

10   prepared to go even further and then do this in a more

11   systematic way, because I frankly don't understand how the

12   Court could possibly decide that enough has been presented at

13   this point to take the process candidly and appropriately out

14   of the hands of Bank of Palestine, when we have done

15   everything that a party is supposed to do in discovery.

16         THE COURT:  All right.  Well, let me ask you a

17   couple of questions.  Mr. Radine, you say that you haven't

18   received all the queries and the search terms.

19         Would -- is there a way in the process that Mr.

20   Berger has suggested that you can clarify the dispute over

21   that and perhaps resolve what's been turned over and what

22   hasn't and what's missing?  Is that something that this meet

23   and confer could help with?

24         MR. RADINE:  Well, we would appreciate, of course,

25   them producing all the search terms and the actual queries

1    they used.  We will need -- I don't know if Your Honor saw the

2    queries.  We need schemata to understand them.

3            They are limited value on their own because the way

4    relational databases work, we quoted the *Sedona Conference* on

5    this, is that without knowing for instance which fields feed

6    into another field, then being told that it is querying that

7    field is insufficient information.  With the queries and the

8    search terms and the schemata, it's an important step, then,

9    and we'd obviously have a lot of feelings about how additional

10   search terms would be deployed and more appropriate queries,

11   yes.

12           THE COURT:  All right.  So we can build that into

13   the process.  Mr. Berger, do you agree?

14           MR. BERGER:  Yes, Your Honor.  I mean, I will -- I

15   will -- just to repeat what I said at the outset, we believe

16   we've given them the search terms and queries, so the meet and

17   confer would certainly give them the opportunity to tell us

18   what they think is missing.

19           We've told them, for example, the old Legacy system,

20   that there are no schema, but yeah, we can have that

21   conversation.  We have no resistance to producing search

22   terms, queries, or schema, and that is something we can

23   productively cover in a meet and confer.

24           And if then they want to say, you know, we've looked

25   at your search terms, your queries, and your schema and we

1   would like you to run these additional search temrs, then

2   okay, you know, we're open to that too.  Our goal here is to

3   prove what we think is the case, that when you look at all the

4   transactions there's not enough for jurisdiction.  So we're

5   not resisting.

6          We're trying to tell them that we've given them what

7   we think we have.  If they think there's something more and

8   they want to explain to us how we can get to that something

9   more, then we'll listen to what they have to say on that

10  subject.

11         THE COURT:  And have you provided all the

12  information from Sullivan and Strickler that you have at this

13  point so that plaintiffs can evaluate it?

14         MR. BERGER:  We will give them the indexes.  That --

15  those indexes were being prepared at the time we spoke.  I'm

16  happy to give them the indexes.  That's the 196,000 lines of

17  text that I mentioned earlier when I said at the outset, when

18  they gave you a wish list.  We'll give them that as well.

19         I mean, I don't know how they're going to get

20  through it in time to have a meet and confer any time in our

21  lifetime, but they seem to have an expert who will help them,

22  so we'll produce that stuff, we'll have a meet and confer,

23  we'll see if we can't narrow our differences.

24         It seems to me that that is a whole lot better than

25  sort of this notion that they've had enough, they're fed up as

1    they've express repeatedly in their very heated language, and

2    therefore, the only thing that can happen is an independent

3    vendor needs to take over.  We object to that and we would

4    have to resist that.

5            It seems to me the easier way here is to just give

6    them these additional items, we -- most of which we think

7    we've given them, have a meet and confer, we'll reconvene with

8    Your Honor.

9            THE COURT:  Well, I don't have a problem with the

10   step-by-step approach.

11           Mr. Radine, the way it's been defined for the

12   Sullivan Strickler indexes and documents, does that work for

13   you?

14           MR. RADINE:  I'm afraid not, Your Honor, for a

15   couple reasons.  First of all, this doesn't help us.  I mean,

16   having the indexes of the tapes would not resolve actually

17   searching the tapes.

18           And while the indexes are useful, if they had -- by

19   the way, as you saw in our briefing, (indiscernible) these

20   lists as well, that would have been helpful for us to review

21   them since they're so long.

22           But this ship has sailed for us.  In terms of BOP

23   saying, you know, sure, we withheld these materials, we relied

24   on the Sullivan Strickler indexes without producing them in

25   our briefing, but now we'll cooperate, this ship has sailed

1    for that.  There's no indication we have that the last year of

2    these obfuscatory tactics are remedied now.

3         And I don't think it's premature.  I find it ironic

4    that Mr. Berger complains that the discovery process had gone

5    beyond the original four months, and yet now our request is

6    premature.  I don't have the sense that this is -- while I

7    think it's all necessary steps and all great that they're

8    produce, I still don't understand why they're so opposed to

9    having someone properly resolve this.  They've represented

10   that they want it properly resolved.  They have yet to be able

11   to do that, and we have proposed our process for making sure

12   that it actually happens.

13        MR. BERGER:  Your Honor, if I may be heard?

14   Respectfully, I don't think that being an angry man is a legal

15   argument, and it's just not helpful.

16        I could be saying in equally impassioned terms, that

17   the bank has done what any defendant is required to do and has

18   frankly gone beyond.  Their complaints are not about

19   substantive discovery.  They've had, since June and July of

20   last year, 250 transactions, the import of which they could

21   have been arguing about on a renewed motion to dismiss for

22   jurisdiction.

23        Since that time, everything has been about changing

24   the subject to discovery about discovery.  We could have

25   resisted discovery about discovery and said, discovery about

1    discovery in general is inappropriate.  And yet, we have

2    indulged them for a year in discovery about discovery to prove

3    to them we are not hiding things.  It is not enough to simply

4    raise your voice, call people names, and say that's a

5    substitute for reasoned analysis.

6           We think we should have been done a long time ago.

7    The spreadsheets tell them what they need to know for us to

8    litigate the motion, but we're prepared to continue this

9    discovery on discovery dialog by giving them this additional

10   information.  I don't care whether he thinks the ship has

11   sailed, the train has left the station, whatever other

12   metaphor he wants to use, the reality is, they're not entitled

13   to it just because they're frustrated and annoyed.

14          THE COURT:  All right.  I'm not sure that

15   (indiscernible) the discussion once you're there.  What I'm

16   looking for is a way to test whether or not what each side is

17   saying is correct.  I mean, each of you says we can't really

18   trust -- well, the plaintiff is saying, we can't really trust

19   the BOP at this point, and BOP says that plaintiff is asking

20   for everything and it should be trusted.

21          Is there some kind of a sampling that can be done to

22   test the hypothesis that the plaintiffs  have at this point?

23          MR. BERGER:  My suggestion -- I'm sorry, Your Honor,

24   if you want to hear from Mr. Radine first, that's fine.  I'll

25   desist.

1          THE COURT:  Yeah.  Mr. Radine.

2          MR. RADINE:  In terms of searching banks?

3          THE COURT:  Well (indiscernible) bank --

4          MR. RADINE:  (Indiscernible).

5          THE COURT:  Yeah.  Go ahead.

6          MR. RADINE:  Well, they won't -- they won't load and

7     search the tapes, so it wouldn't be from the tapes.  It would

8     just have to be -- so it wouldn't be from the SWIFT Alliance

9     access system for the -- unless we can load those, which would

10    be great.  I think that's obviously the independent vendor

11    route.

12         As for banks, then -- as in us proposing more

13    searches to them, and it sounds like their proposal for the

14    further meet and confer process, but no, we think that has

15    probably limited utility.

16         MR. BERGER:  So, Your Honor, I -- you know,

17    obviously you're the one whose views matter here.  My

18    suggestion to synthesize everything I've said and to add one

19    other quality check if Your Honor would like, which is, we'll

20    produce the indexes.  We will create an affidavit.  That's

21    going to take a little bit of time, but we'll create an

22    affidavit.  We would have done it for our motion to dismiss

23    anyway.  We will reproduce the spreadsheets with the

24    additional information.  The parties should meet and confer.

25         If as part of that meet and confer, they want to

1    give us some additional searches, and they want to run as a

2    way for them to test whether everything I've said to Your

3    Honor is correct, everything our experts have said to Your

4    Honor, that's correct, that's fine.

5          And when we resume, if Your Honor wants, we'll bring

6    our IT expert to the hearing and Your Honor can ask our IT

7    expert whatever questions Your Honor might want, and they can

8    do the same with theirs, and then Your Honor won't have this

9    all filtered through a bunch of attorneys who think they know

10    something about IT, and I'm the first to confess that I'm no

11    expert.

12          But I want Your Honor to have access to whatever

13    resources are necessary to answer these questions.  But it

14    really does seem to me that they -- that there's a huge

15    element of gun jumping here that needs to be avoided.

16          That's when I say premature, which is, we don't

17    think it's premature to renew the motion to dismiss, but it is

18    certainly, when you move out of the substantive realm and into

19    the realm of discovery about discovery, it is premature to

20    jump to this sort of absolutely end-game idea of having an

21    independent vendor when these -- these issues, for all of

22    their apparent, you know, supposed complexity, these are --

23    this is day-to-day discovery stuff.

24          There's nothing here the parties can't get to the

25    bottom of, or at least narrow their differences, rather than

1     getting to this notion that okay, the process has failed,

2     let's call an end to it, put a fork in it, it's done, we're

3     going to bring in an independent expert.

4                THE COURT:  Well, I think plaintiffs are saying that

5     they don't have all the data that they need in order to --

6                MR. BERGER:  Yeah, well, we --

7                THE COURT:  -- (indiscernible).

8                MR. BERGER:  -- Your Honor, I -- well, and I think

9     what they've identified as what they need is -- we've said,

10    either we think they have it and need to understand why they

11    think they don't, or they want the Sullivan indexes, which we

12    were in the process of preparing back in February, and we'll

13    give them those.  Okay?

14               They want to read 196,000 lines of text, which is

15    what our expert has had to go through, and they want to run

16    tests on it, fine.  They're going to find the same things we

17    found, which is that most of these tapes -- and that's what

18    these indexes are about.  It's not about the live systems.

19    These tapes are garbage.  That to the extent they have SWIFT

20    data, there's only three of the 39 tapes that might.  They

21    don't -- they're either old; they're too old, or they're too

22    new.  Simple as that.

23               And two of the three tapes are backups of a live

24    system.  So why would one think if they're backups of the live

25    system, that they would contain any more information than is

1　already on the live system, but okay. They'll get the indexes

2　and they'll see for themselves.

3　　　　THE COURT: What about the 26 HP tapes that may

4　contain backups of the legacy system?

5　　　　MR. BERGER: Those are part of the indexes. So the

6　indexes that have been run are of all 26. There's only one.

7　That's how we determined that only one of the 26 had Alliance,

8　which is the, sort of the synonym for SWIFT data on it, but

9　the indexes are there, and the indexes are there for the two

10　Exabyte tapes, which are backups of the live system that have

11　been the product of earlier meets and confers discussed in the

12　parties' affidavits as potentially containing SWIFT

13　information.

14　　　　We'll give them the indexes. Okay? I mean, as I

15　said, you know, my analogy was, they want the card catalog,

16　it's great. This notion that we have to read every book in

17　the library because, you know, we're not sure the card catalog

18　is correct, that's just not the way discovery should be done.

19　　　　THE COURT: And where do the Sullivan indexes fit in

20　with the 26 HP tapes?

21　　　　MR. BERGER: So the indexes are the 26 HP tapes.

22　They are the one that's the line-by-line index. They're

23　further indexes beyond just the 26 of the two Exabyte tapes.

24　In other words, live system backup tapes that everybody

25　thought might contain SWIFT.

1          You may remember almost a year ago we were talking

2     about, we recovered data, recovering tapes, so they were not

3     able to fully recover these 13 Exabyte tapes, but there were

4     two of those 13 that everybody thought might have SWIFT data.

5     We had Sullivan and Strickler index those.

6          I'm going to ask Mr. Alonzo if I'm getting this

7     wrong, just to correct me, because I don't want to misstate

8     anything.  But as the separate 26 historical backup tapes of

9     whatever type they were, we had all 26 indexed, and they can

10    have the index.

11         THE COURT:  And the Exabyte Tape 6 -- is that --

12    what is that included?

13         MR. BERGER:  So Exabyte Tape 6, we do have an index

14    of it.  That's how we were able to tell the Court in our

15    affidavits that it does have SWIFT data.  The SWIFT data

16    covers the time period, 2005 to 2007.  It has one zero-byte

17    file in it from 2004.  So there is an index of that and they

18    can have that as well.

19         You know, for Exabyte Tape No. 2, it has no SWIFT

20    data.  It has 12 system files from 2004 that are not data

21    files.  They can have the index of that.

22         I'm -- I know there's a lot of jargon here, but I'm

23    just trying to sort of put these into the appropriate pigeon

24    holes in the desk here so we know what we're talking about.

25    But to the extent we have the indexes, they can have the

1    indexes.

2          THE COURT:  Mr. Radine, I think we're probably going

3    around in circles a little bit, but if you have those indexes

4    or indexes, what more do you need that you don't have?

5          MR. RADINE:  So the problem with the -- getting the

6    indexes of course is crucial.  We need, as you said, the

7    Exabyte tape indexes, and the 26 DDS Tape indexes.

8          But you can see that we're already disagreeing on

9    information we already know about the tapes.  So BOP has

10   routinely repeatedly said the SWIFT backup files are from

11   2005/2007.  We keep saying, right.  That -- a backup you do in

12   2007, for instance, has a created on date of 2007 and contains

13   all the data that was on the system at that -- in the previous

14   period.  Right?  If you did a -- banks right now, banks have

15   data from December 2002 to the present, so the active system.

16         If you made a backup of it right now, that backup

17   would be dated May 25th, 2022, but it would have data going

18   back to 2002.  Right?  So BOP would have excluded that file

19   because they would say, oh, it's from 2022.  You're looking

20   for historical data.

21         The reason why I'm going through this is because,

22   while I'm sure the indexes will be very helpful and we need

23   them, but we are already disagreeing on the interpretation of

24   them.

25         THE COURT:  Well, it also sounds like you're

1    disagreeing on the scope too.  I mean, at least the time line.

2              So, Mr. Berger, is that correct?  Is there -- when

3    you talk about the dates of the tapes, are they perhaps

4    including -- even though they may have later date stamped on

5    them or whatever, do they include data that's much earlier,

6    and so would you object to producing that?

7              MR. BERGER:  I guess what I'm saying is, it's not

8    just so they have a date stamp on them.  They have file path

9    names and the like, and for example, Exabyte Tape 6, we'll

10   take that as an example.  That's the one that covers two -- it

11   has a beginning date of 2005, has an end date of 2007.  It is

12   a duplicate of the live system, so there's no reason to

13   believe that it has anything on it that is not on the live

14   system.

15             Let's just take that as an example.  They'll get the

16   index.  They'll say, well, we have this hypothesis, which is

17   all Mr. Radine is giving you, a hypothesis that maybe, even

18   though it says the date is 2005 to 2007, that it could contain

19   something earlier.  So fine.  They'll give us a search query.

20             Can you run this query on that tape to test my

21   hypothesis that number one, it contains data from an earlier

22   time period.  Number two, it contains data that is not

23   duplicated in the live system that this backs up.

24             When he talks about that, that is a very different

25   kettle of fish than looking at DDS Tape No. 4, which is, these

1       are the ones that frankly might have some promise, which is

2       why we spent so much time on it.  These are the old system.

3               Why we're wasting time looking at tapes that back up

4       the live system doesn't strike me as very productive.  Tapes

5       that have the old system.  Okay.  So we found one that had

6       data from 1996 to 1998.  Well, it's just not possible that a

7       1996 to 1998 tape has data from 2000 to 2003.  It's just not

8       possible.

9               And so, he has a little fluidity here in the way

10      he's using dates, but fine.  They'll look at the index.

11      They'll say, this file intrigues us, can you retrieve that

12      actual file, as opposed to, let's empty out the library, let's

13      get all the books out on the street and then restack them in a

14      way that makes me comfortable that we've looked at the card

15      catalog index.

16              So there are ways to test these things once they've

17      looked at the indexes, rather than Mr. Radine rejecting every

18      suggestion we have made as saying, not good enough, we don't

19      trust them, we don't want to do it, no, we just want to have

20      somebody else take this out of our hands.  That's overkill.

21      We resist that.

22              THE COURT:  All right.  But it sounds as though

23      you're going to have a meet and confer that the plaintiffs

24      will be able to review some data and they can then make

25      requests for queries, and then if that's not satisfactory,

1    you'll be back to me on -- and one of the remedies that the

2    plaintiffs are going to propose is independent vendor.  You're

3    going to propose that.  I get it.

4         What about the bank subpoenas?  There was some

5    suggestion that the banks have nothing.  What -- are you still

6    resisting these bank subpoenas, and I know there's also a

7    question about whether or not you can, you have standing to do

8    so.  But what's your position, Mr. Berger, on the bank

9    subpoenas?

10        MR. BERGER:  Yeah.  I can do that very quickly, Your

11   Honor.  I mean, we have been told that -- by two of the banks,

12   Citibank and JP Morgan Chase, they have nothing.  I would

13   prefer that they respond to the subpoenas and tell the

14   plaintiffs they have nothing.

15        Now, these are the plaintiff's subpoenas, so they

16   haven't told us whether they've received anything in response

17   to the subpoenas.

18        The one bank we've not heard from and have nobody to

19   contact, is the MUFG Union Bank, and perhaps plaintiffs have

20   heard from them.

21        And my only put there is, again, these subpoenas --

22   our problem with them is not if they have the kind of

23   transactional information.  Our problem is, is they say, give

24   us the entire transaction history of this bank, Bank of

25   Palestine.  You know, that's what we're opposed to.

1          But if -- but I haven't heard from the third bank.

2     If they've got documents, I'd like to know what that third

3     bank has.

4          Other than that, we think they're moot.  The

5     subpoenas are moot because JP Morgan Chase and Citibank have

6     nothing.

7          MR. RADINE:  So, just to fill in --

8          THE COURT:  Yeah.  Mr. Radine, go ahead.  Do you

9     have an issue with --

10          MR. RADINE:  Okay.

11          THE COURT:  -- the subpoenas?

12          MR. RADINE:  So the bank that BOP called their

13     primary correspondent bank, JP Morgan, has refused to

14     participate further given BOP's motion for protective order,

15     so that has stalled right there.

16          THE COURT:  All right.  So let me stop you there.

17     So, Mr. Berger, it sounds as though you're happy to have JP

18     Morgan Chase respond.  Is that correct?

19          MR. BERGER:  Correct, Your Honor.  Yes, correct,

20     Your Honor.

21          THE COURT:  Can you communicate that to JP Morgan

22     Chase?

23          MR. BERGER:  I'll do so, Your Honor.

24          THE COURT:  Okay.  All right.  Go ahead, Mr. Radine.

25          MR. RADINE:  Yeah.  I appreciate that Mr. Berger

1    will do that.  What we understood from JP Morgan is they

2    wanted an order on the motion for protective order.  So, you

3    know, we can -- you know, that --

4             THE COURT:  Well, Mr. Berger, are you saying that in

5    fact you're withdrawing that -- any portion of the motion for

6    a protective order that has to do with the subpoena to JP

7    Morgan?

8             MR. BERGER:  I can't do that, Your Honor, because

9    our scope objection is the one that says their subpoenas are

10   over broad.  If -- you know, if Your Honor were to enter an

11   order that says JP Morgan Chase, Citibank -- is the two I've

12   personally spoken with the lawyers for both of them -- shall,

13   you know, respond as to whether they have any responsive

14   documents, we submitted an affidavit confirming what they told

15   us, which is they have none, then that's -- you know, a minute

16   order to that effect will allow me to figure out whether

17   they've miss -- you know, mysteriously, they've got something

18   else.

19             Our problem is not with subpoenaing the banks.  Our

20   problem is that the scope of what the plaintiffs asked.  If

21   the plaintiffs want to reissue subpoenas -- maybe this is a

22   suggestion that would work.

23             They want to reissue subpoenas that don't ask for

24   the entire correspondent account banking history of Bank of

25   Palestine for this period, but ask instead for things that

1    emulate their first request for production of documents, funds

2    transfers through the United States for the subject entities,

3    then we'll withdraw our motion for protective order because

4    those subpoenas fit the appropriate scope.

5         THE COURT:  Mr. Radine?

6         MR. RADINE:  Well, yes.  Obviously, we oppose that.

7    The two scope objections they have, they don't have standing

8    for either as the Court knows.  But the two scope objections

9    very briefly.  Their first one was date related.  The other

10   one was the -- what they call the entire correspondent history

11   is a request for bank statements.

12        So the reason for the period beyond the last attack

13   is because if there aren't records going back before that,

14   which there might not be due to their age, then what we are

15   trying to show is that BOP processes its transactions at issue

16   through New York is -- you saw in Mr. Berger's argument that

17   the attacks did not arise from post-attack transactions.

18   Right.  That's not what we're saying.

19        What we're saying is, we're trying to establish how

20   BOP processes U.S. dollar transactions for entities like

21   these.  It's still limited to the Hamas entities.  To be able

22   to say, look, how did they process a transaction for Al Salah

23   in 2002?  Well, look at how they did it in 2004.  The

24   inference is, they would have done it in the same manner

25   unless they can show they changed some processes in that

1     period.

2          The second one was the bank statements.  The bank

3     statements is something they said they would have looked at

4     first.  Bank statements may express this information

5     differently.  It may list the counter-party.  It may say that

6     you have an entry that doesn't list one of the Hamas entities,

7     but it says, check settlement payment to PMA.  That's the sort

8     of thing that we would suggest you could read along with other

9     data, such as checks they process for these entities to say

10    that the checks were settled in New York.

11         We're not interested, obviously, in the sum total of

12    BOP's banking -- correspondent banking activity during that

13    period, but we're trying to find documents that might still

14    exist.  Bank statements might exist, for instance, where

15    individual transaction records don't, by way of example.

16         MR. BERGER:  If I may be heard on that?  I mean,

17    that's the problem.  Mr. Radine has put his finger on the

18    problem, which is he says they're not interested in the entire

19    BOP correspondent bank history during the time period.

20         But when you ask for a bank statement -- he asked me

21    for my bank statement for a four-year period.  That is my

22    entire banking history.  There has to be a way for them to

23    narrow these subpoenas so that it asks for information that

24    actually fits the scope of discovery.  When we said we would

25    have looked at them, yeah, we would have looked at them.  We

1    wouldn't have turned them over, we would have looked at them

2    for responsive transactions.

3         So if there are customers that have nothing to do --

4    the U.N. Food Program, there are transfers to the U.N. Food

5    Program through the correspondent account history.  They can't

6    possibly either believe that that's jurisdictionally relevant,

7    or say that they're entitled to that, because these are the

8    types of customers that Bank of Palestine services.

9         And so, they need to narrow their subpoenas.  Then

10   we can say, that overtakes the other subpoenas, that moots the

11   motion for a protective order, they ought to draft these

12   subpoenas.  You know, we're doing a lot of work here to get

13   ready for the meet and confer.  All they're doing is sitting

14   there and saying, their wish list is still big.

15        They ought to redraw their motion for -- they ought

16   to redraw their subpoenas.  They ought to show them to us in

17   the meet and confer.  They ought to reserve them if we can

18   agree on them, and then that will moot that, and then there

19   won't be a pending motion for protective order.

20        In the meantime, I will ask the assistant general

21   counsel to whom I spoke at JP Morgan Chase, and ditto the

22   assistant general counsel to whom I spoke at Citibank, if they

23   can communicate in some way to the plaintiffs that they do not

24   have responsive records relating to these correspondent

25   accounts for this time period, then that will save everybody a

1    lot of work.  I can't control what they do.  I would prefer

2    that they say it so you don't have to take my word for it.

3           MR. RADINE:  Just to be clear, I can't -- I can't

4    write a subpoena -- so the burden of, let's say redacting

5    irrelevant information out of the bank statements is a burden

6    that would fall on the banks not to BOP.

7           It's not BOP's burden.  I don't know if they could

8    write a subpoena that says, you must give me bank statements,

9    but you also must redact them in a way that pleases BOP.  It's

10   a specific document we're requesting because it's a document

11   that would contain relevant information.

12          THE COURT:  Well, but what could be done is you

13   could have the information go to BOP first, and then BOP can

14   say whether there's -- it might be that BOP might be able to

15   settle the problem once it's gotten all of this information.

16   Either it could redact, or it could say that there's nothing

17   there that exists.  Would that work?

18          MR. RADINE:  Yeah.  I mean, ordinarily records

19   contain both relevant and irrelevant information, and usually

20   the -- where there's no particular prejudice, the other party

21   doesn't get to then go through and redact out information that

22   they just think is irrelevant.  It's not -- the other issue --

23   and they don't have standing, of course, to do that.

24          And then lastly, of course, we have the issue where

25   we clearly disagree on what's relevant.  We already have had

1    that discussion about the check clearing that would show up on

2    these bank statements.

3            So we can certainly mention to their correspondent

4    bank that they are free if they want to, to redact out

5    information on some agreed-upon standard.  But I don't think

6    it's something that we can order them to do, or that we would

7    ordinarily agree to having the defendant in the case do to a

8    third-party document.  Again, where there's no -- there's no

9    prejudice.

10           The U.N. Food transactions they're doing, I don't

11   know how it prejudices them if we were to see that.  There's a

12   protective in this case in place anyway.

13           MR. BERGER:  Well, Your Honor -- and Mitchell Berger

14   for Bank of Palestine.  I mean, almost by definition we put

15   this into our briefing on the motion for protective order.

16   Banking information is not -- should not be seen by others.

17           I don't care about the protective order because they

18   still see it.  They are not entitled to look at banking

19   information that does not relate to the issues of whether or

20   not the bank transferred for allegedly Hamas related entities.

21           But again -- look, for an hour and a half I've

22   listened to Mr. Radine say in response to either my suggestion

23   or the Court's suggestion that it's not good enough, no, no,

24   no, and frankly, they need to do a little work themselves,

25   rather than just sort of putting their palm out and say, give

1    me more.

2         And they can either narrow these subpoenas.  I will,

3    in the meantime, get on the phone with the -- with Mr. Gabriel

4    Torres  from JP Morgan Chase who told me they have no records,

5    and Ms. Kirsten Fiore from Citibank, who told me they have no

6    records, and I will ask them to communicate to plaintiff's

7    counsel that they don't have responsive records relating to

8    these correspondent accounts for the years covered in their

9    subpoenas, and maybe that will simplify things yet again.

10        THE COURT:  All right.  Well, that will be the

11   easiest way if in fact that's the case.

12        All right.  So let's set up the time table and then

13   a date for another conference after you've done this.

14        MR. RADINE:  Well, sorry, Your Honor, we still have

15   the interrogatory issue open.  We still want answers to those

16   interrogatories from BOP.

17        MR. BERGER:  Yeah.  On that one, Your Honor, this is

18   one that I think is a -- sort of a black and white issue,

19   which is, they're not entitled to account information.  That

20   is merits discovery.

21        If it happens, as was the case in the Singer 1

22   through 13 spreadsheets, that there are transactions within

23   the accounts, and we've told them what the account numbers are

24   for the accounts that have transactions.  But if there are

25   accounts that do not have dollar transactions, they're not

1　　entitled to the account numbers.

2　　　　　　They're not entitled to account opening -- how on

3　　Earth could account opening documentation and the like, and

4　　all of that activity that they want with respect to accounts,

5　　how could that relate to the jurisdictional issue of whether

6　　or not there are transactions to the United States?  I know

7　　that they would like to get away from what Judge Vitaliano

8　　ordered, but it has nothing to do with it.

9　　　　　　So what they're talking about is interrogatories

10　　that ask for three things that are totally outside the scope

11　　of discovery.

12　　　　　　Account information unrelated to transactions,

13　　information that post-dates, by their own definition, the

14　　relevant time period, and information regarding know your

15　　customer AML type screening of customers that again has

16　　nothing to do with the United States, although I'll represent

17　　that if there were something having to do with transfers to

18　　the United States of the know your customer, anti-money

19　　laundering variety, we would produce that.

20　　　　　　But this is just plain old merits discovery that

21　　they want.  And, you know, there's no reason -- we think we're

22　　right about it.  They think they're right about it.  No reason

23　　to rule on that today, because this is supposed to be

24　　transactions focused, and we can come back.

25　　　　　　We can talk about that some other time, but on that

1    one, we think we're absolutely right.  We think that is one

2    that is a pure matter of law.  You know, it's got to mean

3    something that Judge Vitaliano said transactions.  And

4    transactions are not the same as accounts.

5         THE COURT:  All right.  Well, Judge Vitaliano's

6    order was that jurisdictional discovery be reasonably tailored

7    to the jurisdictional issue of whether BOP engaged in frequent

8    and deliberate use of New York banks during the time period,

9    et cetera.  It may well be that -- well, Judge Vitaliano

10   didn't specifically limit discovery to only a period of time

11   between December 2001 and August 2003.

12        Discovery is -- obviously, in this case when we talk

13   about proportionality, there's a lot -- this is not a typical

14   case.  But I think that there are ways that the

15   interrogatories can be answered that are broader than what BOP

16   is talking about and that can still protect the discovery

17   process.

18        So I'm inclined to -- I'm inclined to be -- I'll

19   take a -- I'll take a look at this again.  I'll try to keep an

20   open mind about it, but at this point I think that the

21   plaintiff's arguments are persuasive to me in the -- to the

22   extent that we're talking about discovery at this point.

23        If it's not admissible, you can't -- and it can't be

24   used, or Judge Vitaliano decides it's not relevant or useful

25   for motion to dismiss, that's one thing.  But I think given

1     plaintiff's access to more information than has been produced

2     in the interrogatories is the way to go here.

3            Now, I can wait until the next conference to be more

4     specific about that, but just to give you a general sense of

5     where I'm tending on the interrogatories.

6            And, you know, as far as the account information

7     goes, I don't think that there's a privilege there that I've

8     heard, or -- and I do think that our protective orders can

9     protect account information.

10           So what I -- what I'd would like to do then, is set

11    up a date for the next conference.  I don't think we need to

12    wait too much longer.

13           How much -- how much time does the plaintiff need in

14    order to do whatever you have to do to review all the data

15    that has just recently been produced to you?

16           MR. OSEN:  Your Honor, this is Gary Osen for the

17    plaintiffs.  Just to address that and to go back for a moment.

18    I promise, I won't belabor the point on the interrogatories.

19    But the reason those are relevant, even to the meet and confer

20    process, is that it helps establish parameters of what the

21    potential, you know, total universe of accounts are.

22           And obviously, this doesn't require production of

23    anything, but it sort of sets the table for what accounts

24    they're actually searching for, whether accounts are relevant

25    or not.  So I think having that information would be

1    incredibly useful to the meet and confer process.

2            As far as the -- as far as the actual conference

3    with Your Honor, I think the first step is for the defendant

4    to, number one, produce the indexes, the schema, and the --

5    and the dictionary, so that we understand what we're looking

6    at.  And of course, at the same time, we can confer with them

7    in the hopes of finally getting the complete search terms and

8    search queries that they've used to date.

9            And I think it doesn't make sense, frankly, in our

10    view to schedule the conference itself until those materials

11    have been produced and we've had, you know, at least a week or

12    so thereafter, maybe two weeks, in order to simply just

13    evaluate what the universe of materials we haven't seen yet

14    constitute.

15            And then basically two weeks after we've gotten the

16    production of all that, we can, you know, jointly write a

17    letter to the Court suggesting a proposed conference date.

18            THE COURT:  Okay.  That will work from my

19    perspective.  Does that work for you, Mr. Berger?

20            MR. BERGER:  On the substantive point about the

21    interrogatories it doesn't work, only -- and -- but I'll get

22    to the scheduling point if I may?  Their interrogatories about

23    accounts are worded -- I'm looking at 1 through 7 -- state

24    whether Bank of Palestine has ever maintained an account or

25    accounts for X entity.

1          It can't possibly be relevant to jurisdictional

2    discovery whether we have quote/unquote, ever maintained

3    accounts for them.  It ought to be during the relevant time

4    period.  How could it matter if we had an account for an

5    entity in 2005 or 2006, or if we had an account --

6          THE COURT:  Okay.  Let me just interrupt you there,

7    yeah, and I understand your point.

8          So in the subpoenas, the relevant time period was

9    generally 1/2000 to December 31, 2004.  I don't have the

10   interrogatories in front of me.  Is that the time period that

11   you're looking for in your interrogatories as well?

12         MR. BERGER:  Well, we would just ask that it be cut

13   off in August of 2003.  But for purposes of the

14   interrogatories if -- you know, if they want to talk about

15   2004, since we already have one account that was identified

16   that we've acknowledged in an affidavit from 2004, the

17   interrogatories that relate to the accounts, I believe, are

18   Number 1 through 7, and we've already made it clear as to some

19   of them that we did maintain accounts because we produced

20   transactions for them.

21         So we're only talking two or three interrogatories.

22   If 1 through 7 are limited to 2000 and 2004, it's fine.  We

23   can answer those interrogatories.

24         THE COURT:  All right.  Does that work for the

25   plaintiffs?

1        MR. OSEN:  Well, there are two issues, and maybe my

2   colleague, Mr. Radine, will address one of them.  But you

3   know, I have less of an issue with a cutoff of 2004 than I

4   think we have with the period before 2000.

5        And that's because, although it may be completely

6   moot and unresponsive, from our perspective, just to give a

7   hypothetical, Your Honor, assume that one of these accounts

8   received a $500 million transaction in 1998 or 1999.

9        We would then have a question about whether that

10  constituted substantial assistance to Hamas during the

11  relevant period.  Obviously, a transaction for $5 would

12  probably not qualify.  But we're much more concerned about

13  artificially cutting off the earlier period than we are the

14  period after 2004.

15       MR. BERGER:  If I may just address that?  I mean, I

16  think Mr. Osen's comment puts the finger on the problem.  He

17  said, that would constitute substantial assistance, and we all

18  know that substantial assistance is the operative language of

19  just the aiding and abetting, which is the one claim they

20  brought here.

21       That's merits discovery, and you've got to be a

22  difference, the merits discovery and jurisdictional discovery,

23  and it's transactions have to arise -- the attacks have to

24  arise from transactions.  And the attacks for 2000 to 2003.

25       So, you know, we're prepared, as I said, despite

1     that, we'll answer the interrogatories going to 2004.  If they

2     think there's some treasure trove of information before 2000

3     that's jurisdictionally relevant and I haven't heard it, then

4     this notion that it's open-ended on the back end, that's got

5     to be completely wrong.

6           It makes a mockery of the arising from component of

7     jurisdiction.  They want to ask us 1999 to 2004, that's fine.

8     You know, it can't be the jurisdictional discovery is just the

9     sort of the thin edge of the wedge that opens the door to

10    merits discovery.

11          THE COURT:  Yeah, I understand what you're saying.

12    So with that, Mr. Osen, 1999 to 2004.  Does that work for you?

13          MR. OSEN:  Yeah.  I think that would be fine, Your

14    Honor.  And again, we're only asking for interrogatory

15    responses.  We're not asking at this stage for them to sort of

16    open up all records, even for 1999, because this is just about

17    responding to the interrogatory, identifying the accounts so

18    that we are better able to meet and confer and know what the

19    universe of potential responsive records might be, and what is

20    appropriate for search purposes.

21          THE COURT:  Okay.  So I think we've resolved that.

22    So are we okay on the interrogatories now?

23          MR. BERGER:  Bear with me, Your Honor, just one

24    second.

25          It says, if so -- if the answer is yes, state the

1    account number, the currency in which the funds were

2    denominated, and the date each account was opened, and if

3    applicable, when each account was closed.  That's more

4    information than they need for jurisdictional purposes.

5         If the answer is, we had accounts, then -- during

6    that period, then that's fine.  Then they need -- then they

7    know what they need to know for purposes of the meet and

8    confer that they say this is really all about.

9         THE COURT:  Look, Mr. Osen --

10         MR. BERGER:  This is not a mystery.  Go ahead.  I'm

11   sorry.

12         THE COURT:  Yeah.  Mr. Osen, what if anything more

13   do you need than identifying whether there's an account?

14         MR. OSEN:  Well, I think we'd be satisfied, Your

15   Honor, with knowing the account, the currency, and also the

16   account number for accounts that were held for these entities

17   during the period 1999 to 2004.

18         THE COURT:  Mr. Berger, can you live with that?

19         MR. BERGER:  Yeah.  Yes.  Yes, Your Honor, I can.

20         THE COURT:  Okay.  Good.  Is there anything else

21   that we can work out here today, or is the rest for the meet

22   and confer?

23         MR. RADINE:  I think that's it for plaintiffs,

24   pending the meet and confer process.

25         MR. OSEN:  And, Your Honor, this is Gary Osen again.

1    Just to be clear, for meet and confer purposes, both the

2    responses to the interrogatories as well as the indexes, the

3    dictionary, and schema, all that is really necessary for the

4    meet and confer process to have any chance of being at all

5    productive.

6         So when that's scheduled, or when that occurs, you

7    know will be obviously somewhat dependent on when the

8    defendant can produce those materials and responses, but once

9    we get them we'll -- you know, we'll be in a position within

10   two weeks to assess when the next conference makes sense.

11        THE COURT:  Okay.  Mr. Berger, do you have a time

12   frame that you can estimate at this point?

13        MR. BERGER:  Well, I guess I'll have to figure out

14   what they think we haven't produced on the scheme and the

15   search terms, but since we think we've already produced it,

16   that shouldn't take long.  The indexes, that's just a

17   technical issue we'll have to go to the Sullivan and

18   Strickler, but that should be a matter of, you know, days.

19        The one time consuming bit is reproducing the

20   spreadsheets and the affidavit and I really can't estimate

21   that right now, but that's got to be a minimum of, you know,

22   two weeks, I would think, before we can do that.

23        THE COURT:  Okay.  All right.  So I think we have an

24   approximate time table, today being the 25th.

25        What -- can you give me a status report, a written

1  status report on June 17th?  Hopefully, you'll have everything

2  together and you'll be reviewing -- is that a reasonable time

3  to do it?

4            MR. RADINE:  I mean (indiscernible).

5            MR. BERGER:  A written status report on June 17?

6            THE COURT:  Yes.

7            MR. BERGER:  For defendant, that's fine.

8            MR. RADINE:  (Indiscernible.).

9            THE COURT:  Does that work for plaintiff?

10           MR. RADINE:  (Indiscernible.) Sure.

11           THE COURT:  Is that too tight, or will that work for

12  you?

13           MR. BERGER:  For -- we'll do our best.  I don't

14  think the 17th should be a problem for a status report.  If it

15  is, I'm sure the one thing we'll be able to agree with the

16  other side on is, we'll tell the Court we need more time.

17           THE COURT:  Okay.  Good.  A good feeling starts with

18  that.  All right.

19           And then I'll just propose, in the status report, if

20  you can and you're ready to do that, you can propose an

21  approximate, you know, time period within which you think

22  you'd be ready for the next conference.

23           And if you can't do that, you'll just tell me you

24  can't do it, and I'll do it in the next couple weeks after.

25           Okay.  Is there anything else to discuss from the

1      plaintiff's end?

2              MR. RADINE:  No, Your Honor.  I guess in that status

3      report we'll also have whatever update about the subpoenas,

4      since we'd like to reengage JP Morgan.

5              THE COURT:  Yes.  Okay.  And defendants, anything

6      else?

7              MR. BERGER:  I think we've covered everything, Your

8      Honor.  Thank you.

9              THE COURT:  Okay.  Thank you.  Have a good day,

10     everyone.

11             MR. BERGER:  All right.  Thank you.  Bye bye.

12             MR. RADINE:  Thank you, Your Honor.

13             THE COURT:  Bye.

14         (Proceedings concluded)

15              I, CHRISTINE FIORE, court-approved transcriber

16     and certified electronic reporter and transcriber, certify

17     that the foregoing is a correct transcript from the official

18     electronic sound recording of the proceedings in the above-

19     entitled matter.

20

21         *Christine Fiore*

22     _____          June 8, 2022

23       Christine Fiore, CERT-410

24         Transcriber

25