1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3  SARRI ANNE SINGER, et al,

                                        Case No. 1:19-cv-00006-ENV-
4            Plaintiffs,                RML-1

5  v.                                   Brooklyn, New York
                                        October 17, 2022
6  BANK OF PALESTINE,                   2:04 p.m.

7            Defendant.

8

9            TRANSCRIPT OF TELEPHONIC HEARING
             BEFORE THE HONORABLE ROBERT M. LEVY
10            UNITED STATES MAGISTRATE JUDGE

   APPEARANCES:
11 For the Plaintiff:          Michael J. Radine, Esq.
                               Gary Osen, Esq.
12                             Osen, LLC
                               190 Moore Street
13                             Suite 272
                               Hackensack, NJ 07601
14
   For the Defendants:         Mitchell R. Berger, Esq.
15                             Squire Patton Boggs (US), LLP
                               1211 Avenue of the Americas
16                             Ste 26th Floor
                               New York, NY 10036
17
   Clerk:                      Unknown
18
   Court Recorder:             Electronic Sound Recording
19
   Transcription Service:      Chris Hwang
20                             Abba Reporting
                               PO Box 223282
21                             Chantilly, Virginia  20153
                               (518) 302-6772
22

23

24 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.
25

1          (Call to order at 2:04 p.m.)

2               THE COURT:  Hello, good afternoon, this is Judge

3     Levy.

4               MR. RADINE:  Good morning, Your Honor this is Mike

5     Radine for the Plaintiffs.

6               MR. BERGER:  Good afternoon, Your Honor, Mitchell

7     Berger here from Squire Patton Boggs.

8               THE COURT:  Okay, so we're going on the record.  This

9     is docket number 19-CV-6, Singer v.  Bank of Palestine.

10              Why don't we start with Plaintiffs' counsel.  Bring

11    me up to date as to where we are at this point, please.

12              MR. RADINE:  Sure, thank you, Your Honor.  This is

13    Michael Radine, although I'll note that I'm joined by my

14    colleague, Gary Osen, who will jump in if I forget anything.

15              Again, I haven't spoken with the Court in some time,

16    so if the Court will indulge me, I'll just summarize where we

17    are in the tape recovery issue at a little bit of length

18    starting with just the background.

19              As the Court is aware, the parties have focused at

20    this stage on two systems on BOP's backup tapes, a backup of

21    BOP's SWIFT Alliance Access Database platform, which is on a

22    tape we'll call Exabyte Tape 6 and several backups of BOPs

23    legacy core banking system on several DDS tapes.  And the main

24    tape there we'll call DDS Tape 23.

25              As Your Honor knows, we've been saying for months

that these backup files should go to an independent qualified vendor to search for responsive records based on agreed upon search queries, rather than rely on BOP's an its IT consultant analyses, which Plaintiffs have consistently maintain were and are at best erroneous.

Well, BOP previously persuaded the Court that the ordering as to give the tapes to an independent qualified vendor is premature because their own vendor Sullivan Strickler had already started the process of analyzing the files from these two tapes and would only need, quote, four to six weeks from when work commenced in early August.

We're now in mid-October, some 10 weeks after early August. And Sullivan Strickler has informed us on our last of two IT conferences we held that it needs perhaps 10 more weeks to complete even a cursory review of the tapes, although it admittedly lacked the capacity to do the kind of forensic work that is reasonably required to properly search the tapes.

Not a disparagement. We're advised that within their limited core competency, they appear to be proceeding in good faith.

But let me turn first to what Sullivan Strickler has found so far, which is itself rather remarkable. And then, I'll summarize why its purported search process is completely insufficient.

So, starting with Sullivan Strickler's findings, they

1    so far confirm certain specific findings about the tape that

2    make clear that essentially every material search, I mean BOP

3    and its IT consultant, had made to this Court about the backup

4    tapes has been at best mistaken.

5              We can detail this chapter and verse in a renewed

6    motion to compel, but I'll just briefly itemize the main

7    points.

8              First, the Court will recall that BOP first insisted

9    that Exabyte Tape 6, which had the backup of the SWIFT

10   database, should be set aside because it only contained one

11   large file, regarding transactional data.

12             We said that was impossible and after we filed a

13   motion to compel, BOP conceded the tape actually contained

14   60,000 files, but now thinks the Sullivan Strickler, BOP has

15   reproduced the filing index and it contains 141,000 files.

16             Now BOP's IT expert Mr. Regard had insisted

17   repeatedly that Exabyte Tape 6 was, quote, nonrelevant because

18   all of these files were from 2005 to 2007 and were therefore

19   outside of the relevant time period.

20             Now we had said the time the backup files were

21   inherently retrospective.  And that even looking at the indexes

22   they produced, well, actually, they withheld during the motion

23   to compel briefing, they were produced afterwards, even there,

24   we could see that files right on the index, archive files, were

25   dated from 2003.

1    However, Sullivan Strickler has now confirmed that

2  there are SWIFT transactional message data from 2003 and

3  presumably earlier.

4    They've also stated that the file contained no create

5  date.  And that entire data column on the indices, Mr. Regard

6  advised so much, was completely erroneous and is now blank in

7  the revised index at page 6.

8    And then, next Mr. Regard had insisted that EDF Tape

9  23, this is the one that we contend had the legacy banking

10  system, quote, did not contain any identifiable backups of the

11  COBOL core banking system during the relevant period because

12  first the data was dated from 1970.

13    And second, because it only contained three KSAM or

14  COBOL utility files, quote, not data files.

15    We contend that the Court knows in our August letter

16  that the tape actually included over 3,000 KSAM files and that

17  the 1970 data was erroneous.

18    Well, unsurprisingly, Sullivan Strickler's confirmed

19  the tape includes a huge amount of KSAM files, although it is

20  still looking into how many, as well as COBOL application

21  files.

22    Now that also means the other 11 tapes we identified

23  as incremental backups Defendant's HP server likely also

24  contained KSAM files from the same system as they contained the

25  same file structures and names.

1           So in sum on the findings so far, after nearly a year

2   of shifting denials, it is now beyond doubt that Exabyte tapes

3   and the DDS tapes contain at least a kind of data that we have

4   long insisted they would.

5           So, with that, I'll just turn to the search method

6   Sullivan Strickler is using.  The methodology that they've been

7   instructed to use is insufficient.

8           As we've previously advised the Court, Sullivan

9   Strickler is a competent but low level data recovery firm, not

10  a correspondent banking and payment transaction analysis firm.

11          As the Court knows, we repeatedly claim that they

12  database files at issue must be reviewed either in their native

13  applications or in modern analytical database, not just a

14  viewing program so that the data field and tables are

15  associated correctly for each record.

16          And indeed in their August 15th letter, BOP stated

17  that, quote, native applications will be used to open and

18  examine individual files to attempt to determine if they

19  contain data from the relative time period.

20          But Sullivan Strickler has informed us that it is not

21  using native applications, but its own forensic software in

22  attempts to search the files without reconstructing them using

23  database management system.

24          But these files, they're not image or text files like

25  a PDF or a Word file that can just be OCR'd and searched using

1    simple search terms.

2           The Sullivan Strickler software searches a jumbled

3    data in the files just for search terms rather than

4    reconstructing them.

5           Data is often spread out over many files or even on

6    one file, data is often (indiscernible) scattered throughout

7    the file.

8           So Sullivan Strickler confirmed their experience and

9    capabilities to us, which is why Plaintiffs wanted the

10   independent qualified vendor to do this kind of database

11   restoration work.

12          So on the specific process they're using, on Tape 6

13   with the SWIFT tape, because the search that they were using as

14   account numbers for the subject entities from the document

15   request were producing far too many hits, they used a technique

16   introduced in the (indiscernible), a search which is meant to

17   limit hits to field 59 in SWIFT messages.

18          But even if that were a method -- and I'll just say

19   field 59 would include what's sort of referred to the

20   beneficiary of a transaction.

21          But they omit the field for the originator of a

22   transaction.  They omit the fact that other SWIFT messages

23   don't have field 59, have other fields for that information.

24   None of those are being searched under this method.

25          Right now, even with this insufficient method, they

have found over 3,800 hits, including on a transaction going

back to November 2003.  And they still reviewing those,

although again, that process is not going to work because they

don't reconstruct the database, which they can't.

On the KSAM side on DDS Tape 23, they are still

wrangling with those files, which are encoded.  And they hope

to complete their review by year's end.

But even the searching they've begun with those

files, we have grave doubts that they're doing it correctly.

So they explained to us that they're using techno (phonetic)

decimal decoding, but the metadata for KSAM files are also

decoded.  Your Honor, my -- just the fact that I'm repeating

things that (indiscernible) here, but I'm doing my best.

And the contents, you get another encoding scheme.

So they are decoding the data using the wrong decoding schemes

and their search results so far have been pointless.

In fact, we can even see that the date that Sullivan

Strickler has entered in a refreshed Tape 23 index are

incorrect.  So we can see already the result of them using the

wrong decoding process.

So in short, Sullivan Strickler will need a total of

some 20 weeks to partially review data -- Defendant's ESI,

excuse me, at the individual file level.

And that cannot -- I think that Sullivan Strickler

rather cannot and has not been instructed to analyze these

1   database files in their native applications.

2           These are just the big picture issues for our motion

3   from the smaller issues that has arisen so far and their

4   processes.

5           What we want as a result is to renew our motion to

6   compel now, that these tapes contain Defendant's ESI, go to an

7   independent vendor that is not only solely qualified to search

8   at the individual file level, but to also load the data at

9   appropriate databases and search for relevant search terms.

10          Okay, that was a lot.  I will stop there for any

11  questions you might have, Your Honor.

12          THE COURT:  Let me hear from Defendant's counsel.

13          MR. BERGER:  Yes, Your Honor, Mitchell Berger from

14  Squire Patton Boggs for Bank of Palestine.  And I listened

15  patiently to Mr. Radine, but I have so say I'm astonished.  It

16  feels like they're living in an alternate reality.

17          From our standpoint, we had been successfully

18  implementing the plan that Your Honor directed in your August

19  22 order.  And maybe this is the reason why Mr. Radine is going

20  on at such length.

21          The fact is we have found SWIFT records and not a

22  single one of them is jurisdictionally relevant.  And perhaps

23  because they don't like the results of that search, they want

24  to take it out of our hands.

25          So let me explain what exactly is going on, see if I

1    can't respond point by point to as many things as possible that

2    Mr. Radine said.

3           First of all, as Your Honor knows from your order of

4    August 22nd, the tape review being done by Sullivan Strickler

5    was meant to focus particularly on two tapes, Exabyte Tape 6

6    and DDS Tape 23.

7           We started with Tape 6 because everybody, at least

8    while we're before the Court, everyone seems to agree that Tape

9    6 is the tape most likely to contain SWIFT records.

10          Mr. Regard, our IT expert, before we began this tape

11   review, said yeah, there are SWIFT records on that tape, but

12   they're outside the relevant time period.

13          After we were before Your Honor in August, when we,

14   you know, we're arguing over whether it was worth drilling any

15   more into these tapes.  We said you know what?  We'll have our

16   experts do it.  We have been fully transparent about that

17   review.

18          There have been two meet and confer sessions between

19   Plaintiffs' IT expert and Sullivan Strickler.  They have run

20   nearly six hours.

21          Sullivan Strickler has completed its recovery of Tape

22   6 and has now finished all of the searches.

23          Now Mr. Radine can invoke whatever jargon he wants to

24   about search methodologies, but we know that the searches are

25   working because the searches have extracted SWIFT records,

1   actual intact SWIFT records.

2           One, only one SWIFT record is from the 2003 time

3   period.  And we have ruled it out as being jurisdictionally

4   relevant because that SWIFT record never went through the

5   United States.  It went elsewhere.

6           There are other hits, if you will, using account

7   names and account numbers.  Most of them are from 2005, 2006,

8   and 2007.  There is a small number from 2004.

9           From our standpoint, all of those are

10  jurisdictionally irrelevant by way of a time frame, but the

11  proof of this particular pudding is that Sullivan Strickler's

12  methodology is working because it is extracting SWIFT records,

13  which is after all what we were supposed to do.

14          Yes, it has taken longer.  When we wrote to Your

15  Honor, we said it would take at least four to six weeks.

16          We're trying to do this painstakingly and correctly.

17  We have had two meet and confers, where we've explained the

18  process.

19          And Mr. Scantling (phonetic), who is their IT expert,

20  at the last meet and confer said the methodology being used by

21  Sullivan Strickler was forensically sound.

22          Which is why I say I'm astonished to hear Mr. Radine

23  get on the call and say, you know, everything notwithstanding

24  our experts saying what you're doing is forensically sound,

25  that all that is garbage and they didn't really mean it and

1    they don't want us to continue.

2            And the reality is we are finishing the process that

3    we promised we would do.  We started with the tape most likely

4    to contain SWIFT records.

5            And indeed as we predicted, it does.  And indeed as

6    Mr. Regard predicted, you can see this at ECF 96, page 2, his

7    early analysis was, yes, they're a SWIFT record, but they're

8    outside the time period.

9            None of the SWIFT records that we have found is from

10   the relevant time period identified by Judge Vitaliano.  Recall

11   that the last attack in this case was August of 2003.

12           And when Judge Vitaliano set the scope of discovery

13   here and referred to the relevant period, he referred to the

14   fact that the relevant period would be the period relevant to

15   the 12 terrorist attacks.  That's his opinion 14.

16           Notwithstanding the fact that August 2003 was the

17   last attack, we looked at manually examined the November 2003

18   SWIFT records and we were able to rule it out because it did

19   not touch the United States.

20           Now as a reminder, and I'm sure Mr. Radine and Your

21   Honor recall this, when we received the document request that

22   started this entire process, Plaintiffs included what they said

23   was a jurisdictional limitation.

24           And I'm quoting it.  Bank of Palestine need only

25   produce responsive records that reflect funds transferred that

cleared and/or settled through the United States.

We have been using that as our filter.  We have been using the relevant time period as our filter.

Even when the Plaintiffs, with Your Honor's direction and leave, sent us written questions in advance of the first meet and confer session, their question was what forensic review process would Sullivan Strickler use for identifying relevant records relating to U.S. dollar denominated cross-border electronic transfers process, processed through Defendant's correspondent accounts in New York between 1999 and 2003?

Well, nothing goes back to 1999.  Nothing is earlier than 2003.  There's one SWIFT transfer in 2003.

Now we explained all of that.  And Mr. Scantling accepted that what's going on is forensically sound.  It's forensically sound, notwithstanding the sleight of hand about native applications, because as Mr. Sullivan from Sullivan Strickler explained to Plaintiffs' IT expert, their proprietary review software allows them to get more granular than the native applications.

And so, here's what we know.  We know that there were SWIFT records on Tape 6.  We know that they were outside the relevant time period.

And we know that we are now done with Tape 6 and no relevant -- jurisdictional relevant SWIFT transfers have been

1   found.

2          That leaves Tape 23.  And again, as Mr. Sullivan

3   explained at the last session, now that we have Tape 3, I'm

4   sorry, Tape 6 finished, we were focused on Tape 23.

5          Tape 23 is an entirely different haystack, because

6   we're truly looking at needles.  Recall that nobody thinks that

7   Tape 23 is a SWIFT database.  Tape 23 at best backs up the

8   bank's legacy COBOL-based banking system.

9          The bank has already explained under oath.  Mr.

10  Regard has already explained under oath that SWIFT transfers

11  were not maintained in the COBOL banking system.

12         Rather, they were kept in a separate standalone SWIFT

13  system from which data was taken and put into an ancillary

14  table that is loaded onto the current system.

15         We searched the ancillary table.  So, in other words,

16  it is highly, highly unlikely Tape 23 will contain, you know,

17  going back to first principles here, will contain cross-border

18  funds, transfers during the relevant period.  At best, it backs

19  up other systems of the banks, but we are willing to see this

20  through.

21         So, yes, the one point I'll give Mr. Radine is it's

22  taking longer.  But you know what?  It's working and it's

23  working the way Your Honor directed, which is we are focusing

24  on these tapes.  We're providing complete transparency.  And we

25  should be allowed to finish it.

1    If at the end of that process, they continue not to

2    like the search results that we're getting because it doesn't

3    prove jurisdiction, that's fine.

4    They can renew their motion to compel at that point.

5    We'll have completed our review of the tapes.  We can lay all

6    of this out in chapter and verse, rather than inundating the

7    Court with a bunch of sort of jargon at this stage.

8    And Your Honor can see that from our review of the

9    tapes, that it was done correctly and soundly and that it has

10   not found any jurisdictionally responsive records.

11   THE COURT:  Thank you.

12   Mr. Radine, would you like to respond?

13   MR. RADINE:  Sure, just briefly.  So I -- you know, I

14   appreciate that Mr. Berger's not going to respond to the whole

15   suite of inaccuracies it attempted to convince the Court of all

16   this time.  And that's fine.

17   Let's focus on the elements he said now.  First of

18   all, as to Mr. Scantling on the technique methodologically

19   sound -- or principally sound, it won't surprise the Court to

20   hear that that's not what he said.  It's not like I think the

21   methodology's wrong in the way that Mr. Scantling doesn't know

22   about.

23   What he said is that it was forensically sound when

24   he's dealing with single files in the SWIFT system to do a text

25   search, not necessarily the searches that Sullivan Strickler

1   was doing.  Certainly not with a limitation to one field, one

2   type of record, which Mr. Berger chose not to address.

3          But most importantly, it does not work with this

4   database, which is made of multiple files working together.

5   So, again, I'll quote from our notes from the transcripts.  I

6   agree it's forensically sound only appearing with single files.

7          The -- again, the wrong fields were not mentioned.

8   There's not been a search of Tape 6 that is even remotely

9   sufficient yet.

10          As for the native application, it's not a sleight of

11  hand.  It's how this process works into something that BOP

12  offered in a letter on August 15th.

13          This line that their program is -- Sullivan

14  Strickler's is more granular is actually -- that's the sleight

15  of hand here.

16          The thing is that the does search at the byte level

17  as they say, but it doesn't reconstruct the data.  Searching at

18  the byte level is pointless without the data reconstructed.

19          These are databases.  It has to be in a database

20  form.  And that's on page 6.

21          On the KSAM tape, they had yet to decode that data.

22  We have sent them information, which they'd asked for because

23  this is somewhat out of their wheelhouse.  And that is a

24  separate issue.

25          As for the core banking system on Tape 23, this is a

1    more recent sort of tact that BOP's taking to say that it

2    doesn't matter because SWIFT transactions are not reflected on

3    the database.

4            It's a core banking system.  Of course, the

5    transactions are on that database.  All that BOP really means

6    is that the actual SWIFT messages are not recorded on that

7    database, but all of those transactions are.

8            You don't need a SWIFT message to prove a transaction

9    more likely than not transited to the United States.  There are

10   distinct ways.  And essentially the only way that BOP can move

11   U.S. dollars from one bank to another is through the United

12   States.

13           The SWIFT message is excellent proof of how that

14   happens, but it's not necessary.  And so, getting that core

15   banking system, which by the way, the only system they produced

16   records for so far is necessary to complete that picture.

17           We know that the production they've made so far from

18   their banking system is incomplete, does not include the

19   transactions that we attached to our reply in our motion to

20   compel, even though Mr. Berger said that he produced all dollar

21   denominated transactions whether they are in their view local

22   or not.

23           So it remains that this process has to happen and it

24   has to happen correctly.

25           MR. BERGER:  May I respond, Your Honor, briefly?

1          THE COURT:  Yes.

2          MR. BERGER:  So, I mean, it's a bit of a false

3   premise to say, well, the reason why when Mr. Scantling said

4   it's forensically sound that they don't really mean that

5   because that only applies to single files.

6          The fact is that's what this tape contains.  It

7   contains actual SWIFT records, single files.

8          If a bank is keeping single files of SWIFT records,

9   the hypothesis, and that's all it is, and that's a nice word

10  for speculation, that this tape somehow contains different data

11  maintained in a different form.

12         In other words, that they blew up the actual SWIFT

13  record and it underwent cellular mitosis and is now kept in

14  tiny little fragments here and there such that relational

15  databases need to use, that's just not what the actual

16  examination of the tapes approval -- is approving is.  It keeps

17  actual SWIFT records.

18         So yeah, they can always change the subject and say,

19  yes, it's forensically sound what you're doing for single

20  files, but it's not forensically sound for something

21  no -- nobody has any reason to think is on this file.

22         Tape 23, look, we can argue forever until the cows

23  come home on this.  The fact is that we said we would complete

24  a review of Tape 23 and we're turning to that now after Tape 6.

25         We think we're right.  They think they're right.

1    There's one way to find out, right?  We don't have to argue

2    over the shape of the table in this negotiation.

3            We have said we would review Tape 23.  We're

4    reviewing Tape 23.  And then, we will know whether the

5    hypotheses that Mr. Radine is putting out there are correct.

6            Your Honor, we've been at this since May of 2021.  We

7    have bent over backwards.  We have provided now complete

8    transparency in six hours' worth of meet and confers.

9            We didn't have to have the second meet and confer.

10   We understood what Your Honor wanted was transparency with

11   follow up.

12           We have answered questions.  We had produced

13   additional documents.  They say they have additional questions

14   for us.  We said, great, put them in writing, so that there's

15   no misunderstanding.

16           And this is after last week's meet and confer.  We

17   haven't received those follow up questions yet.  We're trying

18   to do everything that we say we would do with the tapes.

19           And the tapes is the last thing that is left.  We

20   have produced an enormous amount of information, including

21   transactional spreadsheets.

22           I'm not quite sure what Mr. Radine is implying about

23   transactional spreadsheets.  We produced transactional

24   spreadsheets of every dollar denominated transaction in every

25   account for any of the subject entities.

1    And further, we produced an affidavit as I told the

2    Court we would, which explains what the transaction codes are

3    and why they are not related to transfers to the United States.

4    We are really talking about the last half lap of the

5    race here.  And we're nearly done.  I understand they want to

6    do it all over again with an independent vendor, but they

7    provided no reason to think an independent vendor's going to

8    get different results.

9    We don't have to resolve that today.  I respectfully

10   suggest that we be allowed to finish what we're doing.

11   Your Honor, you can have us come back in early

12   December and let you know where we are.  And if at that point,

13   despite the forensically sound methods that our people use and

14   they want to renew the motion to compel, you know, I can't stop

15   them.

16   All I can do is explain in response that here's why

17   what we've done is correct and that enough is enough and we

18   should be allowed to renew our motion to dismiss for lack of

19   jurisdiction.

20   But frankly, we're not there yet.  We should have the

21   time to finish the process.

22   THE COURT:  Mr. Radine, why is that not a good idea?

23   MR. RADINE:  Well, it's just this process isn't doing

24   anything.  I mean, the one thing I agree it has so far

25   accomplished, it has shown that every one of these sworn

1   statements, as Mr. Berger calls them, that BOP has given the

2   Court, have been flatly untrue.

3         Right, Tape 6 doesn't have one big file of 141,000.

4   The files on that tape don't go back to 2005.  They go back at

5   least to 2003.

6         The KSAM files are in fact on that tape.  That's what

7   is accomplished so far.

8         And while we appreciate that and they're free to

9   continue working on it on their own, we want to move now to get

10   the process started on having this Court review whether or not

11   these tapes should go to a vendor that's qualified to do

12   database recovery and not simply the tape recovery that

13   Sullivan Strickler is doing.

14         Finding fragmentary data they found so far, which is

15   what they have found on this documents is not going to be

16   sufficient whether we give them more time or not.

17         Getting into KSAM, they're not going to be able to

18   reconstruct that database.  That needs to go to a vendor and do

19   that with the further appointment.

20         As I've pointed out what they've accomplished so far

21   on that tape was getting -- was encoding language wrong and

22   have produced entirely incorrect dates.

23         So I'll put it a little different on Tape 6.  If

24   they're searching the individual files, which there are on that

25   tape, they're also the database files.  That means they're not

1    searching them.

2            Oracle, the (indiscernible) runs on, is a relational

3    database.  It does not work just looking at it.  It's sort of

4    akin to their process of just looking at the archive file on

5    Tape 6 and declaring it one giant binary file.

6            It doesn't work.  And they obviously have not done

7    that search if they think that they have found everything there

8    is on that tape.

9            So we'd like to move now to get that process started

10   instead of rewarding BOP with just further delays and

11   distractions, Your Honor.

12           MR. BERGER:  Your Honor, I have to respond briefly on

13   the record.  First of all, every time I don't respond point by

14   point to everything that Mr. Radine says, I hear that somehow

15   we admitted or I'm dodging it.  So let me be perfectly clear.

16           The statements that our people have made under oath,

17   whether it's the bank or whether it's the experts have all

18   proven to be correct as a result of the actual data analysis.

19           This is not the place for me to respond point by

20   point.  When and if we get to a motion to compel, we'll do

21   that.

22           But the whole notion that everything we said is false

23   is -- the exact opposite is true.  Mr. Regard said we can look

24   at Tape 6, but it's going to be a waste of time because it's

25   not going to contain SWIFT records from the relevant period.

1   That core proposition has proven to be true.

2           Plus number 2, everything Mr. Radine says is candidly

3   out of context.  Your Honor directed us to produce Sullivan

4   Strickler, who is I subcontractor vendor to Mr. Regard, who is

5   an IT expert, who is working with counsel.

6           The actual review process for these documents is

7   hardly just Sullivan Strickler.  As Your Honor said, they can

8   ask Sullivan Strickler what they're doing.  Sullivan Strickler

9   takes direction from Mr. Regard.  He's helping the analysis.

10  Counsel is obviously reviewing records.

11          So the notion that Sullivan Strickler alone is

12  running this process, that's completely false and gives I think

13  gives the entire process a misleading impression.

14          The fact is we're doing what we said we would do.  We

15  first tried to convince the Court, I'll admit it, this would be

16  a waste of time.

17          And then finally, we said we don't want to waste any

18  more breadth telling you it's a waste of time.  We'll do it,

19  even though we think it's a waste of time.

20          It has proven our point that there's nothing there,

21  but we will finish it.  And at that point, Your Honor, I don't

22  expect you on the basis of a phone call to be able to make a

23  decision.

24          If they want to make a motion to compel, which I

25  think is, you know, a waste of time, then fine, we'll make our

1    case, but they should know this is not a one-sided deal.

2            We're candidly sick and tired of being accused of all

3    kinds of discovery malfeasance.  And we'll cross-move for cost

4    if it is as I believe it's going to be a baseless motion to

5    compel, but we don't need to resolve that today.  We can

6    resolve that after we have finished the rest of the tape

7    recovery process.

8            THE COURT:  Mr. Radine suggested that S & S has

9    limited capability on doing tape recovery, but not database

10   recovery.  Do you agree with that?

11           MR. BERGER:  I don't.  They have the ability to

12   search for what is on the tapes.  What they're hypothesizing is

13   there data on the tape that is not -- that is a type that isn't

14   conducive to the type of review they're doing.

15           This is one of the preeminent data recovery and

16   analysis firms in the world.  They know how to review whatever

17   there is there.  And if they don't, then Mr. Regard will add to

18   their capabilities by explaining what we need to do.

19           But no, I don't agree that they're using the wrong

20   methods.  I think they're using the right methods for what

21   they're finding on Tape 6.

22           THE COURT:  Mr. Radine, why is that wrong?

23           MR. RADINE:  I mean, we're not guessing what Sullivan

24   Strickler can do.  Mr. Sullivan told us that they don't re-

25   create databases.  They just have a program and searches text

1    in the files, opening them like a, you know, sort like a PDF.

2            It's not our view that they can't do this.  It's not

3    a disparagement.  That's just the role that they play in the

4    market.

5            It's also not our view that they don't know enough

6    about correspondent banking and properly search those records

7    as reflected by the fact that they're only searching one field

8    of all the relevant fields.  It's just, you know, what they've

9    told us.

10            We don't have any insight on Sullivan Strickler

11    beyond what Mr. Sullivan had told us.  We know he's not working

12    alone.  We know he's working with Mr. Regard and that is part

13    of our concern, which is part of why I think the Court directed

14    Mr. Regard not to answer questions for Sullivan Strickler,

15    which we appreciate.

16            But the limits to Sullivan Strickler's capabilities

17    is not a criticism.  It's just the role they play as opposed to

18    other forensic firms that have different capabilities including

19    ones that do recovery for banks that's very recent.

20            MR. BERGER:  You know, Your Honor, I mean, excuse me,

21    Your Honor, it's Mitchell Berger.  If I just may be heard

22    briefly?

23            When we move -- renew our motion to dismiss for lack

24    of jurisdiction, people are going to have to say under oath

25    what the search process was, what they found, what they didn't

1    find.  And we don't take that obligation lightly.

2          Our -- we're doing this, understanding at the end of

3    the day, all of this is going to have to be summarized and

4    explained to the Court under oath in affidavits, submit our

5    renewed motion.

6          What I find astonishing is the tone of the six hours

7    of the meet and confers have all be collegial, friendly,

8    helpful.

9          Mr. Scantling has offered some incites.  Mr. Sullivan

10   has responded.

11         And then, we get to the lawyers and what I hear is

12   everything that we've done is garbage.  And you know, we are

13   providing transparency.  This is a complete one-way street.

14         If they have complaints about what we're doing and

15   they want to do it differently, then it's frankly your

16   obligation to tell us that sooner than later and certainly not

17   for the first time when we're on the phone with the Court.

18         THE COURT:  Uh-huh.  So are you suggesting that a

19   further meet and confer will help resolve the disagreement

20   about database recovery?

21         MR. BERGER:  Your Honor, I -- and I just say this as

22   a preface, we had one meet and confer.  We already voluntarily

23   provided to them.  We'll continue to do that.  They said they

24   want to send us additional questions.  We're happy to receive

25   those and address those.

1    We're doing, I think, everything that the Court

2    directed us to do.  And we're open to doing all of that.

3    But if they think that we can do a better job,

4    despite representing they've told us six hours of meet and

5    confer, fine.

6    Let them tell us because we want to make this process

7    as absolutely water tight as we can, because we already know

8    what it's showing, which is despite all the money and effort

9    that we have already put into it, and all the additional money

10   and effort they want us to put into it, it's not showing

11   jurisdictionally relevant records.  They want to use a cannon

12   to kill a flea.

13   This jurisdictional discovery was supposed to be a

14   small set of potentially relevant customers during a small

15   number of years, looking at one thing, transfers to the United

16   States.

17   And it has grown like topsy.  And the Plaintiffs are

18   turning this into Jarndyce v. Jarndyce.  And there's no reason

19   why this jurisdictional discovery thought process needs to be

20   that way.

21   Let us finish.  They don't like it, let them put

22   their stuff in a motion to compel.  We'll make our

23   cross-motion.  We'll go from there.

24   THE COURT:  What's the feeling that Sullivan

25   Strickler can finish their work?

1          MR. BERGER:  Your Honor, they'll finish whenever you

2     tell us they can.  Mr. Osen at the end of the last meet and

3     confer asked them when they would be finished with this.

4     They -- some back and forth, was essentially by the end of the

5     year.

6          We trust me, we want them to move as quickly as

7     possible.  We're tired of this dragging on as well, but that's

8     why I suggested to Your Honor, it's October 17.

9          If you want to have a conference December 1st or

10    whatever's the closest weekday, that is, I haven't looked at

11    the calendar, we can tell you I want them to be done before

12    then.

13         And now that they're done with Tape 6, all they had

14    to do is look at Tape 23 and feel where that leaves them on the

15    other ones.

16         So we want them to be done sooner than the end of the

17    year.  They're sort of, you know, give themselves breathing

18    room estimate was by the end of the year.

19         THE COURT:  All right, so Mr. Radine, if we

20    gave -- if I gave Sullivan Strickler 30 days basically till

21    just before Thanksgiving and had a conference soon after, would

22    that put you in a position to make your motion to compel if

23    necessary?

24         MR. RADINE:  Sure.  I mean, we'll move to compel when

25    Your Honor directs us.  Sullivan Strickler is not going to

1    develop more capabilities in the next month.  And there's a

2    limit to how much we can help them since we can't design their

3    software or, you know, anything like that.

4            So -- and we'll obviously keep participating in this

5    process.  We are providing information as fast as we can.

6            The last meet and confer with them we had was on

7    Wednesday on their schedule because they're moving very slowly,

8    so we have to wait for them to be ready and so on.

9            And we will keep helping as much as possible.  But

10   they're not going to (indiscernible) capabilities, so you know,

11   we're ready to move to compel.  I've explained that.

12           Now if Your Honor would rather wait a month, we'll do

13   it then, whatever Your -- the Court prefers.

14           THE COURT:  Well, I think that Mr. Berger's going to

15   be asking for time to complete the Sullivan Strickler.  And so,

16   it would make more sense to have that completed at the next

17   conference and then decide whether to move from there.

18           MR. RADINE:  Sure, Your Honor.  I mean, that's fine

19   with us in the sense that we are fine with Sullivan Strickler

20   doing whatever they work they want to do.

21           We're just of the opinion that this point, it's just

22   a something that they're doing for their own purposes, not

23   Sullivan Strickler, but BOP in the sense that -- and look, if

24   they come back and say find these search Tape 23 and it's full

25   of responsive transaction, so be it.

1    But what they're not going to do is -- I suspect

2  they're not going to say that and what they'll have done in

3  that remaining time is sort of beside the point since they

4  won't have the capacity to restore the database.

5    (Indiscernible) Tape 6, they don't have the schema

6  for either or the software to do that.

7    So, again, in terms of filing the motion later, it's

8  fine.  So far, everything Sullivan Strickler has said has

9  further disproven the assertions BOP has made and, you know, I

10  suppose strengthens our brief on that, but I don't think it's

11  changed the shape of discovery.  So I'll leave that schedule to

12  the Court.

13    THE COURT:  Okay, if there's disagreement as to

14  whether or not Sullivan Strickler can re-create a database, I

15  think we'll know in 30 days whether they can and be able to

16  move on at least hopefully one issue less that's been resolved.

17    So why don't we give Sullivan Strickler to the 17th?

18  Why don't we give them until the 28th of November?

19    MR. BERGER:  Yes, Your Honor.  This is Mr. Berger.

20  The 28th of November.  Understood.  And Your Honor, I hope,

21  will give me a standing objection that if I don't respond to

22  every little jab from Mr. Radine, it doesn't mean that I don't

23  disagree with it.

24    We think that actually what's -- this forensic

25  process, this forensically sound process has proven is that our

1  affidavits have been correct.

2       There's a time and place for that.  We'll deal with

3  that in the motions, but if November 28th to finish the

4  process, and then, a status conference with Your Honor, sure,

5  whatever at your convenience.

6       THE COURT:  December 1st for the conference, is that

7  enough time?

8       MR. BERGER:  From Defendant's standpoint, yes,

9  December 1st is fine.

10       MR. RADINE:  That's fine for Plaintiffs.  I'll just

11  note just for the record that the parties aren't disagreeing as

12  to whether Sullivan Strickler can restore databases.  It can't.

13  We're disagreeing as to whether that's forensically necessary

14  just to make sure that that's clear.

15       THE COURT:  (Indiscernible.)

16       MR. RADINE:  Okay, so December 1st is fine for us.

17       THE COURT:  So we'll have a better idea what's

18  forensically necessary by December 1st, correct?

19       MR. BERGER:  We think we'll have -- we're happy to

20  lay all of this out to Your Honor in advance of December 1st,

21  so we don't have to take up quite so much of your time on he

22  said, she said.  We're perfectly prepared to file a letter with

23  the Court November 28th, November -- whatever it is Your Honor

24  wants to hear from us, which will have something to react to

25  before December 1st.  We're happy to help the Court that way.

1          THE COURT:  Okay, that makes sense.  So why

2   don't -- if you could file something by November 28th?  And if

3   Sullivan Stricker could complete its work before then, then I

4   think we'd be in good shape to address these issues on December

5   1st.

6          And I've got time at 2:00 on the 1st, if that works

7   for everyone.

8          MR. BERGER:  We're available whenever the Court's

9   available, Your Honor, so that's fine.

10         THE COURT:  Okay, anything else we need to discuss?

11         MR. BERGER:  You know, because I noticed when I look

12  at the Court's calendar that most matters Your Honor's giving

13  half hour to.

14         And we have proven once again that we will always

15  take up too much of the Court's time and that Your Honor's set

16  an hour for us today, so thank you for that, but we'll try to

17  be more compact in the future.

18         THE COURT:  Okay, but I (indiscernible) anyway.

19         MR. RADINE:  This is Michael Radine again.  Yes, so I

20  don't know how many months it's been since we subpoenaed JP

21  Morgan or that they said they've found records or that this

22  Court now ordered a couple months ago that they produce them to

23  BOP.  We still have not heard anything else about JP Morgan.

24         MR. BERGER:  I can address that, Your Honor, Mitchell

25  Berger here.  We received after Your Honor entered the order

and some further pressing of JP Morgan Chase a spreadsheet that

contains six transactions.

    They are dated April 26, 2004 through October 20,

2004.  And from our standpoint, that is outside the

jurisdiction and relevant time period.  And therefore, should

not have to be produced.

    THE COURT:  All right.

    MR. RADINE:  This is Michael Radine.  We'll meet and

confer with them.  This is the very first we're hearing this

update apparently.  They have for some time, but we will talk

with Defense counsel about that.

    THE COURT:  Okay, good.  All right, so we have the

dates then.  By the 20th, I'll get a letter from BOP.  And

we'll have a conference at 2:00 p.m. on the 1st of December.

    MR. BERGER:  Thank you, Your Honor.

    MR. RADINE:  Thank you.

    THE COURT:  Thank you.

    MR. BERGER:  Bye.

    THE COURT:  Bye.

    (Proceedings concluded at 2:47 p.m.)

1                      **CERTIFICATE**

2

3

4        I, Chris Hwang, court approved transcriber, certify

5 that the foregoing is a correct transcript from the official

6 electronic sound recording of the proceedings in the above-

7 entitled matter.

8

9

10

11

12

13       _____      November 1, 2022

14       Chris Hwang             Date

15       Court Reporter

16

17

18

19

20

21

22

23

24

25