1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3    SARRI ANNE SINGER, et al,

     Case No. 1:19-cv-00006-ENV-RML

4              Plaintiffs,

5    v.                              Brooklyn, New York
                                     December 1, 2022
6    BANK OF PALESTINE,              2:04 p.m.

7              Defendant.

8

9                    TRANSCRIPT OF TELEPHONIC HEARING
                 BEFORE THE HONORABLE ROBERT M. LEVY
10                   UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:
     For the Plaintiffs:          Michael J. Radine, Esq.
                                  Gary Osen, Esq.
12                                Osen, LLC
                                  190 Moore Street
13                                Suite 272
                                  Hackensack, NJ 07601
14
     For the Defendant           Mitchell R. Berger, Esq.
15                               Kassan Dalul, Esq.
                                 Joseph Alonzo, Esq.
16                               Squire Patton Boggs (US), LLP
                                 1211 Avenue of the Americas
17                               Ste 26th Floor
                                 New York, NY 10036
18
     Clerk:                      Unknown
19
     Court Recorder:             Electronic Sound Recording
20
     Transcription Service:      Chris Hwang
21                               Abba Reporting
                                 PO Box 223282
22                               Chantilly, Virginia  20153
                                 (518) 302-6772
23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1      (Call to order at 2:04 p.m.)

2          THE COURT:  Good afternoon, this is Judge Levy.

3  We're here on docket number 19-CV-6, Singer v. Bank of

4  Palestine.

5          Will counsel please state their appearances for the

6  record, starting with the Plaintiff?

7          MR. RADINE:  Good afternoon, Your Honor, this is

8  Michael Radine of Osen, LLC for Plaintiffs.  I am joined today

9  by my colleague Gary Osen.

10         MR. BERGER:  Good afternoon, Your Honor, for Bank of

11 Palestine, this is Mitchell Berger, Squire Patton Boggs.  And

12 I'm joined by my colleagues Kassan Dalul (phonetic) and Joseph

13 Alonzo.

14         THE COURT:  Thank you.  Is either side expecting

15 anyone else?

16         MR. RADINE:  Not Plaintiffs.

17         MR. BERGER:  Not for Bank of Palestine.  And Your

18 Honor, I do note that we filed a status report under seal and I

19 heard there are eight participants in this call.  So I just

20 hope that as for material that was filed confidentially, that

21 all speaking will take cognizance of that.

22         THE COURT:  All right, is there anyone here who's not

23 related to either a party or a part of chambers?  All right.

24         I believe that the additional numbers are members of

25 chambers.

1            MR. BERGER:  Thank you, Your Honor.

2            THE COURT:  All right, so how would you like to

3     handle that discussion of your November 28th letter?

4            MR. BERGER:  Your Honor, if that question is directed

5     to me, Mitchel Berger, for Bank of Palestine, I mean, I would

6     say a couple of things that hopefully will frame the issue for

7     the Court, which is in addition to the tape issue that we

8     addressed in our November 28th, 2022 letter, I think it's worth

9     remembering that we have accomplished everything else that we

10    told the Court we would do by way of jurisdictional discovery,

11    both matters that the Court ordered and matters that we agreed.

12           And you can find a relatively recent list of those

13    accomplishments at Exhibit B to the letter we filed as ECF 100.

14           As to the tapes, in our view, we have successfully

15    implemented the plan that Your Honor directed in your August

16    22nd and October 17, 2022 orders.

17           In that, after review focused on Exabyte Tape 6 and

18    DDS Tape 23.  We have not found any jurisdictionally relevant

19    records, which is to say records of SWIFT transfers through the

20    United States during the relevant period.

21           And just to go back briefly to first principals, we

22    have spent the last year and a half in discovery because Judge

23    Vitaliano directed jurisdictional discovery focused on whether

24    there were transfers through the United States for the subject

25    entities during the relevant period.

1       And that is why we have focused on that.  And that is

2  why our response on the absence of such transfers is

3  jurisdictionally material.

4       So, from our standpoint, and I'm sure I should add

5  that yesterday, we had a three-hour third meet and confer

6  between the IT experts.  So we now have done nine hours of IT

7  expert meet and confers.

8       So Plaintiff's expert and their counsel have an

9  opportunity to question both Mr. Sullivan and Mr. Regard with

10  respect to the declarations for the company in our letter.

11       In our view, looking at the last page of Judge

12  Vitaliano's order of April 30, 2021, we think it's time to

13  schedule a briefing schedule for our renewed motion to dismiss

14  for lack of jurisdiction.

15       I'm sure I'll have something to say in response to

16  what Plaintiff's counsel says, so I'll stop there, Your Honor.

17       THE COURT:  All right, thank you.

18       Would Plaintiff's counsel wish to be heard?

19       MR. RADINE:  Yes, Your Honor, thank you.  So at our

20  last conference, Your Honor asked if the Court gave Sullivan

21  Strickler 30 days, would that put Plaintiffs in a position to

22  make their motion to compel if necessary?

23       Well, subject to our receiving certain responses to

24  outstanding queries that we've made to BOP, the answer to that

25  question is yes.  We are certainly in that position to make

1    that motion to compel.  And it is certainly necessary.

2            Unless Your Honor wants a preview of our motion now

3    and the deficiencies and the discovery process so far, we

4    propose that the Defendant be given until the end of the year

5    for Sullivan Strickler to complete whatever Bank of Palestine

6    wants them to complete in terms of the EDF tapes.

7            And BOP can use that time to provide us as to

8    responses to all outstanding technical questions we've asked

9    them over the last several weeks.

10            And we can meet and confer after the first of the

11    year and submit a proposed briefing schedule for that motion to

12    compel.

13            Again, if Your Honor wants me to elaborate on the

14    need for the motion, I'm happy to do so, but otherwise, we're

15    happy just to put a schedule in place and ultimately provide

16    the Court with a detailed submission early next year.

17            THE COURT:  How does Defendant respond to that?

18            MR. BERGER:  I'm sorry, Your Honor.  Thank you.

19    Mitchell Berger for Bank of Palestine.  Obviously, we don't

20    think there's any basis for a motion to compel, but I won't

21    rehearse our reasons.

22            You know, Your Honor, because of the way these status

23    conferences have gone, we wanted to make sure the Court had a

24    full picture, not only by way of letter, but by way of sworn

25    declarations as to what's happened.

1    So if Your Honor's going to let them file a motion to

2  compel, you know, we'd certainly understand that's within the

3  Court's discretion to do.

4    What that does is kick down the road yet again for

5  multiple months a renewed motion to dismiss for lack of

6  jurisdiction.

7    From our standpoint, the more efficient way to do

8  this would be to use a procedure, not unlike what Rule 56(d)

9  would have in a summary judgment context, which is let us renew

10  our motion to dismiss for lack of jurisdiction, because it's

11  not just the tapes.  It's all the other matters that I've

12  mentioned that we produced over the last year and a half that

13  provide a basis for determining that there is no jurisdiction

14  here.

15    I don't know whether Your Honor just heard somebody

16  drop off.  I just want to make sure that I still have the

17  Court.

18    THE COURT:  The Court is still here.

19    MR. BERGER:  Okay, thank you, Your Honor.  And if

20  they want to in response to our renewed motion to dismiss for

21  lack of jurisdiction, identify using the equivalent of a Rule

22  56(d) procedure what else they really need in order to respond

23  to the jurisdictional issues that we believe are ripe for

24  decision and we think that would be more efficient.

25    If we do this seriatim, where they make a motion to

1    compel, we either oppose or oppose and cross move for

2    protective order, we're looking at candidly well into the end

3    of the first quarter of 2023 before that's resolved.

4         And then, who knows when we renew our motion to

5    dismiss?  And we have been at this since the beginning of May

6    2021.  So our interest is in resolving the jurisdictional

7    question as soon as possible.

8         We are dealing with, by Judge Vitaliano's order, a

9    very narrow question of were there transfers through the United

10   States for the subject entities during the relevant period?

11   And we think we've answered that question.

12        I suppose neither side wants to further argue their

13   potential motions on these issues, but that's my reaction to

14   their proposal, Your Honor.

15        THE COURT:  Does Plaintiff have a response?

16        MR. RADINE:  Sure.  Well, first of all, Your Honor,

17   I'm a little surprised to hear concerns about moving this along

18   more quickly.  I believe Defendant asked for four weeks for

19   Sullivan Strickler to do their work.  And six months later,

20   they haven't been able to finish that yet.

21        But more to the point, the issue is not that if they

22   move to dismiss would we think there are other sources of

23   relevant documents that we want to move to compel on.

24        The issue is that they have yet to search the

25   databases on the tapes that we identified.  They said they

1   weren't there.  Sullivan Strickler proved that they were there,

2   but Sullivan Strickler doesn't have the capability to search

3   them properly.

4          So moving to dismiss now doesn't do anything.  They

5   have to finish the process first of searching the tapes, which

6   is a process (inaudible) all along.

7          As we've said, because that appears to be outside of

8   Sullivan Strickler's capability, that task needs to go to an

9   independent qualified vendor who can do that kind of database

10  restoration work.  Anything else is just a further waste of

11  everyone's time here.

12         MR. BERGER:  So if I may respond to that, Your Honor?

13         THE COURT:  Yes.

14         MR. BERGER:  There's a bit of an inconsistency

15  between Chapter 1 of Mr. Radine's remarks at the beginning and

16  then Chapter 2, which is he says we still haven't finished, but

17  we only need four weeks.

18         The reality is they know from yesterday's very

19  lengthy meet and confer that Tape 6 is done and that all of the

20  analysis on Tape 23 is done with immaterial exceptions.

21         There was a question asked yesterday if you finish

22  the immaterial work, how long would it take?  The answer is it

23  would take potentially up to four weeks doesn't change the

24  conclusions that have been given to you in the two

25  declarations.

1          And as for the attack on the qualifications of our

2     two experts, their qualifications are set forth in their

3     declarations.

4          But here's the bottom line, which is we are now

5     wheels within wheels, discovery on discovery, which is we are

6     only supposed to be searching for transactional records.

7          We have proven that these tapes do not contain the

8     relevant transactional records.  Everything else is a waste of

9     time and money.

10          THE COURT:  Well, as I understand it, Plaintiffs

11     appear to be offering to conduct their own search or an

12     examination and restoration of the tapes.

13          Is -- am I -- is that correct?  Is that what

14     Plaintiffs are ultimately wishing to do?

15          MR. RADINE:  Well, what we've proposed is sending the

16     tapes to an independent qualified vendor that both sides can

17     have access to, that both sides can work with, rather than the

18     process that Defendant has used so far, which has mostly

19     resulted in taking back prior sworn assertions about what was

20     on the tapes and then conducting searches that are not designed

21     to work.

22          So we want that process to start now, but if Sullivan

23     Strickler, BOP want them to finish the following four weeks,

24     then we'll move for it then.

25          MR. BERGER:  Your Honor, I'm sorry, if I may be

1  heard?

2          THE COURT:  Yes.

3          MR. BERGER:  Respectfully, I believe we're talking

4  past each other a bit.  The gratuitous shots at saying that

5  these two experts who have conducted this review are conducting

6  searches that, you know, either are designed to fail or fail,

7  it's -- I'm glad to hear Mr. Radine say we've given you two

8  sworn declarations, however, that are exactly to the contrary.

9          So if they want to try to prove that in a motion to

10  compel, I suppose the Court's going to let them do that, but

11  that's time consuming and expensive for us.

12          And what I can't tell about their proposal, their end

13  game, they want -- we can't let them look at undifferentiated

14  nonresponsive information in the tapes any more than we could

15  say we searched our paper files, why don't you all come in and

16  take a look for yourselves because that is contrary to how any

17  form of discovery and particularly electronic discovery is

18  done.

19          If what they want at the end of the day is to get an

20  independent expert to run yet another set of duplicative tests

21  at their expense, but without allowing them to see

22  undifferentiated nonresponsive information, which we cannot

23  give them.

24          We're in jurisdictional discovery after all.  They

25  shouldn't be able to look at information that is designed to

1    establish jurisdiction until they've established jurisdiction

2    and they are not entitled to look at nonresponsive information.

3           But I guess all of this will be outlined in a motion

4    to compel if that's what they want to bring.  And we can

5    respond to it.  Our objection is we have done everything.  We

6    have gone the extra distance.

7           Yes, it's taken a year and a half because we're the

8    ones who told them about the tapes.  We're the ones who said we

9    would search the tapes.  The tapes contain nothing responsive.

10   It's just going to prolong the process.

11          THE COURT:  Well, it sounded, Mr. Berger, as though

12   you had a proposal that you would accept though if the search

13   were done by an independent vendor if nonresponsive information

14   was not shared with Plaintiffs.

15          And if Plaintiffs assume the cost of the search of

16   the independent vendor, it sounded as though you would be

17   willing to do that?

18          MR. BERGER:  I don't have instructions from my client

19   to accept that, Your Honor.  Obviously, if that's what Your

20   Honor's going to order, we don't think we should be bearing any

21   additional expense and we don't think that they should have

22   access to information.

23          They want to propose search terms.  They want to talk

24   about methodology and the like, they're -- that doesn't give

25   them access to the bank's information.

1          And we have an opportunity to screen what it is

2    that's coming out, then I suppose there's a way of working out

3    a protocol.  That protocol has never been worked out.

4          But certainly, if they want to bear the expense, then

5    at least we're one step down the line towards something, but it

6    is very, very time consuming and time matters.

7          THE COURT:  Well, I think that's actually where we

8    were headed before.  I think Plaintiffs had made a similar

9    motion previously.

10          Defendants had made clear that Sullivan and Strickler

11    was the horse they were betting on to be able to produce the

12    information that was necessary.

13          And so, therefore, time was given to Sullivan and

14    Strickler to complete its task.  It's taken longer than was

15    anticipated by Defendant, but I'm not faulting Defendant for

16    the delay.  It sounds that you wanted to be thorough.

17          So it seems to me that the logical next step in order

18    to close the book once and for all on jurisdictional discovery

19    would be to permit Plaintiff to do this if that's what in fact

20    Plaintiff is wishing to do.

21          So, Mr. Radine, is that what you'd like to do?

22          MR. RADINE:  Yes, we'd like to make that -- well,

23    right.  Would Your Honor want that in a form of a motion to

24    make I understand what the Court was -- because yes, that's

25    what we've been looking for.

1    We've been looking for this to go to an independent

2    qualified vendor.  We're happy to talk further about the

3    defense issue.

4    We had initially, if the Court recalls, offered to

5    pay half of the freight for that.  We have obviously gone

6    through quite a bit of expense in the last several months of

7    Defendant's processes that have not moved the ball forward at

8    all.

9    We still need to have this go to an independent

10   qualified vendor.  So we, I think, may feel a little

11   differently about paying that half, but we can brief that

12   before the Court.

13   THE COURT:  So that's the only part of the proposal

14   that Mr. Berger might accept or might have proposed.  The only

15   part that you might disagree with is who pays the bill of the

16   independent vendor and how much?

17   MR. RADINE:  Right, Your Honor, because we had -- we

18   have consistently throughout the process said that data should

19   go to BOP and in the first instance.  And they can decide what

20   is responsive.

21   But we need to be able to have communication with the

22   vendor about what processes they're doing.  And of course, that

23   it be a vendor that's capable of doing the specific database

24   work that's needed here.  But again, we've always said that we

25   do not get unfettered access to their records under our

1    proposal.

2            MR. BERGER:  If I may, Your Honor?

3            THE COURT:  Yes.

4            MR. BERGER:  Some of the devil of this is in the

5    details.  And it's hardly credible that Plaintiffs could have

6    spent as much money on their watching what we're doing as we

7    have spent on two different experts.

8            And normally, the way I've understood the discovery

9    would work under the Sedona principals and otherwise is they

10   have to demonstrate some demonstrable material defect in what

11   we've done.

12           You've received sworn testimony that said not we

13   can't find it, because we don't know what we're doing.  It's

14   that we found SWIFT records and they're not responsive.

15           So, to do it all over again, that should certainly be

16   at their expense when there is evidence before the Court that

17   the process has been completed.  It has not generated

18   responsive documents.

19           So they want to a do-over, which is essentially what

20   they're asking.  Because they say, okay, we've had nine hours

21   of insight into what your folks have been doing.  You paid for

22   all of it.

23           We want a do-over because we don't trust you and we

24   don't think you're doing it the right way.  There's no reason

25   why that should be at Bank of Palestine's expense when all they

1    want is a do-over.

2            And what the Court apparently wants and certainly

3    understand that is the certainty that this in fact has been

4    done right.

5            But if that independent second, third check on what

6    we have done, that's something that the Plaintiffs insist on,

7    they ought to pay for it.

8            THE COURT:  Well, there may be some other way of

9    resolving this and I'm only thinking about it at this point,

10   but it may be that the -- well, first of all, do we have any

11   idea how much it would cost to conduct this independent review?

12           MR. RADINE:  Well, Your Honor, this is Michael Radine

13   for Plaintiffs.  We had sent out some proposals before.  I will

14   say that some of that most basic work may have already been

15   done by Sullivan Strickler that is just extracting the files

16   from the tapes.

17           So that may affect the cost, but on the -- so I don't

18   know exact.  It may be even as much as $150,000.  I don't know.

19   We can certainly re-ask the -- what that be included in a

20   brief.  And in that brief, I'll just note that we'll also set

21   out the material defect assertions as well to make that clear.

22           But anyway, just to frame it, I might say 150-, but

23   that's with the caveat that perhaps Sullivan Strickler will

24   have saved some time on the more basic steps.

25           I'd also note that in this process, we need to have a

1    full say in who the vendor is.

2         We didn't ask for Sullivan Strickler.  We didn't ask

3    for six months to be spent on a vendor who is I think very

4    capable at what they do, but doesn't do this kind of database

5    reconstruction.  So we need to be participating in that process

6    of selecting a vendor and then working with the vendor once

7    they are engaged.

8         MR. BERGER:  Your Honor, if the Court would permit me

9    to ask the Court to ask Mr. Radine a question.  This would

10   certainly help me, which is what is it that they believe that

11   an independent vendor is going to find that Sullivan Strickler,

12   which has done more than decompress files, (inaudible) search

13   files, and IDS, which has also searched these files, what do

14   they believe an independent vendor's going to find that is

15   going to justify this additional time and expense?

16        THE COURT:  Mr. Radine, would you like to answer

17   that?

18        MR. RADINE:  Sure.  What we've asked for consistently

19   and what we've explained is that these files have to be

20   reviewed in either their native format or a modern analytical

21   database software that emulates that native format.

22        And in fact, in their August I think 15th letter, BOP

23   said evidently agreeing with us that they would be reviewing

24   these records as Sullivan Strickler in a native format.

25        They have since taken that back because it turns out

1   that's not a capability that Sullivan Strickler has.

2          What Sullivan Strickler does is they decompress all

3   the files.  And there are hundreds of thousands here.  And they

4   dump them all together into a single undifferentiated

5   environment.  And then, they run search terms on that

6   environment.  The problem is -- and as they said in the and as

7   you saw in the declarations, thousands of hits.

8          Now the problem with that is that database data

9   becomes disassociated when you just dump it into a single

10  environment.

11         It has to be loaded into a database format so that

12  for instance the date of a transaction is with the account

13  number of transactions so on and so forth.  That is what

14  a -- the type of vendor we're looking for would do.

15         MR. BERGER:  Your Honor, Mitchell Berger.  If I may

16  be heard?  I mean, respectfully, that's not an answer to the

17  question, which is they want to fish is the answer.

18         We have -- it's not like we say, oh, we couldn't find

19  anything.  We found SWIFT records.  You know, that's what they

20  call empirical testing.  We were looking for SWIFT records.  We

21  found SWIFT records.  They just weren't responsive.

22         So it would seem to me that Mr. Radine's answer has

23  to be that they believe, after all this additional effort and

24  expense they want to go through, that their independent vendor,

25  the independent vendor, will find some SWIFT transactions we

1    haven't found.

2           And there's no reason to believe that given what you

3    have in front of you, Your Honor, in two sworn declarations,

4    which is why understanding that the Court wishes to assure

5    itself that this has been done correctly.

6           But that is why if they really insist on we want a

7    fish again and see if we come up with anything more than you

8    came up with, that is not a cost that ought to be visited on

9    BOP.

10          THE COURT:  Well, I think that Plaintiff is saying

11   that the methodology that was selected wasn't fine-tuned enough

12   to be able to capture the data that they're looking for and

13   that they have a strong belief that if an independent expert

14   were to conduct the proper search, that there would be hits.

15   (Indiscernible?)

16          MR. BERGER:  I'm sorry, Your Honor, I spoke

17   prematurely.  I didn't know if you were directing a question to

18   Mr. Radine or to me?  This is Mitchell Berger.

19          THE COURT:  I was directing it to Mr. Radine.

20          MR. RADINE:  Well, yes, Your Honor.  The methodology

21   doesn't work.  But to answer both your question and Mr.

22   Berger's assertions, it appears that there are -- that there

23   would be transactions that have been missed, transactions that

24   they've produced already to us have not been found any backups

25   of those same database.

1              The suggestion there is that the searches aren't

2       working.  As we talked about -- talked with our IT expert who

3       will -- can give us greater detail to provide the Court if

4       that's helpful, it appears that the search processes are

5       failing both on the decoding level and on the database

6       analytical level.

7              But yes, they're currently missing transactions that

8       appear to be the case already, given the databases that

9       Sullivan Strickler was able to locate on the tapes

10      notwithstanding BOP's prior assertions did the opposite.

11             So this is why this is worth having another vendor

12      take a look at this and the expense being something that does

13      not fall to the Plaintiffs.

14             THE COURT:  Is there a way to do a micro search as a

15      test to see whether or not your theory is correct before a

16      tremendous undertaking is taken and a large amount of money is

17      spent?  Is that possible?

18             MR. RADINE:  Sure.  Maybe.  I would want to take that

19      back to my IT expert, but I don't think so.  I think the larger

20      problem is that to search a database, the database has to be

21      restored.  And that is the main I think job to be done.

22      Running the searches, I think, is less of an issue.

23             But already, BOP has said there's tens of thousands

24      of hits.  And that's just on the files that they've been able

25      to search, much less the database ones that I think they've not

1   been able to search.

2          So I think the larger issue is getting those

3   databases restored, so data could be accurately searched more

4   than running sample searches.

5          So I think it's going to take that first big step of

6   loading the data into either a native format or a modern

7   analytical database software that can emulate that format.

8          MR. BERGER:  So, Your Honor, trying to be responsive

9   to the Court's question and suggestion, may I make this

10  suggestion, which is understanding that what we're looking for

11  are SWIFT records, right?

12         That's the goal of determining whether they're

13  transfers to the United States.  That was the question Judge

14  Vitaliano raised.

15         I think it is common consensus including at

16  yesterday's meet and confer that only Tape 6, put aside the

17  other tapes, only Tape 6 contains SWIFT records.  And that's

18  because the DES tapes like Tape 23 are incomplete backups as

19  you know from the affidavits.

20         But whether they're complete or incomplete, they're

21  only backups of the core banking system into which SWIFT data

22  from the relevant period wasn't entered.

23         If what Mr. Radine and his colleagues would like to

24  do is put together a proposal focused on Tape 6, that after he

25  consults with his IT expert, suggests a way of testing.

1          Because all the Sedona principals suggest you sort of

2    take this layer by layer, so that there's some initial testing.

3    And give us what they think the protocol is for that.  And we

4    can meet and confer on that.

5          And then, we can come back.  And if we can't reach an

6    agreement on it, then they want to file their motion to compel,

7    fine.

8          But it seems to me at least if we're being asked to

9    understand what they want to do, we ought to narrow it to Tape

10   6, they ought to put a more formal proposal into writing.

11         I'm happy if they want to share it with the Court at

12   the same time, but if they want to share it with us first, then

13   we can meet and confer about that proposal.

14         Let's see if it's narrow enough and quick enough and

15   it doesn't require entirely reinventing the wheel.  And then,

16   we can report back to the Court.

17         THE COURT:  Mr. Radine?

18         MR. RADINE:  A couple things to address here.  First

19   is a pretty important, I think, misrepresentation here that has

20   to be corrected.

21         SWIFT messages are excellent evidence of a transfer

22   through the United States, but they're not (inaudible).

23   They're essentially the envelopes that a transfer goes in if

24   transfers were mailed.

25         But transfers from banks outside the United States

1   all have been reprocessed from New York.  That's why we have

2   been doing discovery into the core banking system, which has so

3   far produced 500 transactions from BOP.

4         The attempt to set aside the core banking system that

5   we've been discussing this whole time as not being able to

6   SWIFT (inaudible) is not how this works.

7         All these transactions are responsive.  Tape 23 and

8   the other tapes that we identified in our last joint letter to

9   the Court, which Sullivan Strickler also found contained

10  iterative backups of the core banking system contained

11  potentially responsive transactional information.

12        What we proposed doing is this.  We can meet and

13  confer with BOP and see if we can't agree on a process here.

14  And if not, we will submit a briefing schedule to the Court for

15  our motion to compel after BOP's had the opportunity to answer

16  all outstanding questions we presented throughout the

17  (inaudible) software.

18        THE COURT:  Mr. Radine, would the idea of picking a

19  sample work in any way?  In other words, if you just took Tape

20  6, not as the only case that you would be necessarily entitled

21  to look at in the long run if you prevailed, but as a test as

22  to whether or not there's more on those in that database than

23  what was disclosed, would that be a way of approaching this?

24        MR. RADINE:  Yeah, that could work, Your Honor.

25  Again, reserving very much that Tape 6 and Tape 23 are very

1    different.

2           And we have -- we don't think either one was properly

3    searched.  And they both have potentially different kinds of

4    responsive transactions, then yes, we could start with Tape 6

5    and have a qualified independent vendor examine that.

6           THE COURT:  And if nothing was found on that that was

7    responsive to your needs, Mr. Berger would then say I'm sure

8    that would show that the motion to compel would not be

9    realistic with respect to other databases and that that should

10   end the inquiry at least as to what BOP would have to pay for

11   or contribute to.  Would that part of an arrangement that you

12   could accept?

13          MR. RADINE:  In terms of payment, that's something I

14   think that could work.  Obviously, we still want Tape 23 of the

15   other backup tapes properly examined, but I think that's

16   something we'd be happy to talk about with BOP and essentially

17   the Court as a proposal.

18          THE COURT:  Right, with the idea that if there were

19   other -- if you wanted to examine Tape 23 on your own dime, you

20   could do that.

21          But as far as what would be jointly paid for, you

22   would work out some kind of arrangement with -- for Tape 6.

23   And if that came up with some evidence that was useful to you,

24   then you'd be allowed to continue.

25          MR. RADINE:  Yes, I think we understand the Court's

1    suggestion.

2            THE COURT:  Okay.  All right, is there anything else

3    we need to discuss?

4            MR. BERGER:  Only this, Your Honor, just as a point

5    of information.  And I -- this is why we certainly commend

6    focusing on Tape 6, which is when you go back as I know the

7    Court already has at the front of its mind to what we filed as

8    Document 100 and Exhibit B, part of the reason why Tape 23 and

9    the rest of these EDF tapes are necessary is we've already

10   produced transactions for the core banking system.

11           So again, Mr. Radine would have to be in a position

12   to say that over and above the transactions we have produced,

13   that somehow these stencil backup tapes of the core banking

14   system would contain something new.

15           So we certainly want to focus on Tape 6.  And we

16   certainly want to see if the IT experts can come up with a

17   testing protocol for lack of a better word that a sampling

18   protocol perhaps is the best way to say that, so that we don't

19   have to do this all over again because there's no reason to

20   think that an independent vendor is going to take less time

21   doing this than Sullivan and Strickler has.

22           Indeed, given all of the bells and whistles that Mr.

23   Radine wants to add, it's likely to take more time.  So

24   sampling is the way to go.

25           THE COURT:  Uh-huh.  I think we're agreed on that,

1    aren't we, Mr. Radine?

2         MR. RADINE:  Well, again, I don't -- I mean, we're

3    happy to start with certain searches.  The problem of sampling,

4    again, is just that I think the main expense is database

5    reconstruction more than it is running searches.

6         THE COURT:  Right.

7         MR. RADINE:  So, you know, one can see where one is

8    at after so many searches, but running searches generally is a

9    pretty quick process.

10         It's not really possible to reconstruct part of a

11    database.  So it's like having part of a car assembled for it

12    to work, the whole thing has to be reconstructed.

13         No, Tape 6, that database is a more modern database.

14    Might be a easier reconstruction project for a vendor, but we

15    will see.

16         So, we would agree to then split costs on Tape 6.  I

17    think that's a little productive.  We might have a firmer line

18    on costs on Tape 23.

19         As Mr. Berger pointed out, they already produced

20    transactions from that core banking system that's backed up on

21    Tape 23.  And yet, their search methodology has not produced a

22    single one of those transactions they've already produced.  So

23    obviously things are not working there.

24         THE COURT:  Uh-huh.

25         MR. RADINE:  So, we'll take one step at a time and

1    start with Tape 6.

2              THE COURT:  Okay.

3              MR. BERGER:  Your Honor, just so the record is clear,

4    it's not limited -- when I say something is not working here,

5    these are ad hoc tapes.  So to say that, oh, well you got six

6    ad hoc tapes and even though you're -- you've produced

7    documents from your entire core banking system that ad hoc

8    tapes that capture tiny slices of your entire core banking

9    system haven't produced the same transactions.

10             That's not only unsurprising.  It's to be expected

11   because it's not a full backup.  So he's setting up a strawman

12   and knocking it down.

13             And when he -- my only last point is if he's going to

14   come to us with a proposal, database reconstruction when you

15   hold it up to the mirror sounds like it reads expensive.

16             So I'd like to know what database reconstruction is

17   going to cost before the Court orders that BOP have to share

18   that cost.

19             THE COURT:  That seems to make sense.

20             Any objection, Mr. Radine?

21             MR. RADINE:  We'll keep working with Defendant and

22   working with the Court to pull this process along.

23             THE COURT:  Okay, so we'll focus -- I mean, in my

24   mind, I'm thinking of focusing on 6 as being a sample of the

25   entire universe.  I know that's not the way you were using the

1  term.

2       But it seems to me that focusing on 6, Tape 6 with

3  the (inaudible) shared and with shared vision as to what would

4  be done seems like the best approach right there.  And then, we

5  could review the findings and take it from there.

6       How long will it take you all to meet and confer and

7  work out some kind of a protocol with respect to Tape 6?

8       MR. RADINE:  Well, so this is Michael for Plaintiffs.

9  We're ready to talk to Defendant now.  So we're aware of some

10  vendors in this space that we are happy to contact and check

11  their availability and share all those transparently with BOP.

12  Two to three weeks perhaps?

13       THE COURT:  And how does the fact that it's probably

14  going to take Sullivan and Strickler another four weeks to

15  complete its work, how does that fit into the timing of what it

16  is that we're looking at now?

17       MR. RADINE:  Well, this is Michael again.  Just two

18  notes.  One is this Sullivan and Strickler is working I believe

19  exclusively now on Tape 23, not Tape 6.

20       THE COURT:  Okay.

21       MR. RADINE:  We do have an outstanding question to

22  BOP that the answers of which would still affect our -- how

23  this process would go, which is not to say that we couldn't

24  proceed now with Tape 6, but we'd still want those questions

25  answered.

1    THE COURT:  Uh-huh.  So that would be part of your

2  meet and confer?

3    MR. RADINE:  Sure.

4    THE COURT:  Okay.  So --

5    MR. BERGER:  Your Honor, may I ask the Court one

6  question?

7    THE COURT:  Sure.

8    MR. BERGER:  Just in terms of understanding the

9  parameters you're laying out, that shared vision as to what

10  would be done, I just didn't want there to be any doubt about

11  that, that the premise is if this goes forward, Plaintiffs do

12  not have vision insight access to the underlying data unless it

13  is determined to be responsive the way it would be determined

14  to be responsive in any normal discovery process.

15    THE COURT:  Yes, I think I heard Mr. Radine agree to

16  that.

17    MR. BERGER:  Thank you, Your Honor.

18    MR. RADINE:  Right, we don't want to see anything

19  confidential.  We obviously want to be able to ask questions

20  about things like number of hits on a search term or the time

21  period that search terms are in, that sort of thing.

22    Without that, we're essentially outside of the

23  process.  But in terms of the confidential customer information

24  in a particular transaction, then no, we think that would go to

25  BOP.

1          THE COURT:  Okay.

2          MR. BERGER:  So perhaps this is proposal, Your Honor.

3  As you rightly pointed out about the work being done on Tape 23

4  and the questions that Plaintiffs have, why don't they go and

5  get some ideas about how much what they have in mind would cost

6  for Tape 6?

7          We'll continue of course to answer the questions that

8  were remained open including yesterday's new request at the

9  meet and confer.

10          And then, we report to the Court.  Let's assume this

11  allows Sullivan Strickler the four weeks it needs.  We report

12  to the Court at a reasonable time right after the 1st of the

13  year where we are on all of these fronts.

14          THE COURT:  That sounds good to me.

15          MR. RADINE:  That sounds good to the Plaintiffs.

16          THE COURT:  All right, so why don't we pick a date

17  for the status report that works for everyone?

18          Mr. Berger, do you want to, since you're closest to

19  Sullivan Strickler, do you want to pick the date?

20          MR. BERGER:  That's a great honor, Your Honor, thank

21  you.  Let us -- could we perhaps -- any date during the week of

22  the January 9th would be sensible.  I believe that the 2nd is

23  an observed federal holiday.  And I've heard rumors that people

24  actually go on vacation.

25          So any time during the week of -- shall we say a

1    status report due January 10th?  And then, we can have a call

2    with Your Honor if necessary.  You could schedule for later

3    that week, the 12th or the -- oh, I think we should all avoid

4    Friday the 13th.

5         So perhaps if the Court's available on January the

6    12th with a status report due on either the 9th or the 10th,

7    that would make sense to me.

8         THE COURT:  Okay, well, I think that you're going to

9    come up with a mutually agreeable proposal here.  So you

10   probably won't need my time, but let me see what I have that

11   week.  So a status report on the 10th definitely.

12        MR. BERGER:  Your Honor, if you think you don't need

13   to book time, we can certainly let the Court know in the status

14   report if we think we need to be heard and we'll certainly

15   going to try to work things out.  So I don't mean to burden the

16   Court's calendar --

17        THE COURT:  Okay.

18        MR. BERGER:  -- if it's not necessary.

19        THE COURT:  Well, I was just looking to see if there

20   was any time.  I'll squeeze you in one way or another if I need

21   to.  So hopefully, you won't need my help, but if you do, we'll

22   work it out.

23        MR. BERGER:  Thank you, Your Honor.

24        THE COURT:  So anything else from the Plaintiff?

25        MR. RADINE:  No, Your Honor.

1          THE COURT:  And how about Defendant?

2          MR. BERGER:  No, Your Honor.  Thank you.

3          THE COURT:  Good, well, I'm glad to hear that you're

4   able to work together.  I think that makes -- can make all of

5   your lives easier.  And as Mr. Berger says, you might actually

6   be able to take a vacation (inaudible).

7          MR. BERGER:  Thanks very much, Your Honor.  We

8   appreciate the help.

9          THE COURT:  You have a good holiday, all of you.

10          MR. BERGER:  All right, thanks.

11          MR. RADINE:  You, too, bye bye.

12      (Proceedings concluded at 2:47 p.m.)

1                         **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____            December 9, 2022

14    Chris Hwang                    Date

15    Court Reporter

16

17

18

19

20

21

22

23

24

25